**William F. Martson, Jr.,** OSB #72163
      E-Mail:      rick@tonkon.com
**Steven M. Wilker,** OSB # 91188
      E-Mail:      steven@tonkon.com
**Paul W. Conable,** OSB #97536
      E-Mail:      paul@tonkon.com
Tonkon Torp LLP
1600 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204-2099
Telephone:    (503) 221-1440
Facsimile:    (503) 274-8779

      Attorneys for Plaintiff Portland General Electric Company

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| **PORTLAND GENERAL ELECTRIC COMPANY, an Oregon corporation,** | ) ) ) | Civil No. CV 03 1641-HA |
| **PLAINTIFF,** | ) ) ) | **COMPLAINT FOR DECLARATORY RELIEF (28 U.S.C. § 2201)** |
| v. | ) ) | |
| **HARDY MYERS, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF OREGON,** | ) ) ) ) ) | |
| **DEFENDANT.** | ) | |

      Plaintiff Portland General Electric Company ("PGE"), for its COMPLAINT

herein, alleges as follows:

### PARTIES

      1.      Plaintiff PGE is an Oregon corporation with its principal place of business

in Portland, Oregon.

      2.      Defendant Hardy Myers (the "Attorney General") is the Attorney General

of the State of Oregon. He is sued in his official capacity as Attorney General of the State of

Oregon for non-monetary relief only.

Page 1 -    COMPLAINT FOR DECLARATORY RELIEF

Exhibit 1
Page 1 of 143
Memo in Oppo

## JURISDICTION AND VENUE

3.     Jurisdiction lies in this Court over PGE's federal claims under the U.S. Constitution and the Federal Power Act under 28 U.S.C. § 1331 and 16 U.S.C. § 825p. Jurisdiction over PGE's state law claims arises under 28 U.S.C. § 1367.

4.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

5.     In 1996, the California Legislature enacted Assembly Bill ("AB") 1890 to restructure California's system for the generation and sale of electricity. Under AB 1890, California's retail utilities divested themselves of much of their power generation facilities.

6.     As a direct result of AB 1890, the California Independent System Operator ("Cal ISO") and California Power Exchange Corporation ("Cal PX") were formed to serve as clearinghouses for the distribution and transmission of wholesale power in California. The Cal PX and Cal ISO operated under tariffs filed with and approved by the Federal Energy Regulatory Commission (the "FERC") under the Federal Power Act (the "FPA"), 28 U.S.C. § 824, *et. seq.*

7.     Under the Cal PX and Cal ISO tariffs, sellers of electricity at wholesale made sales at market-based rates, rather than traditional cost-based rates. Each seller of power could make such sales if the seller had itself filed and had approved by the FERC a market-based rate tariff permitting it to sell at market-based rates. PGE filed and had approved a market-based rate tariff permitting it to sell power at wholesale into the Cal ISO and Cal PX at market rates.

8.     The Cal PX operated a "day ahead" market into which generators with approved market-based rate tariffs within and outside of California could sell their available generation capacity for the following day at a price established through a bidding process. The Cal ISO operated "hour ahead" and "real time" markets designed to fill the remaining needs of California utilities and to balance supply and demand on California's electricity grid. If there were insufficient bids to sell the power needed to balance demand, the Cal ISO was responsible for finding and purchasing additional power.

Page 2 -     COMPLAINT FOR DECLARATORY RELIEF

Exhibit 1
Page 2 of 143
Memo in Oppo

9.     In 2000, at times, sellers of power did not bid in sufficient power in the Cal PX day ahead market to meet the demands of local utilities. The Cal ISO was thus forced to identify and purchase power in the hour ahead and real time markets to meet and balance the demands of local utilities. Because supply was restricted relative to demand, prices rose. Additionally, there were times when power was simply unavailable, which led to rolling blackouts in Northern California in June 2000.

10.     In August 2000, San Diego Gas & Electric Company filed a complaint at the FERC seeking certain relief in connection with the California energy crisis. That proceeding, FERC Docket No. EL00-95, is now commonly referred to as the California Refund Case. In the California Refund Case, purchasers of power in the markets operated by the Cal ISO have claimed that certain sellers into the Cal PX and Cal ISO markets engaged in improper conduct resulting in unjust and unreasonable prices in violation of the sellers' market-based rate tariffs. The purchasers are seeking refunds for the difference between their power costs and what they claim market prices would have been in the absence of the alleged misconduct.

11.     The *San Diego* Complaint and the FERC's investigation ultimately led to a number of additional FERC investigations and proceedings, including proceedings specific to PGE. In FERC Docket No. EL02-114-006, the FERC opened an investigation of PGE's trading activities with Enron Power Marketing, Inc. ("EPMI"), including allegations that PGE violated its Code of Conduct, its market-based rate tariff, and/or FERC standards of conduct relating to the posting of transactions with an affiliate, by allegedly participating in improper transactions with EPMI. For purposes of this Complaint, we will refer to that investigation as "the EPMI docket."

12.     Subsequently, the FERC issued Orders to Show Cause to more than 30 respondents, including PGE (FERC Docket No. EL03-165-000), alleging that they engaged in certain transactions in the Cal PX and or the Cal ISO designed to improperly "game" the

Page 3 -     COMPLAINT FOR DECLARATORY RELIEF

Exhibit 1
Page 3 of 143
Memo in Oppo

interstate wholesale power market. For purposes of this Complaint, we will refer to that investigation as "the gaming docket."

13. The FERC also opened investigations into the need for Western Region-wide price cap (Docket No. EL00-95-031), anomalous bidding behavior into the California spot markets during 2000 and 2001 (Docket No. IN03-10), possible manipulation of electricity and gas prices in Western markets (Docket No. PA02-2), and requests for price caps and refunds in the Pacific Northwest markets (Docket No. EL01-10).

14. The State of Oregon, through the Oregon PUC, represented by the Attorney General, participated in the EPMI docket as an intervenor and ultimately consented to and participated in a complete settlement of the claims made against PGE. A true and correct copy of the settlement documents submitted to the FERC is attached as Exhibit A. A true and correct copy of the Order of the Oregon PUC approving the settlement is attached as Exhibit B. That settlement has now been certified to the FERC for approval. 105 FERC ¶ 63,016 (Nov. 10, 2003). At no time did the State assert before FERC that FERC lacked exclusive jurisdiction over the matters investigated in the EPMI docket.

15. On behalf of the State of Oregon, acting through the Oregon PUC, the Attorney General agreed to the settlement in exchange for $800,000 in rate relief for PGE's ratepayers. The Attorney General specifically agreed to the settlement of "the proposed Oregon PUC investigation into Portland's trading activities for the 17-day transactions, posting errors and use of the integrated resource contract, as they are outlined in the Oregon Public Utility Commission Staff Report dated June 12, 2003." The "17 days of transactions" refers to certain trading activities on 17 separate days in the period from April 6, 2000 to June 6, 2000 that were disclosed by PGE in response to a data request by FERC in May 2002. With specific exceptions not relevant here, the settlement broadly bars any further action based on the transactions and occurrences that the Attorney General is now seeking to investigate: "The signatories will not

Page 4 -   COMPLAINT FOR DECLARATORY RELIEF

Exhibit 1
Page 4 of 143
Memo in Oppo

pursue the issues set for hearing in this proceeding against [PGE] in this or any other judicial or regulatory forum * * *." Ex. A, Appendix A, ¶ 14.

16. The allegations in the gaming docket have also been settled by PGE and FERC Trial Staff, and the settlement has been Certified to the FERC by the Administrative Law Judge with a recommendation that it be approved. 105 FERC ¶ 63,029 (Nov. 21, 2003). A true and correct copy of the Certification of the Settlement of the gaming docket is attached as Exhibit C.

17. On or about November 6, 2003, the Attorney General, through the Financial Fraud/Consumer Protection Section of the Oregon Department of Justice, issued a Civil Investigative Demand ("CID") pursuant to ORS 646.618 and an Investigative Subpoena pursuant to ORS 166.730 to PGE. A true and correct copy of the CID is attached as Exhibit D. A true and correct copy of the Investigative Subpoena is attached as Exhibit E. Although the response procedures are somewhat different, the interrogatories and document requests in the CID and the Investigative Subpoena are identical.

18. The CID recites: "The Oregon Department of Justice has reason to believe that Portland General Electric Company (PGE), and other persons or enterprises, has engaged in or is engaging in, acts or practices declared to be unlawful by the Oregon Unlawful Trade Practices Act, ORS 646.605 et. [s]eq. This Civil Investigative Demand is issued pursuant to the provisions of ORS 646.618(1)."

19. The Investigative Subpoena recites: "The Oregon Department of Justice has reason to believe that Portland General Electric and other persons or enterprises, has engaged in or is engaging in, acts or practices declared to be unlawful under and [sic] the Oregon Racketeer Influenced and Corrupt Organizations Act, ["ORICO"] ORS 166.715 et. seq. This investigative subpoena is issued pursuant to the provisions of ORS 166.730."

Page 5 -   COMPLAINT FOR DECLARATORY RELIEF

Exhibit 1
Page 5 of 143
Memo in Oppo

20.     The Interrogatories in both the CID and the Investigative Subpoena seek information concerning the specific interstate sales of electric power at wholesale that were the subject of the EPMI docket and the gaming docket.

21.     The Document Requests in both the CID and the Investigative Subpoena seek information concerning the specific interstate sales of electric power at wholesale that were the subject of the EPMI docket and the gaming docket.

22.     In the Federal Power Act ("FPA"), 16 U.S.C. § 825p, Congress has given the FERC exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce. That exclusive authority preempts state regulation of the sale or transmission of electric energy at wholesale under the Supremacy Clause of the United States Constitution, Article VI, Clause 2.

23.     The FERC's exclusive jurisdiction over interstate wholesale electricity sales and transmissions is not limited to regulation of rates for such sales. Rather, under the FPA, 16 U.S.C. §§ 824e(a), the FERC's exclusive authority covers sales, transmission, and any rule, regulation, practice, or contract concerning wholesale interstate sales of electric energy.

24.     In its CID and Investigative Subpoena, the Attorney General seeks information with respect to PGE's interstate sales and transmissions of electricity at wholesale.

25.     These wholesale interstate electricity transactions are subject to FERC's exclusive jurisdiction and they were the subject of a FERC investigation, in which the Attorney General participated. As a result of that investigation, PGE entered into a full settlement of all claims related to the transactions and occurrences that the Attorney General now seeks to investigate. The Attorney General was a party to that investigation and signed the settlement on behalf of the State of Oregon in exchange for $800,000 for PGE's ratepayers.

* * *

* * *

* * *

Page 6 -     COMPLAINT FOR DECLARATORY RELIEF

Exhibit 1
Page 6 of 143
Memo in Oppo

# FIRST CLAIM FOR RELIEF

## (Declaratory Relief)

## (Count One – Federal Preemption)

26.    Plaintiff realleges ¶¶ 1 through 25.

27.    The Attorney General's investigation into PGE's interstate sales and transmissions of electricity at wholesale is barred by the doctrines of field preemption and conflict preemption.

28.    In the FPA, 16 U.S.C. §§ 824e(a), Congress gave the FERC exclusive jurisdiction over interstate sales and transmissions of electricity at wholesale, as well as practices and contracts related to such sales and transmissions. By so doing, Congress stated its intent that federal regulation occupy the field of the interstate sale and transmissions of wholesale power.

29.    Because Congress stated the intent that federal government occupy that field, any state action or regulation that intrudes in the area is preempted.

30.    The Attorney General's CID seeks information related to interstate sales and transmissions of electric power at wholesale. That investigation, no matter how characterized, intrudes on an area of exclusive federal regulation and is therefore preempted.

31.    Under the doctrine of conflict preemption, the Attorney General's investigation is also barred.

32.    In the FPA, Congress dictated that not only the exclusive federal authority to investigate and act on the claims presented here, but also the scope of remedies available to the investigating agency.

33.    Because the ultimate goal of this investigation are additional remedies unavailable under the FPA, the investigation and the underlying causes of action conflict with FERC's exclusive authority under the FPA. Pursuant to the doctrine of conflict preemption, this investigation is therefore barred.

Page 7 -    COMPLAINT FOR DECLARATORY RELIEF

Exhibit 1
Page 7 of 143
Memo in Oppo

34. PGE is therefore entitled to a declaratory judgment that the Attorney General's investigation, including the CID and the Investigative Subpoena, into PGE's wholesale trading and transmission activities is preempted by the FPA under the Supremacy Clause.

**(Count Two – Claim Preclusion – Federal Common Law)**

35. Plaintiff realleges ¶¶ 1 through 34.

36. The Attorney General's investigation is also barred by the doctrine of claim preclusion or *res judicata*.

37. The FERC investigation, to which the Attorney General was a party, addressed these identical facts and occurrences. In its settlement of the EPMI docket, the Attorney General agreed to a settlement of all claims related to these facts and occurrences in exchange for $800,000 from PGE for its ratepayers.

38. A party who has litigated or settled a claim, on the merits or otherwise, whether in court or in an administrative tribunal, is barred from relitigating those claims or litigating other claims arising from the same events or circumstances as the original claims. That is what the Attorney General is seeking to do here and, accordingly, his investigation is barred as a matter of claim preclusion.

39. PGE is therefore entitled to a declaratory judgment that the Attorney General's investigation, including the CID and the Investigative Subpoena, is barred by the doctrine of claim preclusion or *res judicata*.

**(Count Three – Judicial Estoppel – Federal Common Law)**

40. Plaintiff realleges ¶¶ 1 through 39.

41. The Attorney General's investigation is also barred under the doctrine of judicial estoppel. By participating in the FERC docket and agreeing to the settlement, thus compelling the administrative law judge to certify the uncontested settlement of the EPMI docket to the FERC, the State of Oregon consented to and benefited from FERC's exclusive jurisdiction over these facts and occurrences.

Page 8 -     COMPLAINT FOR DECLARATORY RELIEF

Exhibit 1
Page 8 of 143
Memo in Oppo

42.    PGE is entitled to a declaratory judgment that the Attorney General's investigation, including the CID and Investigative Subpoena, is barred by the doctrine of judicial estoppel.

## SECOND CLAIM FOR RELIEF

### (Declaratory Relief)

### (Count One – Claim Preclusion – State Law)

43.    Plaintiff realleges ¶¶ 1 through 42.

44.    The Attorney General's investigation is also barred under state law by the doctrine of claim preclusion or *res judicata*.

45.    The FERC investigation, to which the Attorney General was a party, addressed these identical facts and occurrences. In its settlement of the EPMI docket, the Attorney General agreed to settlement of all claims related to these facts and occurrences in exchange for $800,000 from PGE.

46.    A party who has litigated or settled a claim, on the merits or otherwise, whether in court or in an administrative tribunal, is barred from relitigating those claims or litigating other claims arising from the same events or circumstances as the original claims. That is what the Attorney General is seeking to do here and, accordingly, his investigation is barred as a matter of claim preclusion.

47.    PGE is therefore entitled to a declaratory judgment that the Attorney General's investigation, including the CID and the Investigative Subpoena, is barred by the doctrine of claim preclusion or *res judicata*.

### (Count Two – Judicial Estoppel – State Law)

48.    Plaintiff realleges ¶¶ 1 through 47.

49.    The Attorney General's investigation is also barred under state law by the doctrine of judicial estoppel. By participating in the FERC docket and agreeing to the settlement, thus compelling the administrative law judge to certify the uncontested settlement of

Page 9 -    COMPLAINT FOR DECLARATORY RELIEF

Exhibit 1
Page 9 of 143
Memo in Oppo

the EPMI docket to the FERC, the State of Oregon consented to and benefited from FERC's exclusive jurisdiction over these facts and occurrences.

50.    PGE is entitled to a declaratory judgment that the Attorney General's investigation, including the CID and Investigative Subpoena, is barred by the doctrine of judicial estoppel.

### (Count Three – Contract – State Law)

51.    Plaintiff realleges ¶¶ 1 through 50.

52.    The settlement of the EPMI docket is a contract between PGE and the State of Oregon disposing finally of all claims arising from the facts and occurrences addressed in the EPMI docket.

53.    By commencing this investigation into those same facts and occurrences, as the Attorney General has apparently taken the position that the contract does not preclude this investigation.

54.    In this second investigation, addressing claims he has already settled, the Attorney General seeks to violate the parties' contract.

55.    PGE is therefore entitled to a declaratory judgment that the Attorney General's investigation, including the CID and the Investigative Subpoena, is barred by the parties' contract.

### THIRD CLAIM FOR RELIEF

### (ORS 646.618(2))

56.    Plaintiff realleges ¶¶ 1 through 55.

57.    The Attorney General's CID under the Unfair Trade Practices Act (the "UTPA") is not relevant to any claim or action that the Attorney General has authority to pursue.

58.    The Attorney General's investigation is preempted by the Federal Power Act under the Supremacy Clause of the United States Constitution, and is precluded by the doctrines of claim preclusion and judicial estoppel. It is also barred by contract.

Page 10 -    COMPLAINT FOR DECLARATORY RELIEF

Exhibit 1
Page 10 of 143
Memo in Oppo

59.     Because any purported UTPA claim by the Attorney General would be beyond his authority, the CID related to that purported claim is improper and will be oppressive and unduly burdensome to PGE.

60.     Allowing this improper investigation to go forward would subject PGE to undue burden and oppression and would contravene clear congressional intent that regulation of the sale and transmission of electric power at wholesale be exclusively committed to the jurisdiction of the FERC.

61.     Because the Attorney General's CID is preempted, barred by the doctrines of claim preclusion and judicial estoppel, and contrary to the parties' contract, and would impose undue burden and oppression on PGE, there is "good cause" to set the CID aside within the meaning of ORS 646.618(2). Accordingly, this Court should set aside the Attorney General's CID for good cause shown under ORS 646.618(2).

## FOURTH CLAIM FOR RELIEF

### (ORS 166.730; ORCP 36B(1), 36C)

62.     Plaintiff realleges ¶¶ 1 through 61.

63.     Under ORS 166.730(1), the Attorney General's authority to issue an Investigative Subpoena under ORICO is subject to the limits set by the Oregon Rules of Civil Procedure.

64.     The Attorney General's Investigative Subpoena under ORICO is not relevant to any claim or action that the Attorney General has authority to pursue.

65.     The Attorney General's investigation is preempted by the Federal Power Act under the Supremacy Clause of the United States Constitution, and is precluded by the doctrines of claim preclusion and judicial estoppel. It is also barred by contract.

66.     Because any purported ORICO claim by the Attorney General would be beyond his authority, the Investigative Subpoena related to that purported claim is improper and will unnecessarily cause undue burden and oppression on PGE.

Page 11 -    COMPLAINT FOR DECLARATORY RELIEF

Exhibit 1
Page 11 of 143
Memo in Oppo

67. Allowing this improper investigation to go forward would subject PGE to undue burden and oppression and would contravene clear congressional intent that regulation of the sale and transmission of electric power at wholesale be exclusively committed to the jurisdiction of the FERC.

68. Because the Attorney General's Investigative Subpoena is preempted, barred by the doctrines of claim preclusion and judicial estoppel, and contrary to the parties' contract, and would impose undue burden and oppression on PGE, there is good cause to bar the Investigative Subpoena pursuant to ORCP 36C and Fed. R. Civ. P. 26(c). Accordingly, this Court should set aside the Attorney General's Investigative Subpoena for good cause shown under ORS 166.730, ORCP 36C, and Fed. R. Civ. P. 26(c).

WHEREFORE, plaintiff prays for judgment as follows:

1. On Count One of its First Claim for Relief against defendant Hardy Myers, a declaration that the Attorney General's CID and Investigative Subpoena are preempted by the Federal Power Act and the Supremacy Clause of the United States Constitution.

2. On Count Two of its First Claim for Relief against defendant Hardy Myers, a declaration that the Attorney General's CID and Investigative Subpoena are barred by the doctrine of claim preclusion.

3. On Count Three of its First Claim for Relief against defendant Hardy Myers, a declaration that the Attorney General's CID and Investigative Subpoena are barred by the doctrine of judicial estoppel.

4. On Count One of its Second Claim for Relief against defendant Hardy Myers, a declaration that the Attorney General's CID and Investigative Subpoena are barred under state law by the doctrine of claim preclusion.

5. On Count Two of its Second Claim for Relief against defendant Hardy Myers, a declaration that the Attorney General's CID and Investigative Subpoena are barred under state law by the doctrine of judicial estoppel.

Page 12 -   COMPLAINT FOR DECLARATORY RELIEF

Exhibit 1
Page 12 of 143
Memo in Oppo

6. On Count Three of its Second Claim for Relief against defendant Hardy Myers, a declaration that the Attorney General's CID and Investigative Subpoena are barred under state law by the parties' contract.

7. On its Third Claim for Relief against defendant Hardy Myers, an Order setting aside the Attorney General's CID for good cause shown pursuant to ORS 646.618(2).

8. On its Fourth Claim for Relief against defendant Hardy Myers, an Order pursuant to ORCP 36C that discovery pursuant to the Attorney General's Investigative Subpoena is improper and will cause undue burden, hardship, annoyance and oppression, and therefore that discovery may not be had against PGE.

DATED this 26th day of November, 2003.

TONKON TORP LLP

By _____
William F. Martson, Jr., OSB #72163
  Direct Dial:  (503) 802-2005
  Direct Fax:  (503) 972-3705
  E-Mail:     rick@tonkon.com
Steven M. Wilker, OSB # 91188
  Direct Dial:  (503) 802-2040
  Direct Fax:  (503) 972-3740
  E-Mail:     steven@tonkon.com
Paul W. Conable, OSB #97536
  Direct Dial:  (503) 802-2188
  Direct Fax:  (503) 972-3888
  E-Mail:     paul@tonkon.com

Of Attorneys for Plaintiff
Portland General Electric Company

Page 13 - COMPLAINT FOR DECLARATORY RELIEF

Exhibit 1
Page 13 of 143
Memo in Oppo

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 NEW YORK AVENUE, N.W.

WASHINGTON, D.C. 20005-2111

TEL: (202) 371-7000

FAX: (202) 393-5760

http://www.skadden.com

September 26, 2003

FILED
OFFICE THE SECRETARY

03 SEP 26 PM 1:06

FEDERAL ENERGY
REGULATORY COMMISSION

FIRM/AFFILIATE OFFICES

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEWARK
NEW YORK
PALO ALTO
RESTON
SAN FRANCISCO
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO

VIA HAND DELIVERY

Magalie R. Salas, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

RE:     Portland General Electric Company
        Docket Nos. EL02-114-000 and EL02-115-001

Dear Ms. Salas:

Pursuant to Rule 602 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission ("Commission"), 18 C.F.R. §385.602, Commission Trial Staff ("Staff"), Portland General Electric Company ("Portland"), the People of the State of California, *ex rel.* Bill Lockyer, Attorney General ("California AG"), the California Public Utilities Commission ("CPUC"), the City of Tacoma, Washington ("Tacoma"), the Oregon Public Utility Commission ("Oregon PUC"), Enron Power Marketing, Inc. ("EPMI"), Industrial Customers of Northwest Utilities ("ICNU") and Blue Heron Paper Company ("Blue Heron") (the "Signatories") submit for filing and for transmittal to the Presiding Administrative Law Judge, the Honorable Jeffie Massey, an original and fourteen copies of an Offer of Settlement and an Agreement and Stipulation, with attached exhibits A, A-1, A-2, A-3, A-4 A-5 and B (together, the "Offer of Settlement") requesting certification to the Commission. Submitted under separate cover are two related joint motions, one to the Presiding Judge and the Chief Judge requesting suspension of the procedural schedule and the second to the Commission requesting transfer of issues in this proceeding relating to EPMI to Docket No. EL03-154, conditioned upon Commission approval of the Offer of Settlement.

The Offer of Settlement provides for a resolution of all allegations against Portland in the Commission's August 13, 2002 Order Initiating Investigation, and Establishing Hearing Procedures and Refund Effective Date ("Hearing Order"). Expeditious consideration and approval of this Offer of Settlement by the Presiding Judge and certification to the Commission is requested. The Offer of Settlement is

Exhibit 1
Page 14 of 143
Memo in Oppo

Exhibit A
Page 1 of 74
PGE's Complaint

the result of negotiations between and among the Signatories, reflects a fair and reasonable resolution of the issues, and is in the public interest.

Pursuant to the Hearing Order, Staff and other intervening parties conducted an extensive investigation of Portland's trading activities and its relationship with its affiliate, EPMI. In the interest of settlement and without admitting liability, Portland offered to pay a settlement amount of $8.5 million, to cap its market-based rate authority for a period of twelve months for new transactions, and to take other actions to improve training and document retention policies. In consideration of these commitments, the Signatories have agreed to resolve this and other related administrative and judicial proceedings, as set forth in the Offer of Settlement. The Offer of Settlement provides that issues related to EPMI and the record developed in the instant proceeding will be transferred to Docket No. EL03-154, where similar issues are currently pending litigation.

Pursuant to the requirements of Rule 602, an original and fourteen copies of the following are submitted:

(1)     The "Offer of Settlement" settling Docket Nos. EL02-114-000 and EL02-115-001 as to Portland, including an "Agreement and Stipulation" and Exhibits A, A-1, A-2, A-3, A-4, A-5 and B (tab 1);

(2)     An Explanatory Statement in Support of Offer of Settlement (tab 2); and

(3)     A draft Commission order, "Order Approving Offer of Settlement and Granting Motion to Transfer," and diskette containing the draft order in Microsoft Word format.

Service of this letter constitutes notice of the date on which comments on the Offer of Settlement are due in accordance with Rule 602(d)(2). Those dates are October 16th, 2003 for initial comments and October 27th, 2003 for reply comments.

Exhibit 1
Page 15 of 143
Memo in Oppo

**Exhibit A**
**Page 2 of 74**
**PGE's Complaint**

Please date-stamp the extra copies of this Motion and return them **with our** messenger.  Please contact the undersigned with any questions you may have.

Respectfully submitted,
Portland General Electric Company

Richard L. Brusca
Skadden, Arps, Slate, Meagher **& Flom LLP**
1440 New York Avenue, N.W.
Washington, D.C.  20005
Telephone: (202) 371-7000

Exhibit 1
Page 16 of 143
Memo in Oppo

**Exhibit A**
**Page 3 of 74**
**PGE's Complaint**

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused the foregoing document to be served and distributed to those parties contained on the service lists established in this proceeding.

Dated this 26th day of September, 2003 in Washington, D.C.

Richard L. Brusca
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, DC 20005
202.371.7000

Exhibit 1
Page 17 of 143
Memo in Oppo

**Exhibit A**
**Page 4 of 74**
**PGE's Complaint**

| | | | |
|---|---|---|---|
| Portland General Electric Company | ) | Docket Nos. | EL02-114-000 |
| Enron Power Marketing, Inc. | ) | | EL02-115-001 |

## OFFER OF SETTLEMENT
## AS TO PORTLAND GENERAL ELECTRIC COMPANY

To:  The Honorable Jeffie J. Massey
     Presiding Administrative Law Judge

Pursuant to Rule 602 of the Rules of Practice and Procedure of the Federal Energy

Regulatory Commission ("Commission"), 18 C.F.R. § 385.602 (2003), Portland General

Electric Company ("Portland"), Commission Trial Staff ("Staff"), the People of the State

of California, ex rel. Bill Lockyer, Attorney General ("California AG"), the California

Public Utilities Commission ("CPUC"), the City of Tacoma, Washington ("Tacoma"), the

Oregon Public Utility Commission ("Oregon PUC"), Enron Power Marketing, Inc.

("Enron" or "EPMI"), Industrial Customers of Northwest Utilities ("ICNU"), and Blue

Heron Paper Company ("Blue Heron"), (together, the "Signatories") jointly submit this

Offer of Settlement ("Offer of Settlement") to the Commission in full and final resolution

of the Portland issues that were set for hearing on August 13, 2002 in the above-

captioned proceeding, *Portland General Elec. Co.*, 100 FERC ¶ 61,186 (2002) ("Hearing

Order").[1]  The Signatories have been advised that all of the remaining parties to this

proceeding[2] do not oppose the Offer of Settlement.[3]

---

[1]  The California AG and the CPUC's settlement in resolution of this proceeding should not be construed as concurrence with a Commission approach that results in the institution of individual enforcement proceedings.
[2]  Dynegy Power Marketing, Inc. filed a motion to withdraw as a party to this proceeding on October 7, 2002. It was unopposed and became effective under Rule 216 as of October 22, 2002.

Exhibit 1
Page 18 of 143
Memo in Oppo

Exhibit A
Page 5 of 74
PGE's Complaint

This Offer of Settlement was reached after months of investigation by Staff and certain of the Intervenors into Portland's activities during 2000 and 2001, followed by diligent and productive settlement negotiations. All participants who have filed testimony in this proceeding join the Offer of Settlement. The result is a settlement that is fully consistent with the public interest, and which should be certified to the Commission expeditiously. Consistent with this request, the Signatories, by separate motion filed concurrently, ask that the Chief Judge and the Presiding Judge suspend the procedural schedule in this proceeding, pending review by the Presiding Judge of this Offer of Settlement and Commission action on it. Additionally, by separate motion filed concurrently, the Signatories are filing with the Commission a motion to transfer the issues in this docket related to EPMI to Docket No. EL03-154 conditioned upon ultimate Commission approval of this Offer of Settlement.

I.    **PROCEDURAL HISTORY**

During the course of the Commission's fact-finding investigation into potential manipulation of electric prices in Docket No. PA02-2, Portland conducted an internal investigation that disclosed certain posting errors with respect to its trades with its affiliate EPMI. Portland requested a meeting with Commission Enforcement Staff to report these errors, which was held on April 15, 2002. At that meeting, Portland provided spreadsheets to Enforcement Staff detailing what Portland had found.

A few weeks later, as part of its investigation in Docket No. PA02-2, the Commission became aware of Enron memoranda that described trading strategies allegedly employed by Enron's electricity traders in the West. After receiving the

---

[3]   CARE's support for the Offer of Settlement in no way waives its Requests for Stay filed in other pending Commission dockets, nor its Request for Rehearing in Docket Nos. EL00-95, *et al.*, except as such may specifically conflict with the Offer of Settlement as to Portland.

2

Exhibit 1
Page 19 of 143
Memo in Oppo

**Exhibit A**
**Page 6 of 74**
**PGE's Complaint**

memoranda on May 6, 2002, on May 8, 2002 the Commission issued data requests to identified sellers of wholesale electricity and/or ancillary services in the West seeking information about their knowledge and use of the Enron trading strategies. Portland responded to this data request on May 22, 2002 (even though Portland was not served with the data request), essentially stating that it had not been aware of these strategies. Portland also responded to two more sets of industry-wide data requests issued by the Commission (dated May 21 and May 22, 2002) regarding electric and gas trading strategies.

Based on Portland's May 22, 2002 response, on June 4, 2002, the Commission issued a show cause order to Portland and three other companies, directing them to show cause why their market-based rate authority should not be revoked. *See* 99 FERC ¶ 61,272 (2002). Portland provided data regarding its purchases and sales during 2000-2001 and related trading and transmission transcripts.

On August 1, 2002, Portland provided further information to Enforcement Staff in PA02-2 regarding the posting errors it previously had disclosed. Using Enforcement Staff's definition of what constituted a posting error, Portland performed a comprehensive analysis of its affiliate trades over the period 1999-2001 and provided Enforcement Staff with a complete list of transactions for which posting had not been made in accordance with the Enforcement Staff's criteria.

On August 13, 2002, the Commission instituted a proceeding under Section 206 of the Federal Power Act, 16 U.S.C. § 824e, setting for hearing the issues of whether Portland violated its code of conduct, its market-based rate tariff, or the Commission's standards of conduct in its transactions with EPMI. Hearing Order at P 10. The

3

Exhibit 1
Page 20 of 143
Memo in Oppo

**Exhibit A**
**Page 7 of 74**
PGE's Complaint

Commission also included within the scope of the issues set for hearing, the previously-reported posting errors, as well as the issue of whether Portland provided all relevant information to the Commission in the PA02-2 investigation. *Id*. at PP 11 & 12. Finally, the Commission set for hearing the imposition of remedies for any adjudged violations, and identified the revocation of Portland's market-based rate tariff as a potential remedy. *Id*. at P 12. The presiding administrative law judge was appointed by Chief Administrative Law Judge Wagner by order dated August 23, 2002.

Pursuant to the Order Establishing Procedural Schedule, dated September 6, 2002, Staff and certain of the other Signatories conducted extensive discovery. During the course of the proceeding, Staff, for example, propounded and Portland responded to 154 data requests, many with multiple subparts. At the time of filing its answering testimony, Portland had provided to Staff and the other participants over 15,000 pages of hard copy and numerous CDs of electronic data, including Excel spreadsheets, Word documents, e-mails, "wav" files of power trader and/or transmission services conversations, and other electronic files. Discovery continued, and additional information was provided to Staff and the other parties after the filing of Portland's testimony. The information produced included general information about Portland and its operations, all the materials submitted in the PA02-2 docket, Portland's organizational structure, Portland's implementation of its code of conduct and the standards of conduct, compensation information, documentation of trading activity for 2000-2001, use of trading tools such as sleeves, brokers, management reports, price curves, bidding strategies, and other information relating to Portland's trading activities, transcripts and detailed explanations of trader and transmission tapes, information about EPMI transactions, information on

4

Exhibit 1
Page 21 of 143
Memo in Oppo

**Exhibit A**
**Page 8 of 74**
**PGE's Complaint**

posting, transaction data logs, and miscellaneous other data. Staff and Tacoma noticed and conducted depositions, in which certain other parties participated, of many present and former Portland employees.

Staff also held in-person meetings with Portland representatives in Washington, D.C., conducted a field audit in Portland's offices in October 2002, observed Portland's transaction and accounting systems, and toured the trading and transmission floors. Portland provided a review of its trading and transmissions operations and its data and accounting systems, provided explanations of the transactions with EPMI ("17-day transactions"), and made its personnel available for interviews.

Staff submitted its Statement of Alleged Violations on November 14, 2002, contending that Portland violated Sections 205 and 206 of the Federal Power Act, its code of conduct, its market-based rate tariff, Enron's "Conduct of Business Affairs, Procedures for Use of Communications Services and Equipment" ("Enron CBA"), the CAISO Tariff, Portland's transmission agreement with Bonneville Power Administration ("BPA"), and Portland's Energy Trading Policy and Procedures by (1) participating in the 17-day transactions with EPMI during April - June 2000, and using a marketing sleeve as part of those transactions, (2) failing to report concerns regarding these transactions to ethics or legal officials, and (3) failing to properly post certain affiliate transactions. This Statement of Alleged Violations was amended with the submission of Staff's Direct Testimony on December 10, 2002, to exclude the allegations that Portland's actions violated the Enron CBA, the CAISO Tariff, and the BPA Agreement. Otherwise, Staff's Direct Testimony alleged facts designed to support the asserted violations. Staff recommended several remedies designed to improve Portland's training and data

5

Exhibit 1
Page 22 of 143
Memo in Oppo

**Exhibit A**
**Page 9 of 74**
**PGE's Complaint**

retention, along with a two-year suspension of Portland's market-based rate tariff. Direct Testimony and exhibits containing additional allegations and monetary remedies were submitted on December 17, 2002 by the California AG and the CPUC (jointly) and by Tacoma.

Portland responded to these allegations in its Answering Testimony on February 24, 2003, explaining that, other than the posting errors which it previously had brought to the Commission's attention, Portland believed that its conduct was, at all times, in compliance with its code of conduct, its market-based rate tariff, the Commission's standards of conduct, the Federal Power Act, and its internal policies. Portland described the previously-disclosed 17-day transactions, and the confusion surrounding them, but maintained that at the time neither its traders nor its management thought that the transactions were being used by EPMI as part of a circular schedule. Portland further explained that it believed it had fully cooperated with the Commission's PA02-2 investigation, and denied that any remedy was appropriate under these circumstances.

Staff, the California AG and CPUC (jointly), and Tacoma filed Rebuttal Testimony on May 12, 2003. Staff and Intervenors were permitted to (but did not) file additional allegations and testimony on August 4, 2003 based on new evidence that had been released by the Department of Justice. The procedural schedule, as recently modified by the Presiding Judge, also allows Portland and EPMI to submit additional testimony and exhibits based on the Department of Justice information and the testimony in Staff's May 12 submission on or before September 29, 2003. Rebuttal to Portland's September 29 testimony by Staff and Intervenors is due on or before October 8, 2003.

6

Exhibit 1
Page 23 of 143
Memo in Oppo

Exhibit A
Page 10 of 74
PGE's Complaint

In the interest of settlement, the Signatories make no determination regarding any of the alleged violations. Rather, the Signatories stipulate to the undisputed facts established in this proceeding and agree upon certain remedies and conditions as a means to resolve this proceeding. The Agreement and Stipulation ("Agreement") attached as Appendix A to this Offer of Settlement sets out these facts and remedies. The Offer of Settlement is conditioned on the Commission making no adverse findings as to Portland (other than the simple finding that there were posting errors, and nothing more) in its order approving the Offer of Settlement, including the Agreement, in its entirety without modification or condition.

## II.     THE OFFER OF SETTLEMENT IS IN THE PUBLIC INTEREST

The proposed Offer of Settlement is uncontested among the Signatories and the remaining parties in the proceeding have advised that they do not oppose it. The Commission may approve an uncontested offer of settlement upon a finding that it "appears to be fair and reasonable and in the public interest." 18 C.F.R. §385.602(g)(3). The information produced during the last year of discovery and submitted in pre-filed testimony demonstrates that the Offer of Settlement is fair and reasonable, and should therefore be approved as consistent with the public interest.

The Agreement attached as Appendix A to this Offer of Settlement fully addresses the issues set for hearing in this docket. First, it addresses the issues identified in the Hearing Order – the transactions between EPMI and Portland, the posting errors, and Portland's cooperation in the Commission's investigations. Second, it establishes remedies, including a suspension of Portland's market-based rate authority that explicitly was mentioned in the Hearing Order and recommended by Staff, and a monetary remedy

7

Exhibit 1
Page 24 of 143
Memo in Oppo

**Exhibit A**
**Page 11 of 74**
PGE's Complaint

in the form of a payment by Portland of $8.5 million directly to consumer representatives and wholesale market participants.

Moreover, the Agreement resolves a complex and novel proceeding without the need for full litigation and decision by the Commission. Portland, Staff and Intervenors disagree as to whether the conduct alleged (other than certain posting errors) was a violation of any applicable law, regulation, tariff or agreement. The Agreement resolves this contentious issue without reaching the difficult legal questions presented.

The Agreement further serves the public interest by increasing Portland's training and related document retention for code of conduct and affiliate issues, and by ensuring the maintenance, for five years from the date of final Commission approval of the Agreement, of Portland's recordings of affiliate trading transactions, affiliate postings and related accounting records. This will facilitate Commission review of Portland's ongoing compliance with its code of conduct and the Commission's affiliate rules.

Finally, as noted in Paragraph 14 of the Agreement, the Agreement resolves other pending administrative and court proceedings, and commits Portland to cooperate in other ongoing investigations. This benefit should not be overlooked, given the vast amount of litigation spawned by the Western energy crisis of 2000-2001, most of which is not completed.

## III. DISTRIBUTION OF THE SETTLEMENT AMOUNT

As described in Paragraph 9 of the Agreement, Portland has agreed to pay $8.5 million as part of the Offer of Settlement. This amount is being allocated to settling Intervenors in this proceeding in a manner determined by such Intervenors, with significant input by Staff. These allocations are set forth on Exhibit A to the Agreement

8

Exhibit 1
Page 25 of 143
Memo in Oppo

Exhibit A
Page 12 of 74
PGE's Complaint

that is attached hereto and made a part hereof. Exhibits A-1, A-2, A-3, A-4 and A-5 to the Agreement detail the manner in which each of the entities receiving a portion of the Settlement Amount will ensure that consumers directly benefit from these payments.

## IV. THE REMAINING ALLEGATIONS AS TO EPMI SHOULD BE TRANSFERRED TO DOCKET NO. EL03-154

As noted above, this Offer of Settlement and the Agreement resolve only the allegations related to Portland. The Hearing Order, however, set for hearing in this docket related allegations as to EPMI. Even if this case were to proceed as to severed, contesting parties, the Offer of Settlement is explicitly conditioned on the transfer of the EPMI allegations to the pending proceeding at Docket No. EL03-154. The Signatories are concurrently filing with the Commission a motion to transfer these issues.

Alleged gaming practices by EPMI, other than those at issue in the instant docket, already are the subject of a pending Section 206 proceeding in Docket No. EL03-154. That case is but one of the consolidated cases addressing sellers' participation in activities that are alleged to constitute gaming and/or anomalous market behavior in violation of the CAISO's and the California Power Exchange's Tariffs during the period January 1, 2000 to June 20, 2001 in Docket No. EL03-137, et al. The subject matter of Docket No. EL03-137, et al. includes alleged circular schedule transactions, the same alleged gaming practice in dispute in this proceeding. The Signatories would rather pursue the EPMI allegations in that docket, both to avoid the invariable duplication that would result from conducting two simultaneous proceedings and to maximize the possibility of a global settlement involving EPMI. EPMI supports proceeding in this manner, provided that the substantive and procedural issues set out in the Hearing Order, including the burden of proof, do not change.

9

Exhibit 1
Page 26 of 143
Memo in Oppo

Exhibit A
Page 13 of 74
PGE's Complaint

It is the intent of the Signatories that litigation of the matters set for hearing in Docket No. EL02-114 shall, except as expressly modified in the Agreement, be pursued in Docket No. EL03-154 in the same procedural posture and with the same record established in Docket No. EL02-114 as of the date of the transfer. Accordingly, pursuant to the express provisions of the Agreement, participants asserting claims against EPMI shall bear the burden of proof imposed by Section 206 of the Federal Power Act[4] to demonstrate that EPMI: (1) engaged in the conduct alleged in Commission Staff's Second Revised Statement of Asserted Violations, Section II, Statement of Asserted Violations by EPMI (dated May 12, 2003) ("Statement of Asserted Violations"); (2) that such conduct violated the tariffs and statutes cited therein; and (3) that such conduct justifies a remedy imposed under Section 206.[5] Further, the record and the witnesses in Docket No. EL02-114 shall be available in Docket No. EL03-154 pursuant to the express provisions of the Agreement.

In Docket No. EL02-114, the procedural schedule provided for additional testimony and exhibits to be filed by EPMI on September 29, 2003 and for rebuttal testimony and exhibits to be filed by Staff and Intervenors asserting claims against EPMI on October 8, 2003. These filing dates shall be revised to conform to the procedural schedule in Docket No. EL03-154. That is, under the present EL03-154 schedule,

---

[4] EPMI's current burden of proof as a show cause respondent in Docket No. EL03-154 shall in all other respects remain unchanged.
[5] The Commission initiated Docket No. EL02-114 pursuant to Section 206 of the FPA. Hearing Order PP 2, 13 and Ordering Paragraph (A). Judge Massey directed Staff to file a statement of asserted violations identifying the violations that it intends to prove. Tr. 23:10. The procedural schedule is consistent with allocation of the burden of proof to Staff and Intervenors seeking a remedy, i.e., direct testimony filed by Staff and Intervenors, answering testimony filed by EPMI and Portland, and rebuttal testimony filed by Staff and Intervenors. Order Establishing Procedural Schedule (Sept. 6, 2002). Although the procedural schedule has been revised several times, the procedural framework has not been altered. Judge Massey and Staff acknowledged that Staff and Intervenors alleging claims against EPMI bears the burden of proof in Docket No. EL02-114 and no party disagreed. Tr. 109:6-13; 268:20-21.

Exhibit 1
Page 27 of 143
Memo in Oppo

**Exhibit A**
**Page 14 of 74**
**PGE's Complaint**

EPMI's testimony would be due on or before November 3, 2003 and Staff and Intervenors' testimony would be due on or before December 23, 2003. Should the procedural schedule change in Docket No. EL03-154, these testimony deadlines will follow suit. No prejudice will result to any contesting parties from such a transfer since they will be free to pursue these issues in Docket No. EL03-154.

The Signatories recognize that the Presiding Judge may not unilaterally transfer issues set for hearing before her. Therefore, concurrent with the filing of this Offer of Settlement, the Signatories are filing with the Commission a Joint Motion to Transfer Allegations Related to EPMI that is conditioned upon certification by the Presiding Judge and approval by the Commission of this Offer of Settlement.

## V.     PROCEDURE FOR PARTIES THAT CONTEST SETTLEMENT

This Offer of Settlement is signed by all of the participants that have filed testimony, as well as several others. The Signatories have been advised that all of the remaining parties do not oppose the Offer of Settlement, however, to the extent any Intervenors submit comments opposing the Offer of Settlement, the Signatories request that the Presiding Judge certify the Offer of Settlement as uncontested as to the Signatories and those parties who have not contested the Offer of Settlement (together, "the settling parties") pursuant to Rule 602(h)(2), sever those contesting parties for purposes of hearing and decision, and permit Portland to continue to defend itself against them in this docket. The Commission's case law supports treating such settlements as "uncontested" as to the settling parties. *See Texas Gas Transmission Corporation*, 98 FERC ¶61,244, at 61,994 (2002) (Commission balanced its concern with imposing the settlement on the contesting party with its regard for the support of the non-contesting

Exhibit 1
Page 28 of 143
Memo in Oppo

Exhibit A
Page 15 of 74
PGE's Complaint

EPMI's testimony would be due on or before November 3, 2003 and Staff and Intervenors' testimony would be due on or before December 23, 2003. Should the procedural schedule change in Docket No. EL03-154, these testimony deadlines will follow suit. No prejudice will result to any contesting parties from such a transfer since they will be free to pursue these issues in Docket No. EL03-154.

The Signatories recognize that the Presiding Judge may not unilaterally transfer issues set for hearing before her. Therefore, concurrent with the filing of this Offer of Settlement, the Signatories are filing with the Commission a Joint Motion to Transfer Allegations Related to EPMI that is conditioned upon certification by the Presiding Judge and approval by the Commission of this Offer of Settlement.

## V.     PROCEDURE FOR PARTIES THAT CONTEST SETTLEMENT

This Offer of Settlement is signed by all of the participants that have filed testimony, as well as several others. The Signatories have been advised that all of the remaining parties do not oppose the Offer of Settlement, however, to the extent any Intervenors submit comments opposing the Offer of Settlement, the Signatories request that the Presiding Judge certify the Offer of Settlement as uncontested as to the Signatories and those parties who have not contested the Offer of Settlement (together, "the settling parties") pursuant to Rule 602(h)(2), sever those contesting parties for purposes of hearing and decision, and permit Portland to continue to defend itself against them in this docket. The Commission's case law supports treating such settlements as "uncontested" as to the settling parties. *See Texas Gas Transmission Corporation*, 98 FERC ¶61,244, at 61,994 (2002) (Commission balanced its concern with imposing the settlement on the contesting party with its regard for the support of the non-contesting

Exhibit 1
Page 28 of 143
Memo in Oppo

Exhibit A
Page 15 of 74
PGE's Complaint

EPMI's testimony would be due on or before November 3, 2003 and Staff and Intervenors' testimony would be due on or before December 23, 2003. Should the procedural schedule change in Docket No. EL03-154, these testimony deadlines will follow suit. No prejudice will result to any contesting parties from such a transfer since they will be free to pursue these issues in Docket No. EL03-154.

The Signatories recognize that the Presiding Judge may not unilaterally transfer issues set for hearing before her. Therefore, concurrent with the filing of this Offer of Settlement, the Signatories are filing with the Commission a Joint Motion to Transfer Allegations Related to EPMI that is conditioned upon certification by the Presiding Judge and approval by the Commission of this Offer of Settlement.

## V.     PROCEDURE FOR PARTIES THAT CONTEST SETTLEMENT

This Offer of Settlement is signed by all of the participants that have filed testimony, as well as several others. The Signatories have been advised that all of the remaining parties do not oppose the Offer of Settlement, however, to the extent any Intervenors submit comments opposing the Offer of Settlement, the Signatories request that the Presiding Judge certify the Offer of Settlement as uncontested as to the Signatories and those parties who have not contested the Offer of Settlement (together, "the settling parties") pursuant to Rule 602(h)(2), sever those contesting parties for purposes of hearing and decision, and permit Portland to continue to defend itself against them in this docket. The Commission's case law supports treating such settlements as "uncontested" as to the settling parties. *See Texas Gas Transmission Corporation*, 98 FERC ¶61,244, at 61,994 (2002) (Commission balanced its concern with imposing the settlement on the contesting party with its regard for the support of the non-contesting

11

Exhibit 1
Page 28 of 143
Memo in Oppo

Exhibit A
Page 15 of 74
PGE's Complaint

parties and decided that it was appropriate to preserve the benefits of the settlement for the non-contesting parties and provide the contesting party with a forum to litigate the contested issues). *See also Cove Point LNG*, 97 FERC ¶61,276, at 62,270-62,271 (2001) (same as above); *Kern River Gas Transmission Co.*, 90 FERC ¶61,124, at 61,375 (2000) (same as above); *Dominion Transmission, Inc.*, 94 FERC ¶ 61,329, at 62,229 (2000) (same as above). If the Commission approves the Offer of Settlement as to the settling parties, the hearing process that remains as of the date of filing of this Offer of Settlement would then be rescheduled as to the contesting parties by the Presiding Judge. The contesting parties must take the record as they find it on the day of the filing of this Offer of Settlement, and only the currently remaining procedural dates shall be rescheduled.

The Signatories request this procedure for several reasons. The contesting parties have failed to avail themselves of numerous opportunities to file any pre-filed testimony and therefore have presented no evidence of any violations of law or harm to the market or, for that matter, of harm or damages to themselves. Reinstituting the litigation schedule in precisely the posture in which it currently stands for contesting parties is the most equitable and non-prejudicial way to ensure that Portland will not be unfairly disadvantaged by a party that attempts to gain undue leverage by opposing the Offer of Settlement reached among Portland and the active participants in this proceeding. This is preferable to the Signatories as opposed to the certification of a contested settlement under Rule 602(h)(1).

## VI.  REQUEST FOR EXPEDITIOUS CERTIFICATION AND COMMISSION APPROVAL

The Signatories respectfully request expeditious treatment of the Offer of Settlement. Not only does the Offer of Settlement resolve an extended and complex set

12

Exhibit 1
Page 29 of 143
Memo in Oppo

Exhibit A
Page 16 of 74
PGE's Complaint

of issues, but it also includes procedural provisions, the timing of which affects all parties. Expeditious certification by the Presiding Judge and approval of the Offer of Settlement by the Commission would allow the proposed transfer of EPMI issues into Docket No. EL03-154 in a time frame that would coincide with the procedural schedule established for the consolidated EL03-137, *et al.* cases. Timely transfer, that is contingent upon Commission approval of the Offer of Settlement, would prevent either delay in the Docket No. EL03-154 schedule or later duplication of effort if similar issues have to be relitigated or additional testimony filed in that docket. Further, expeditious approval would allow the instant litigation to proceed in a timely fashion as to the non-settling parties. Only two rounds of testimony remain to be filed in the instant docket as of this date (the September 29 filing by Portland, if any, and the October 8 rebuttal, if any), before a hearing can be held. Assuming approval of the Offer of Settlement, the remaining hearing process as to the non-settling parties can take place in a short time frame, and the case can be quickly brought to conclusion.

## VII.    CONCLUSION

Based upon all of the foregoing, the Signatories believe that this Offer of Settlement is in the public interest. The Offer of Settlement has been the subject of intense negotiations over several months. It reflects a delicate balance of interests and compromises in a carefully crafted agreement between and among a wide range of interests and divergent parties. Accordingly, the Signatories respectfully request the Presiding Judge to certify the Offer of Settlement, as filed, to the Commission and respectfully urge that the Commission approve the Offer of Settlement as the full and

13

Exhibit 1
Page 30 of 143
Memo in Oppo

Exhibit A
Page 17 of 74
PGE's Complaint

final resolution of the issues set for hearing as to Portland, without condition or modification.

Respectfully submitted,

Hollis J. Alpert
Marcia C. Hooks
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426
(202) 502-8783

*Commission Staff Counsel*

Clifford M. Naeve
Richard L. Brusca
Cheryl M. Foley
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Ave., NW
Washington, DC 20005
(202) 371-7000

Bill Lockyer, California Attorney General
Tom Greene, Senior Assistant Attorney
  General
Vickie P. Whitney, Deputy Attorney
  General
1300 I Street, Suite 125
Sacramento, CA 95814
(916) 445-8194

Douglas R. Nichols
Vice President, General Counsel and
  Secretary
J. Jeffrey Dudley
Portland General Electric Company
121 SW Salmon Street
Portland, OR 97204
(503) 464-8000

*Counsel for Portland General Electric Company*

Kevin J. McKeon
Lillian S. Harris
Hawke McKeon Sniscak & Kennard LLP
100 N. Tenth St., P.O. Box 1778
Harrisburg, PA 17105
(717) 236-1300

*Attorneys for the People of the State of California, ex rel. Bill Lockyer, Attorney General of the State of California*

Michael J. Kurman
J. Michael Carr, Jr.
Arent Fox Kintner Plotkin & Kahn, PLLC
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5339
(202) 857-6345

*Counsel for City of Tacoma, Washington*

14

Exhibit 1          Exhibit A
Page 31 of 143     Page 18 of 74
Memo in Oppo       PGE's Complaint

_(signature)_ Jason W. Jones (PtB)
Jason W. Jones, Assistant Attorney General
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301-4096
(503) 378-6322

*Attorney for the Public Utility Commission of Oregon*

_(signature)_ Laurence G. Chaset (PtB)

Arocles Aguilar
Laurence G. Chaset
California Public Utilities Commission
505 Van Ness Ave.
San Francisco, CA 94102
(415) 355-5595

*Counsel for the Public Utilities Commission of the State of California*

_(signature)_ Charles A. Moore (PtB)
Charles A. Moore
H. Liza Moses
Samuel G. Backfield
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
1000 Louisiana Street, Suite 1400
Houston, Texas 77002
(713) 287-2086

*Counsel for Enron Power Marketing, Inc*

_(signature)_ Melinda J. Davison (PtB)
Melinda J. Davison
Matthew Perkins
Davison Van Cleve, P.C.
1000 SW Broadway, Suite 2460
Portland, OR 97205
(503) 241-7242

*Counsel for Blue Heron Paper Company and Industrial Customers of Northwest Utilities*

September 26th, 2003

Exhibit 1
Page 32 of 143
Memo in Oppo

Exhibit A
Page 19 of 74
PGE's Complaint

## AGREEMENT AND STIPULATION

### BACKGROUND AND STIPULATED FACTS

1.    Parties.  This Agreement and Stipulation ("Agreement") is entered into this 26th

day of September, 2003, by and between Portland General Electric Company

("Portland"), Commission Trial Staff ("Staff"), the People of the State of California, *ex*

*rel.* Bill Lockyer, Attorney General ("California AG"), the California Public Utilities

Commission ("CPUC"), the City of Tacoma, Washington ("Tacoma"), the Oregon Public

Utility Commission ("Oregon PUC"), Enron Power Marketing, Inc. ("Enron" or

"EPMI"), Industrial Customers of Northwest Utilities ("ICNU"), and Blue Heron Paper

Company ("Blue Heron"), (together, the "Signatories").  The Signatories have prepared

an Offer of Settlement as to Portland General Electric Company ("Offer of Settlement")

of which this Agreement is a part.  The Offer of Settlement is incorporated in its entirety

herein by reference.

2.    Background.  Portland is an integrated electric utility company, serving customers

at retail in the State of Oregon.  Portland's owned generation is not sufficient to meet the

needs of its retail customers, and Portland is an active participant in the wholesale power

market, primarily to supplement its supply and balance its load requirements.  During

2000-2001, Portland was engaged in both buying power from and selling power to the

CAISO and the California Power Exchange.

3.    Relationship With EPMI.  On July 1, 1997, Portland's former parent merged with

Enron Corp., and Portland became a wholly owned subsidiary of Enron Corp.  Pursuant

Exhibit 1
Page 33 of 143
Memo in Oppo

**Exhibit A
Page 20 of 74
PGE's Complaint**

to its market-based rate tariff accepted by the Commission in 1998, Portland is permitted to trade directly with its power marketing affiliates, including EPMI. Under its market-based rate tariff and its affiliate code of conduct: "[w]hen [Portland] offers to sell capacity and/or energy to or purchase capacity and/or energy from an affiliated power marketer, it will make the same offer, at the same time, to non-affiliated entities on an electronic bulletin board at www.pge-online.com . . . [Portland] will post on an electronic bulletin board, simultaneously with each transaction with a power marketer affiliate, the actual price charged or paid under the affiliate transaction."

4.    Posting Errors. After an internal investigation conducted in the Spring of 2002, Portland requested a meeting with Commission Enforcement Staff to report certain posting errors that Portland had uncovered with respect to its trades with EPMI. At this meeting, held on April 15, 2002, Portland provided spreadsheets detailing what it had found. Pursuant to the Enforcement Staff's request and using that Staff's definition of what constituted a posting error, Portland conducted a comprehensive analysis of its affiliate trades over the period 1999-2001, and on August 1, 2002, provided the Enforcement Staff with a complete list of transactions for which posting had not been made in accordance with the Enforcement Staff's criteria.

    (a)    Portland agrees that it erred in failing to post correctly certain affiliate transactions. The posting errors fall into the following five categories: failure to post offer (5 errors), offer posting errors (42 errors), acceptance posting errors (5 errors), multiple errors (4 errors) and unable to confirm posting/acceptance status (160 errors). These total 216 posting errors out of 1,979 transactions with EPMI during the period.

2

Exhibit 1
Page 34 of 143
Memo in Oppo

**Exhibit A**
**Page 21 of 74**
**PGE's Complaint**

(b)     Enforcement Staff's criteria, adopted by Staff in this proceeding, included another category of posting errors, those where the "accepted deal" differed from the "offered product." In these cases, the affiliate accepted a product that was a subset of that which had been posted; that is, a lesser quantity in some hours. Both the offer and the actual amounts accepted were posted. This fact pattern occurred on 1,074 occasions. Portland does not concede that these were posting violations.

(c)     Upon discovery of the posting errors, Portland suspended trading with affiliates, and placed the manager in charge on administrative leave without pay and thereafter removed him from his position as manager. Trading with affiliates continues to be suspended to date.

5.     <u>17-Day Transactions</u>.

(a)     In April 2000, Portland began providing service to EPMI in connection with certain EPMI transactions that are believed to have circulated power out of and back into California (the "17-day transactions"). The service provided by Portland may have comprised one leg of the alleged EPMI circular schedules. The Portland service involved Portland receiving power at the California/Oregon border ("COB") from Avista, acting as a marketing intermediary for Enron, and through a series of transactions, reselling the power to EPMI at John Day.[1]

---

[1]     Avista's role in these transactions was investigated in a separate proceeding in Docket No. EL02-115-000. A contested "Agreement in Resolution of Section 206 Proceeding", that contains a conclusion by Staff of no wrongdoing by Avista is pending before the Commission. The Offer of Settlement here as to Portland shall not in any way be construed as affecting the positions of the participants with respect to the contested issues in Docket No. EL02-115-000.

3

Exhibit 1
Page 35 of 143
Memo in Oppo

**Exhibit A**
**Page 22 of 74**
**PGE's Complaint**

(b)     EPMI scheduled this transaction starting on April 6, 2000 and on 16 other days during the April to June 2000 period. These transactions totaled 2,529 MWhs over the 17 days.

(c)     Portland charged EPMI $.90 per MWh, plus losses for each of the 17-day transactions.

6.     Portland's Cooperation in the PA02-2 Investigation and This Investigation. Portland cooperated with the Commission's investigation, its May 8, May 21 and May 22, 2002 data requests in Docket No. PA02-2, and the June 4, 2002 show cause order. Portland also cooperated with Staff's investigation in this docket.

## REMEDIES AND CONDITIONS OF SETTLEMENT

7.     This Agreement constitutes a full and final resolution of "possible violations by Portland . . .of [its code of conduct] or market-based rate tariffs and the Commission's standards of conduct, and the imposition of any appropriate remedies...[and] the issue of whether Portland has in fact provided all relevant information in the investigation and what the appropriate remedies for any failure should be, including whether Portland's market-based rate authority should be revoked", as set for hearing on August 13, 2002 in *Portland General Elec. Co.*, 100 FERC ¶ 61,186 (2002)("Hearing Order"). It is a compromise of disputed and uncertain claims entered into by the parties for legitimate regulatory and business reasons. It is the result of negotiations between and among the Staff and the parties. It shall not be deemed an admission of fault or liability by Portland for any reason and implies no admission or fault by Portland.

Exhibit 1
Page 36 of 143
Memo in Oppo

Exhibit A
Page 23 of 74
PGE's Complaint

8. This Agreement, including the Offer of Settlement is conditioned on the Commission making no adverse findings as to Portland (other than the simple finding that there were posting errors, and nothing more) in its order approving the Settlement.

9. In recognition of the burdens, costs, and uncertainty associated with the litigation process, Portland has agreed to pay the amount of $8.5 million (the "Settlement Amount") to the entities identified in Exhibit A hereto in the amounts described therein. Exhibits A-1, A-2, A-3, A-4 and A-5 describe the disposition of the funds allocated to each entity. The Settlement Amount will be paid in accordance with Paragraph 28 of this Agreement. By agreeing to pay the Settlement Amount, Portland does not admit that the allegations set forth in the Hearing Order or the allegations set forth in the pleadings or testimony of the participants in this proceeding have any merit, or that during the relevant period in this proceeding any of Portland's trading activities violated any governing tariff, regulation, or statute, or adversely affected the price formation process. Payment of the Settlement Amount does not constitute the payment of any penalty or fine.

10. Portland agrees that as part of the Offer of Settlement, it will file an amendment to its market-based rate tariff to impose, for a period of twelve months, a suspension of its market-based rate tariff (i.e., a cost-based cap) that will apply to sales transactions entered into by Portland during that 12-month period. The proposed tariff amendment is attached hereto as Exhibit B. This amendment will take effect on the day following the date that the Commission approves the Offer of Settlement. Portland warrants that it will not utilize any existing or newly-created affiliate, subsidiary or other business entity to carry out its wholesale electricity marketing activities in such a way as to circumvent the

5

Exhibit 1
Page 37 of 143
Memo in Oppo

Exhibit A
Page 24 of 74
PGE's Complaint

cost-based cap on its wholesale sales. Portland may make wholesale sales of electricity under any other applicable cost-based tariff that is on file with the Commission.

11.     Portland will increase training and related documentation retention on code of conduct and affiliate issues. Specifically, Portland will conduct annual training for trading floor employees on code of conduct, standards of conduct, antitrust and ethics. It will keep records of such training for a period of 3 years.

12.     Portland will maintain, for five years from the date of final Commission approval of the Offer of Settlement, recordings of affiliate trading transactions, affiliate postings and related accounting records.

13.     Portland agrees to cooperate with the California AG in its investigations of electric power and gas markets in California. The California AG agrees that requests for information and/or assistance from Portland will be reasonably made. Portland will use good faith and will make reasonable efforts to respond to any such requests.

14.     The Signatories will not pursue the issues set for hearing in this proceeding against Portland in this or any other judicial or regulatory forum, except that the Signatories do not waive their claims and nothing in this Agreement precludes them from pursuing their claims against Portland in *San Diego Gas & Electric Company v. All Sellers, et al.*, Docket Nos. EL00-95-000 *et al.*, in *Puget Sound Energy, Inc. v. All Sellers, et al.*, Docket Nos. EL01-10, *et al.* and claims of Blue Heron alleged against Portland in Clackamas County Circuit Court Case No. CCV0106223. Other existing cases resolved as between the California AG and Portland by this paragraph include Docket No. EL03-165; *The People of the State of California, ex rel. Bill Lockyer, Attorney General v. Portland General Electric*, San Francisco Superior Court Case No. CGC-02-408493;

6

Exhibit 1
Page 38 of 143
Memo in Oppo

Exhibit A
Page 25 of 74
PGE's Complaint

United States District Court, Northern District of California, Case No. CV-02-3318 VRW; the pending appeal at the Ninth Circuit Court of Appeals, Case No. 03-15489, and the pending non-public investigation by the California AG. Another case resolved as between the Oregon PUC and Portland by this paragraph is the proposed Oregon PUC investigation into Portland's trading activities for the 17-day transactions, posting errors and use of the integrated resource contract, as they are outlined in the Oregon Public Utility Commission Staff Report dated June 12, 2003. This Agreement does not limit the Oregon PUC's authority to hold Portland's retail customers harmless for any costs associated with the requirement that Portland file an amendment to its market-based rate tariff to impose, for a period of twelve months, a cost-based cap that will apply to sales transactions entered into by Portland during that 12-month period, as described herein and in Exhibit B. Further, nothing in this Agreement precludes the participants from pursuing claims against all parties in Docket Nos. EL03-137 through 179, except that the California AG has agreed not to pursue claims against Portland in Docket No. EL03-165-000. Except as described herein, the Offer of Settlement does not resolve any other issues involving Portland in any other pending or future proceeding.

15.     With respect to the California AG, any waivers, including the waiver found at California Civil Code Section 1542, do not apply to any acts or omissions by Portland that are (a) criminal, or (b) willfully fraudulent; provided that this exception (b) does extend to claims of willful fraud which are based solely on the acts or omissions of Portland that occurred prior to the effective date of this Agreement and that are currently known to the California AG.

16.     If the Offer of Settlement is approved by the Commission, the Signatories (other than Portland and EPMI) will not participate in any hearing that is subsequently held in this proceeding, will not make their witnesses available, and will not offer their pre-filed testimony into evidence.

17.     The Offer of Settlement is conditioned on the Commission granting the Signatories' joint motion to transfer all allegations in the Hearing Order related to Enron/EPMI to Docket No. EL03-154, which is part of the consolidated cases addressing sellers' participation in activities that are alleged to constitute gaming and/or anomalous market behavior in violation of the CAISO's and California Power Exchange's tariffs during the period January 1, 2000 to June 20, 2001.  The transfer of such allegations with regard to EPMI will not alter in any way the procedural or substantive issues as set forth in the Hearing Order and/or burden of proof as they are presently aligned in this docket.

18.     It is the intent of the Signatories that litigation of the matters set for hearing in Docket No. EL02-114 shall, except as expressly modified herein, be pursued in Docket No. EL03-154 in the same procedural posture and with the same record established in Docket No. EL02-114 as of the date of the transfer.  Accordingly, participants asserting claims against EPMI shall bear the burden of proof imposed by Section 206 of the Federal Power Act[2] to demonstrate that EPMI: (1) engaged in the conduct alleged in Commission Staff's Second Revised Statement of Asserted Violations, Section II, Statement of Asserted Violations by EPMI (dated May 12, 2003) ("Statement of Asserted

---

[2]  EPMI's current burden of proof as a show cause respondent in Docket No. EL03-154 shall in all other respects remain unchanged.

8

Exhibit 1
Page 40 of 143
Memo in Oppo

**Exhibit A**
**Page 27 of 74**
**PGE's Complaint**

Violations"); (2) that such conduct violated the tariffs and statutes cited therein; and (3)

that such conduct justifies a remedy imposed under Section 206.[3]

The Statement of Asserted Violations with respect to EPMI are that:

A.    Enron misrepresented the nature and amount of power Enron intended to
       sell into the California market, as well as the load it intended to serve.

      1.    EPMI's misrepresentations violated CAISO Tariff Sections MMIP
           2.1, MMIP 2.1.1, MMIP 2.1.1.3, MMIP 2.1.1.5, and MMIP 2.1.3,
           as described above.

      2.    EPMI's misrepresentations constituted unjust and unreasonable
           practices under sections 205 and 206 of the FPA which may have
           adversely affected markets in California. Therefore, EPMI
           undermined the Commission's intent to ensure just and reasonable
           rates and practices and its intent to mitigate any potential for
           affiliate abuse in authorizing EPMI's market-based rate tariff.

      3.    EPMI's misrepresentations also violated Enron's own "Conduct of
           Business Affairs, Procedures for Use of Communication Services
           and Equipment," which states that communication services and
           equipment may not be used for any illegal/criminal activity or any
           activity that violates any Company policy.

B.    EPMI developed a scheme under which it created false congestion and
       received payment for falsely relieving congestion on California
       transmission lines. It implemented this scheme by arranging with its
       affiliate, PGE, to schedule power to flow to PGE, through Washington
       Water Power, and by scheduling redeliveries back to the Los Angeles
       Department of Water and Power (LADWP). The redeliveries scheduled to

---

[3]    The Commission initiated Docket No. EL02-114 pursuant to Section 206 of the FPA. Hearing
       Order PP 2, 13 and Ordering Paragraph (A). Judge Massey directed Staff to file a statement of
       asserted violations identifying the violations that it intends to prove. Tr. 23:10. The procedural
       schedule is consistent with allocation of the burden of proof to Staff and Intervenors seeking a
       remedy, i.e., direct testimony filed by Staff and Intervenors, answering testimony filed by EPMI
       and Portland, and rebuttal testimony filed by Staff and Intervenors. Order Establishing Procedural
       Schedule (Sept. 6, 2002). Although the procedural schedule has been revised several times, the
       procedural framework has not been altered. Judge Massey and Staff acknowledged that Staff and
       Intervenors alleging claims against Enron bear the burden of proof in Docket No. EL02-114 and
       no party disagreed. Tr. 109:6-13; 268:20-21.

9

Exhibit 1
Page 41 of 143
Memo in Oppo

Exhibit A
Page 28 of 74
PGE's Complaint

LADWP were outside the supervision and knowledge of the California ISO since EPMI utilized transmission capacity which was outside the CAISO control area and not under the operational control of the CAISO.

1. EPMI's false congestion scheme violated CAISO Tariff Sections MMIP 2.1, MMIP 2.1.1, MMIP 2.1.1.3, MMIP 2.1.1.5, and MMIP 2.1.3, as described above.

2. EPMI's false congestion scheme constituted unjust and unreasonable practices under sections 205 and 206 of the FPA which may have adversely affected markets in California. Therefore, EPMI undermined the Commission's intent to ensure just and reasonable rates and practices in authorizing EPMI's market based rate tariff.

3. EPMI's scheme also violated Enron's own "Conduct of Business Affairs, Procedures for Use of Communication Services and Equipment," which states that communication services and equipment may not be used for any illegal/criminal activity or any activity that violates any Company policy.

4. EPMI's arrangement with PGE to implement its false congestion scheme violated sections 2, 3, and 5 of the Code of Conduct set forth in EPMI's Market Based Rate Tariff, Rate Schedule FERC No. 1, Revision No. 1. These provisions require EPMI operating personnel to function independently from PGE and prohibit PGE from giving to EPMI any undue preference with respect to transmission services or other regulated service.

19. The record filed in Docket No. EL02-114, including but not limited to testimony and exhibits, pleadings, depositions and responses to discovery requests, shall be transferred to Docket No. EL03-154 in its entirety, and may be used in Docket No. EL03-154 as if taken or procured in Docket No. EL03-154. All participants retain their rights to proceed under the rules pertaining to evidentiary objections and admissibility of evidence, and to present testimony and witnesses subject to rulings by the presiding judge in Docket No. EL03-154. All Signatories agree that insofar as any witness who has presented pre-filed sponsoring testimony or exhibits (collectively "Sponsored Testimony") which are transferred hereunder to the record in Docket No. EL03-154, no

10

Exhibit 1
Page 42 of 143
Memo in Oppo

Exhibit A
Page 29 of 74
PGE's Complaint

Signatory will oppose or object to any subpoena or deposition request by any other Signatory that may be necessary to secure such testimony in admissible form. As to Sponsored Testimony, each Signatory will endeavor in good faith to produce any such witness in person at the hearing, provided that no Signatory will be required to expend any money whatsoever to fulfill its good faith efforts; however, this provision will not be the basis for opposing or objecting to a subpoena or deposition request. The Signatory requesting the presence of or issuing a subpoena to a witness shall be required to bear the costs of that witness pursuant to Rule 510. In the event that such efforts to produce witnesses fail, any Signatory may secure such testimony in admissible form by proceeding to examine any such witness pursuant to Rule 404. Further, the deposition of such witness (including any cross-examination and re-direct during the deposition) may be used under Rule 405 (a) and (b) as if the witness were present, testifying and available for cross-examination during the hearing under Rule 506. No Signatory shall object to such evidence on the grounds that such testimony fails to comply with Rule 506. Notwithstanding this agreement to refrain from making objections about the manner in which the testimony is obtained, as stated above, participants shall retain their right to make all other evidentiary objections pursuant to the rules that are subject to a determination by the Presiding Judge in Docket No. EL03-154. Signatories do not waive any rights that such witnesses may have.

20.     In Docket No. EL02-114 the procedural schedule provided for additional testimony and exhibits to be filed by EPMI on September 29, 2003 and for rebuttal testimony and exhibits to be filed by Staff and Intervenors asserting claims against EPMI on October 8, 2003. These filing dates shall be revised to conform to the procedural

Exhibit 1
Page 43 of 143
Memo in Oppo

Exhibit A
Page 30 of 74
PGE's Complaint

schedule in Docket No. EL03-154. That is, under the present EL03-154 schedule, EPMI

testimony would be due on or before November 3, 2003 and Staff and Intervenors'

testimony would be due on or before December 23, 2003. Should the procedural

schedule change in Docket No. EL03-154, these testimony deadlines will follow suit.

21.     The Signatories agree to file appropriate pleadings and take other appropriate

actions in support of Commission approval of the Offer of Settlement.

## RESERVATIONS

22.     Neither the Signatories nor any other person or party shall be bound or prejudiced

by any part of this Agreement, unless it is approved by the Commission without

modification or condition and becomes effective in accordance with the provisions of this

Agreement.

23.     This Agreement is made upon the express understanding that it constitutes a

negotiated settlement in the above-captioned proceeding. Neither the Signatories nor any

other person or party shall be deemed to have approved, accepted, agreed to or otherwise

consented to any ratemaking, jurisdictional or tariff principle or methodology or damage

calculation, nor shall any party be deemed to have agreed to any principle of law

underlying, or supposed to underlie, any of the claims advanced or the matters resolved

under this Agreement. This Agreement shall not be deemed to establish a "settled

practice" as described in *Public Serv. Comm'n v. FERC*, 642 F. 2d 1335 (D.C. Cir 1980).

24.     The Offer of Settlement, and any Commission order approving the Offer of

Settlement, shall not be deemed or construed as an admission, or as evidence of

wrongdoing or violation of any law or regulation, including any Commission rule,

regulation, or order, by Portland. This Offer of Settlement is for purposes of this

12

Exhibit 1
Page 44 of 143
Memo in Oppo

**Exhibit A**
**Page 31 of 74**
**PGE's Complaint**

proceeding only and shall not be admissible as evidence in any form in any judicial or administrative proceeding for any reason other than to enforce its terms.

## EFFECTIVENESS

25. This Agreement shall not become effective until the Commission shall have issued a final order (i.e., an order that is not subject to further Commission review) approving the Offer of Settlement without modification or condition or, if modified or conditioned, upon its acceptance by the Signatories.

26. If Commission approval of the Offer of Settlement is conditioned or the Offer of Settlement is in any way modified, then within 20 days thereafter, a Signatory affected by such condition or modification shall be permitted to withdraw from the Offer of Settlement by providing written notice to the Commission and the other Signatories, and if it shall do so, then the Offer of Settlement, including this Agreement, shall not become effective as to that Signatory and the portion of the Settlement Amount, if any, to be paid to such Signatory shall not be paid. If a Signatory has not notified the Commission within 20 days of such condition or modification, then such Signatory shall be deemed to have accepted the conditions or modifications.

27. For purposes of the Offer of Settlement, the term "administratively and/or judicially final order" shall mean one that is no longer subject to review.

28. (a) Except for that portion allocated to the Oregon PUC on Exhibit A, Portland will pay the Settlement Amount (as per the allocations agreed upon by the Signatories) within thirty-five (35) days of Commission approval of the Offer of Settlement. In the event that the Offer of Settlement is contested and parties seek rehearing of the Commission's order, on such 35th day or a reasonable time thereafter, Portland shall

13

Exhibit 1
Page 45 of 143
Memo in Oppo

Exhibit A
Page 32 of 74
PGE's Complaint

deposit the Settlement Amount, less the portion allocated to the Oregon PUC on Exhibit A, into segregated interest bearing escrow accounts as per the allocations identified in Exhibit A, to be controlled by a neutral entity or person, and the amount in escrow will not be distributed until the entry of an administratively and/or judicially final order approving the Offer of Settlement.

(b) Within thirty-five (35) days of Commission approval of the Offer of Settlement, Portland will establish a credit account equal to the portion of the Settlement Amount allocated to the Oregon PUC on Exhibit A for the benefit of Portland's retail customers. Portland shall accrue interest on the credit account at a rate equal to the then current Oregon PUC approved overall rate of return for Portland. The credit account, together with any accrued interest shall be refunded or otherwise credited to Portland's retail customers pursuant to further order of the Oregon PUC; provided that, Blue Heron will not receive any further refunds or credits from the Oregon PUC's allocation and further provided, that in the event that the Offer of Settlement is contested and parties seek rehearing of the Commission's order, no refund will be ordered by the Oregon PUC until the entry of an administratively and/or judicially final order approving the Offer of Settlement.

(c) If this Offer of Settlement is ultimately rejected in an administratively and/or judicially final order, the Settlement Amount, plus interest, will be returned to Portland.

29. This Agreement shall be executed in any number of counterparts, each of which shall constitute an original and all of which shall constitute one and the same instrument.

14

Exhibit 1
Page 46 of 143
Memo in Oppo

**Exhibit A
Page 33 of 74
PGE's Complaint**

AGREED TO AND ACCEPTED THIS 25ᵗʰ DAY OF SEPTEMBER 2003:


_Hollis J. Alpert_

Hollis J. Alpert
Marcia C. Hooks
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426
(202) 502-8783

*Commission Staff Counsel*


Clifford M. Naeve
Richard L. Brusca
Cheryl M. Foley
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Ave., NW
Washington, DC 20005
(202) 371-7000


Bill Lockyer, California Attorney General
Tom Greene, Senior Assistant Attorney
  General
Vickie P. Whitney, Deputy Attorney
  General
1300 I Street, Suite 125
Sacramento, CA 95814
(916) 445-8194


Douglas R. Nichols
Vice President, General Counsel and Secretary
J. Jeffrey Dudley
Portland General Electric Company
121 SW Salmon Street
Portland, OR 97204
(503) 464-8000

*Counsel for Portland General Electric
Company*


Kevin J. McKeon
Lillian S. Harris
Hawke McKeon Sniscak & Kennard LLP
100 N. Tenth St., P.O. Box 1778
Harrisburg, PA 17105
 (717) 236-1300

*Attorneys for the People of the State of
California, ex rel. Bill Lockyer, Attorney
General of the State of California*


Michael J. Kurman
J. Michael Carr, Jr.
Arent Fox Kintner Plotkin & Kahn, PLLC
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5339
(202) 857-6345

*Counsel for City of Tacoma, Washington*


Exhibit 1
Page 47 of 143
Memo in Oppo

**Exhibit A
Page 34 of 74
PGE's Complaint**

AGREED TO AND ACCEPTED THIS 25<u>th</u> DAY OF SEPTEMBER 2003:


_(signature)_

Hollis J. Alpert
Marcia C. Hooks
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426
(202) 502-8783

Clifford M. Naeve
Richard L. Brusca
Cheryl M. Foley
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Ave., NW
Washington, DC 20005
(202) 371-7000

*Commission Staff Counsel*


_(signature)_

Bill Lockyer, California Attorney General
Tom Greene, Senior Assistant Attorney
  General
Vickie P. Whitney, Deputy Attorney
  General
1300 I Street, Suite 125
Sacramento, CA 95814
(916) 445-8194

Douglas R. Nichols
Vice President, General Counsel and Secretary
J. Jeffrey Dudley
Portland General Electric Company
121 SW Salmon Street
Portland, OR 97204
(503) 464-8000

*Counsel for Portland General Electric
Company*


Kevin J. McKeon
Lillian S. Harris
Hawke McKeon Sniscak & Kennard LLP
100 N. Tenth St., P.O. Box 1778
Harrisburg, PA 17105
 (717) 236-1300

Michael J. Kurman
J. Michael Carr, Jr.
Arent Fox Kintner Plotkin & Kahn, PLLC
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5339
(202) 857-6345

*Attorneys for the People of the State of
California, ex rel. Bill Lockyer, Attorney
General of the State of California*

*Counsel for City of Tacoma, Washington*

Exhibit 1
Page 48 of 143
Memo in Oppo

**Exhibit A**
**Page 35 of 74**
**PGE's Complaint**

AGREED TO AND ACCEPTED THIS 25 DAY OF SEPTEMBER 2003:

---

Hollis J. Alpert
Marcia C. Hooks
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426
(202) 502-8783

*Commission Staff Counsel*

---

Bill Lockyer, California Attorney General
Tom Greene, Senior Assistant Attorney
  General
Vickie P. Whitney, Deputy Attorney
  General
1300 I Street, Suite 125
Sacramento, CA 95814
(916) 445-8194

---

Kevin J. McKeon
Lillian S. Harris
Hawke McKeon Sniscak & Kennard LLP
100 N. Tenth St., P.O. Box 1778
Harrisburg, PA 17105
(717) 236-1300

*Attorneys for the People of the State of
California, ex rel. Bill Lockyer, Attorney
General of the State of California*

---

Clifford M. Naeve
Richard L. Brusca
Cheryl M. Foley
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Ave., NW
Washington, DC 20005
(202) 371-7000

---

Douglas R. Nichols
Vice President, General Counsel and Secretary
J. Jeffrey Dudley
Portland General Electric Company
121 SW Salmon Street
Portland, OR 97204
(503) 464-8000

*Counsel for Portland General Electric
Company*

---

Michael J. Kurman
J. Michael Carr, Jr.
Arent Fox Kintner Plotkin & Kahn, PLLC
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5339
(202) 857-6345

*Counsel for City of Tacoma, Washington*

Exhibit 1
Page 49 of 143
Memo in Oppo

**Exhibit A
Page 36 of 74
PGE's Complaint**

AGREED TO AND ACCEPTED THIS 25th DAY OF SEPTEMBER 2003:


Hollis J. Alpert
Marcia C. Hooks
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426
(202) 502-8783

*Commission Staff Counsel*


Bill Lockyer, California Attorney General
Tom Greene, Senior Assistant Attorney
  General
Vickie P. Whitney, Deputy Attorney
  General
1300 I Street, Suite 125
Sacramento, CA 95814
(916) 445-8194


Kevin J. McKeon
Lillian S. Harris
Hawke McKeon Sniscak & Kennard LLP
100 N. Tenth St., P.O. Box 1778
Harrisburg, PA 17105
 (717) 236-1300

*Attorneys for the People of the State of
California, ex rel. Bill Lockyer, Attorney
General of the State of California*


Clifford M. Naeve
Richard L. Brusca
Cheryl M. Foley
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Ave., NW
Washington, DC 20005
(202) 371-7000


Douglas R. Nichols
Vice President, General Counsel and Secretary
J. Jeffrey Dudley
Portland General Electric Company
121 SW Salmon Street
Portland, OR 97204
(503) 464-8000

*Counsel for Portland General Electric
Company*

Michael J. Kurman
J. Michael Carr, Jr.
Arent Fox Kintner Plotkin & Kahn, PLLC
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5339
(202) 857-6345

*Counsel for City of Tacoma, Washington*

Exhibit 1
Page 50 of 143
Memo in Oppo

**Exhibit A
Page 37 of 74
PGE's Complaint**

Jason W. Jones, Assistant Attorney General
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301-4096
(503) 378-6322

*Attorney for the Public Utility
Commission of Oregon*

Charles A. Moore
H. Liza Moses
Samuel G. Backfield
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
1000 Louisiana Street, Suite 1400
Houston, Texas 77002
(713) 287-2086

*Counsel for Enron Power Marketing, Inc*

Melinda J. Davison
Matthew Perkins
DAVISON VAN CLEVE, P.C.
1000 SW Broadway, Suite 2460
Portland, OR 97205
(503) 241-7242

*Counsel for Industrial Customers of Northwest
Utilities*

Melinda J. Davison
Matthew Perkins
DAVISON VAN CLEVE, P.C.
1000 SW Broadway, Suite 2460
Portland, OR 97205
(503) 241-7242

*Counsel for Blue Heron Paper Company*

Arocles Aguilar
Laurence G. Chaset
California Public Utilities Commission
505 Van Ness Ave.
San Francisco, CA 94102
(415) 355-5595

*Counsel for the Public Utilities Commission
of the State of California*

September 25th, 2003

Exhibit 1
Page 51 of 143
Memo in Oppo

**Exhibit A
Page 38 of 74
PGE's Complaint**

Charles A. Moore

---

Jason W. Jones, Assistant Attorney General
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301-4096
(503) 378-6322

*Attorney for the Public Utility
Commission of Oregon*

---

Charles A. Moore
H. Liza Moses
Samuel G. Backfield
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
1000 Louisiana Street, Suite 1400
Houston, Texas 77002
(713) 287-2086

*Counsel for Enron Power Marketing, Inc*

---

Melinda J. Davison
Matthew Perkins
DAVISON VAN CLEVE, P.C.
1000 SW Broadway, Suite 2460
Portland, OR 97205
(503) 241-7242

*Counsel for Industrial Customers of Northwest
Utilities*

---

Melinda J. Davison
Matthew Perkins
DAVISON VAN CLEVE, P.C.
1000 SW Broadway, Suite 2460
Portland, OR 97205
(503) 241-7242

*Counsel for Blue Heron Paper Company*

---

Arocles Aguilar
Laurence G. Chaset
California Public Utilities Commission
505 Van Ness Ave.
San Francisco, CA 94102
(415) 355-5595

*Counsel for the Public Utilities Commission
of the State of California*

September 25th, 2003

Exhibit 1
Page 52 of 143
Memo in Oppo

**Exhibit A
Page 39 of 74
PGE's Complaint**

Jason W. Jones, Assistant Attorney General
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301-4096
(503) 378-6322

*Attorney for the Public Utility
Commission of Oregon*

Melinda J. Davison
Matthew Perkins
DAVISON VAN CLEVE, P.C.
1000 SW Broadway, Suite 2460
Portland, OR 97205
(503) 241-7242

*Counsel for Industrial Customers of Northwest
Utilities*

Charles A. Moore
H. Liza Moses
Samuel G. Backfield
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
1000 Louisiana Street, Suite 1400
Houston, Texas 77002
(713) 287-2086

*Counsel for Enron Power Marketing, Inc*

Melinda J. Davison
Matthew Perkins
DAVISON VAN CLEVE, P.C.
1000 SW Broadway, Suite 2460
Portland, OR 97205
(503) 241-7242

*Counsel for Blue Heron Paper Company*

Arocles Aguilar
Laurence G. Chaset
California Public Utilities Commission
505 Van Ness Ave.
San Francisco, CA 94102
(415) 355-5595

*Counsel for the Public Utilities Commission
of the State of California*

September 25, 2003

Exhibit 1
Page 53 of 143
Memo in Oppo

**Exhibit A
Page 40 of 74
PGE's Complaint**

Jason W. Jones, Assistant Attorney General
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301-4096
(503) 378-6322

*Attorney for the Public Utility
Commission of Oregon*

Charles A. Moore
H. Liza Moses
Samuel G. Backfield
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
1000 Louisiana Street, Suite 1400
Houston, Texas 77002
(713) 287-2086

*Counsel for Enron Power Marketing, Inc*

Melinda J. Davison
Matthew Perkins
DAVISON VAN CLEVE, P.C.
1000 SW Broadway, Suite 2460
Portland, OR 97205
(503) 241-7242

*Counsel for Industrial Customers of Northwest
Utilities*

Melinda J. Davison
Matthew Perkins
DAVISON VAN CLEVE, P.C.
1000 SW Broadway, Suite 2460
Portland, OR 97205
(503) 241-7242

*Counsel for Blue Heron Paper Company*

Arocles Aguilar
Laurence G. Chaset
California Public Utilities Commission
505 Van Ness Ave.
San Francisco, CA 94102
(415) 355-5595

*Counsel for the Public Utilities Commission
of the State of California*

September 25, 2003

Exhibit 1
Page 54 of 143
Memo in Oppo

Exhibit A
Page 41 of 74
PGE's Complaint

TOTAL  P.02

# EXHIBIT A

## ALLOCATION OF SETTLEMENT AMOUNT

| | |
|---|---|
| California (payable to the Department of Water Resources Electric Power Fund) | $6.1 million |
| City of Tacoma, Washington | $1.1 million |
| Oregon PUC | $800,000 |
| Industrial Customers of Northwest Utilities | $250,000 |
| Blue Heron Paper Company | $250,000 |

A
1

Exhibit 1
Page 55 of 143
Memo in Oppo

**Exhibit A
Page 42 of 74
PGE's Complaint**

**EXHIBIT A-1**

## CITY OF TACOMA, WASHINGTON

**— Utilization of EL02-114-000 Settlement Proceeds —**

The City of Tacoma, Washington, a municipal corporation ("Tacoma"), owns and operates a municipal, load-serving electric utility -- doing business as Tacoma Power -- that serves approximately 148,000 metered customers.

In order to meet native load obligations, Tacoma purchased power from numerous sellers in the Western wholesale electricity market during the period under consideration in this proceeding, including purchases by Tacoma directly from Portland General Electric Company ("Portland"). In its initial testimony, filed on December 17, 2002 in this proceeding, Tacoma specified its refund claims against Portland relative to its wholesale purchases therefrom.

Accordingly, Tacoma itself is a wholesale market participant with direct claims for relief -- in the form of an allocation of the settlement proceeds -- in this proceeding. Tacoma, in turn, will utilize its agreed-upon allocation of the settlement proceeds to reduce the revenue requirements for which its retail ratepayers are responsible.

A-1

1

Exhibit 1
Page 56 of 143
Memo in Oppo

Exhibit A
Page 43 of 74
PGE's Complaint

# EXHIBIT A-2

## STATEMENT ON THE CALIFORNIA DEPARTMENT OF WATER RESOURCES ELECTRIC POWER FUND

The $6.1 million settlement funds allocated to California shall be payable to the Department of Water Resources Electric Power Fund, administered by the California Department of Water Resources (the "Department"). This will enable the refund to be utilized to reduce the amount for which ratepayers are responsible in satisfying the revenue requirement for the purchase of power by the Department that is delivered to retail end-use customers in California. The Department will administer the refunds to ensure that California ratepayers directly benefit.

The Department, through the creation of the separate division known as the California Resources Scheduling Division (CERS) in January 2001, was given the authority to purchase energy to meet the needs of retail end-use customers of the Investor Owned Utilities (IOUs) in California when they became regarded as no longer creditworthy in the California energy markets. CERS accounts for these energy purchase activities under the Electric Power Fund (EPF).

A Trust Indenture dated October 1, 2002 (as amended) is to authorize and secure the Department's Power Supply Revenue Bonds. The security for the bonds is a pledge of the Department's revenues arising from or in connection with the conduct of the Department's power program under state legislation. The Indenture governs the deposit and use of all Revenues, which includes as the primary source, revenue from ratepayers in the service territories of the IOUs. The Trust Indenture establishes a number of funds and accounts within the EPF (Section 502). Among those accounts established is the Operating Account. Section 503 of the Indenture requires all Power Charge Revenues and other Revenues, other than Bond Charge Revenues and certain Qualified Swap payments, to be deposited in the Operating Account.

Amounts in the Operating Account are used to pay, directly or indirectly, Department operating expenses including the cost of Department-purchased power that is delivered to retail end-use customers. These retail end-use customers are the customers of the three California IOUs, which include Pacific Gas and Electric Company (PG&E), Southern California Edison Company (Edison) and San Diego Gas & Electric Company (SDG&E).

Under section 80134(a) of the California Water Code, the Department is authorized and obligated to at least annually, and more frequently as required, establish and revise its revenue requirements sufficient, together with any monies on deposit in the fund, to cover all operating expenses and bond costs. Under California Water Code section 80110, the Department is entitled to recover as a revenue requirement, amounts and at the times necessary to enable it to comply with section 80134.

California Water Code section 80134(b) and the Rate Agreement obligate the Department to notify the California Public Utilities Commission ("CPUC") of its revenue

Exhibit 1
Page 57 of 143
Memo in Oppo

requirements. The CPUC covenants in the Rate Agreement (at Section 6.1(a) as to operating expenses and certain other costs) to calculate, revise, and impose charges on ratepayers, sufficient to provide moneys in the amounts and at the times necessary to satisfy the "Retail Revenue Requirements" specified by the Department.

Section 80116 of the California Water Code provides that the Department may sell power to retail end-use customers (i.e., ratepayers/customers of PG&E, Edison and SDG&E) at not more than the Department's total costs as provided in California Water Code section 80200 – i.e., charges to ratepayers cannot return to the Department more than its costs.

The Rate Agreement, at Section 4.1(c) provides that the Department's Retail Revenue Requirements must take into account whatever monies it has on hand and any anticipated surpluses. As a result, at such time as the settlement in this matter is approved and the payments received by the Department, they will be deposited into the EPF Operating Account. Thus, the next time the Department determines its revenue requirement, the $6.4 million settlement funds will be taken into account by the Department by way of a reduction in the Retail Revenue Requirement to be satisfied by Department charges to be established by the CPUC.

A-2
2

Exhibit 1
Page 58 of 143
Memo in Oppo

Exhibit A
Page 45 of 74
PGE's Complaint

# EXHIBIT A-3

## THE PUBLIC UTILITY COMMISSION OF OREGON

### --Utilization of EL02-114-000 Settlement Proceeds--

The Public Utility Commission of Oregon ("OPUC") is a state governmental entity regulating utility industries in the State of Oregon. The OPUC's primary responsibility is to ensure that customers receive adequate service at fair and reasonable rates. The settlement funds allocated to the OPUC will directly benefit the retail customers of Portland General Electric Company ("PGE").

As part of the settlement, PGE will establish a credit account of $800,000 for the benefit of PGE's retail customers. The account will accrue interest at the rate equal to the then current OPUC approved overall rate of return for PGE. The OPUC will order that the credit account and accrued interest will be refunded or otherwise credited to PGE's retail customers.

A-3

1

Exhibit 1
Page 59 of 143
Memo in Oppo

**Exhibit A**
**Page 46 of 74**
**PGE's Complaint**

**EXHIBIT A-4**

**BLUE HERON PAPER COMPANY**

– Utilization of EL02-114-000 Settlement Proceeds –

Blue Heron Paper Company ("Blue Heron") is a Delaware Corporation with its principal place of business in Oregon City, Oregon. Blue Heron produces newsprint and specialty papers at its Oregon City paper mill and is a customer of Portland General Electric ("Portland").

In May 2000, Blue Heron purchased its Oregon City paper mill from Smurfit Newsprint ("Smurfit") and assumed the terms of an Agreement for Electric Power Service (the "Agreement") between Smurfit and Portland. Blue Heron's power costs under the Agreement were based entirely on Dow Jones California-Oregon Border Index market prices. Also in May 2000, the extreme instability and price volatility in the Western electric markets during this period led to excessive power costs for Blue Heron. During the period that Blue Heron was on a market-based price index for the calculation of its energy charges from Portland, Blue Heron's charges for electric service were substantially higher than Portland's cost of service rate.

Accordingly, Blue Heron was a customer of Portland taking service under a market-based tariff from May to July 2000, and Blue Heron has a direct claim for relief in this proceeding. Blue Heron will utilize its agreed upon allocation of the settlement proceeds to offset the cost of electric service from Portland.

Exhibit 1
Page 60 of 143
Memo in Oppo

Exhibit A
Page 47 of 74
PGE's Complaint

<u>**INDUSTRIAL CUSTOMERS OF NORTHWEST UTILITIES**</u>

**-- Utilization of EL02-114-000 Settlement Proceeds --**

Industrial Customers of Northwest Utilities ("ICNU") is an incorporated, non-profit association of large industrial electric customers in the Pacific Northwest, with offices in Portland, Oregon. Many of ICNU's members are retail electric service customers of Portland General Electric ("Portland").

Many of ICNU's members received electric service from Portland during the period of electric market instability of 2000 and 2001, and certain ICNU members took electric service from Portland under tariffs priced at market-based rates during this time period. Accordingly, in this proceeding, ICNU has claims for relief from Portland on behalf of its members. ICNU will distribute its allocation of the settlement proceeds to members who have been affected by market instability in order to allow those members to offset the cost of electric service from Portland.

A-5

1

Exhibit 1
Page 61 of 143
Memo in Oppo

Exhibit A
Page 48 of 74
PGE's Complaint

## TABLE OF CONTENTS

*Sheet
Number*

1.0   Availability ..................................................................................................2

2.0   Applicability ................................................................................................2

3.0   Character of Service......................................................................................2

4.0   Rates.............................................................................................................2

5.0   Service Agreements ......................................................................................3

6.0   Transmission Service ....................................................................................4

7.0   Other Terms and Conditions..........................................................................4

       SCHEDULE A.............................................................................................4A

       CODE OF CONDUCT...................................................................................5

Issued by:  James Lobdell
            Vice President, Power Operations
Issued on:  September __, 2003

Effective:  Effective Date

Exhibit 1
Page 62 of 143
Memo in Oppo

Exhibit A
Page 49 of 74
PGE's Complaint

## PORTLAND GENERAL ELECTRIC COMPANY
## FERC ELECTRIC TARIFF
## FIFTH REVISED VOLUME NO. 11
## MARKET-BASED RATES TARIFF

1.   AVAILABILITY

1.1   This Electric Tariff applies to the sale of electric capacity and/or energy by Portland General Electric Company to a Buyer, including an affiliate, at wholesale pursuant to a signed service agreement between Portland General Electric Company and the Buyer. Portland General Electric Company will not make any sale of energy or capacity to, or purchase of energy or capacity from PG&E Energy Services Corporation absent the Commission's approval of the sale or purchase under Section 205 of the Federal Power Act.

1.2   This Electric Tariff also makes available for sale to the California Independent System Operator Corporation, its suppliers and market participants and duly registered scheduling coordinators, and the California Department of Water Resources, Replacement Reserve Service and the following ancillary services as defined by the California ISO Tariff, as it may be amended from time to time: Regulation Service, Spinning Reserve Service, and Non-Spinning Reserve Service, ("California Ancillary Services").

2.   APPLICABILITY

2.1   Except as provided in Schedule A, this Electric Tariff is applicable to all sales of electric capacity and/or energy at wholesale unless such sales are made pursuant to another rate schedule or Electric Tariff of Portland General Electric Company.

2.2   Portland General Electric Company may also sell California Ancillary Services to the California Independent System Operator Corporation, its suppliers and market participants and duly registered scheduling coordinators and the California Department of Water Resources.

3.   CHARACTER OF SERVICE

3.1   Portland General Electric Company may provide capacity and/or energy, and/or California Ancillary Services under this tariff in varying amounts, at varying levels of firmness or priorities of service, for varying periods of service, and in accordance with varying delivery schedules, as agreed to between the Buyer and Portland General Electric Company.

4.   RATES

4.1   All sales hereunder shall be made at rates established by agreement between the Buyer and Portland General Electric Company.

4.2   Portland General Electric Company will sell capacity and/or energy to its power marketing affiliates at a rate that is no lower than the rate it charges non-affiliates. Portland General Electric Company will purchase capacity and/or energy from marketing affiliates at the

Issued by:  James Lobdell
            Vice President, Power Operations
Issued on:  September __, 2003

Effective:  Effective Date

Exhibit 1
Page 63 of 143
Memo in Oppo

Exhibit A
Page 50 of 74
PGE's Complaint

# SCHEDULE A

## 12-MONTH CAP ON MARKET-BASED RATES FOR AFFECTED TRANSACTIONS

This schedule places a twelve-month cap on sales under this tariff of capacity and/or energy, entered into by Portland General Electric Company during the twelve-month period beginning on the day following the date of issuance of a Commission order approving the Offer of Settlement filed by Portland General Electric Company and signing parties in Docket No. EL02-114 ("Effective Date").

1.  Definitions

    a.  Affected Transactions shall be sales under this tariff of capacity and/or energy entered into by Portland General Electric Company during the Applicable Period.

    b.  Applicable Period shall be the 12-month period beginning on the day following issuance of a Commission order approving the Offer of Settlement in Docket No. EL02-114.

    c.  Customer shall mean the party purchasing capacity and/or energy from Portland General Electric Company.

    d.  Third Party shall mean any person not owned, managed, controlled, or directed by Portland General Electric Company.

2.  Compensation

    a.  Prices charged for Affected Transactions for delivery during the Applicable Period shall not exceed the charges set forth in this Section.

    b.  Compensation for the supply and delivery of capacity and/or energy shall be no greater than the sum of the following rates for the transaction:

        i.  Demand charge ("Demand Charge"):

            (1)  At the rate of up to $ 7.32 per kilowatt reserved per month, or

            (2)  At the rate of up to $ 1.68 per kilowatt reserved per week, or

            (3)  At the rate of up to $ 0.3378 per kilowatt reserved per day, subject to the limitation that the total Demand Charge in any consecutive seven-day period shall not exceed the product of

Issued by:  James Lobdell
            Vice President, Power Operations
Issued on:  September __, 2003

Effective: Effective Date

Exhibit 1
Page 64 of 143
Memo in Oppo

Exhibit A
Page 51 of 74
PGE's Complaint

the highest number of kilowatts reserved on any day in the seven-day period and $ 1.68, or

    (4)    At the rate of up to $21.11 per megawatt reserved per hour, subject to the limitation that the total Demand Charge in any consecutive seven-day period shall not exceed the product of the highest number of kilowatts reserved in any hour in the seven-day period and $ 1.68. In addition, the total Demand Charge in any day shall not exceed the product of the highest number of kilowatts reserved in any hour in the day and $ 0.3378.

  ii.    Energy charge ("Energy Charge"):

    (1)    For energy generated by Portland General Electric Company: The Energy Charge per megawatt-hour delivered is up to 100% of Portland General Electric Company's actual out of pocket cost of supplying energy.

    (2)    For energy purchased from a Third Party to supply energy: The amount paid by Portland General Electric Company, plus the cost of any Third Party transmission charges and losses and any applicable taxes borne by Portland General Electric Company.

3.    Other Arrangements:

a.    Prices charged for Affected Transactions for delivery during the Applicable Period shall not exceed the charges set forth in this Section.

b.    Customer Supplied Fuel: Upon mutual agreement of the parties, Customers may supply fuel to Portland General Electric Company. In such event, the charges will not exceed the sum of the Demand Charge and Energy Charge in subsections 2(b)(i) and 2(b)(ii).

c.    Exchange: At the time an exchange is agreed to, Parties shall agree on the type of exchange as one of the following: (a) kilowatt for kilowatt exchange with no Demand Charge or Energy Charge provided the exchange ratio does not exceed 1.5 to 1.0, (b) kilowatt-hour for kilowatt-hour with no Demand Charge or Energy Charge provided the exchange ratio does not exceed 1.5 to 1.0, (c) up to the Demand Charges specified in subsection 2(b)(i) and energy is returned in kind as mutually agreed, or (d) a rate of exchange where the value to Portland General Electric Company of energy received, as measured by Portland General Electric Company's out of pocket costs at the time of receipt, does not exceed the cumulative rate caps for capacity and energy. Should Portland General Electric Company resell the capacity

Issued by:  James Lobdell                  Effective: Effective **Date**
            Vice President, Power Operations
Issued on:  September __, 2003

Exhibit 1
Page 65 of 143
Memo in Oppo

**Exhibit A**
**Page 52 of 74**
**PGE's Complaint**

and energy received in an exchange, the rates for the subsequent resale of such exchange shall not exceed the Demand Charge and Energy Charge in subsections 2(b)(i) and 2(b)(ii).

d.    Option: At the time an option is agreed to, Parties will agree on the terms of the transaction, provided that the compensation to Portland General Electric Company will in no event exceed the Demand Charge in subsection 2(b)(i) above. Parties will agree on compensation that is due whether or not the Customer exercises the option as well as additional charges that are due if the Customer exercises the option. The total compensation for the option shall, in no event exceed the Demand Charge and Energy Charge in subsections 2(b)(i) and 2(b)(ii).

e.    Kilowatt-hour denominated rate: Parties may agree to fixed rates per kilowatt-hour for the term of a transaction provided, however, in no case shall the compensation, during the Applicable Period, exceed the Demand Charge and Energy Charge above.

Issued by:  James Lobdell
            Vice President, Power Operations
Issued on:  September ___, 2003

Effective: Effective Date

Exhibit 1              Exhibit A
Page 66 of 143         Page 53 of 74
Memo in Oppo           PGE's Complaint

## TABLE OF CONTENTS

*Sheet
Number*

1.0   Availability ..................................................................................................2

2.0   Applicability ................................................................................................2

3.0   Character of Service....................................................................................2

4.0   Rates............................................................................................................2

5.0   Service Agreements .....................................................................................3

6.0   Transmission Service ..................................................................................4

7.0   Other Terms and Conditions......................................................................4

      SCHEDULE A.............................................................................................4A

      CODE OF CONDUCT............…...............................................................5

~~Issued by: Mary Turina   Vice President, Power Supply~~   Effective: ~~February 8, 2001~~ <u>Effective Date</u>
<u>Issued by: James Lobdell</u>
      <u>Vice President, Power Operations</u>
Issued on:<u>February 8, 2001 September ___, 2003</u>

Exhibit 1
Page 67 of 143
Memo in Oppo

**Exhibit A
Page 54 of 74
PGE's Complaint**

# PORTLAND GENERAL ELECTRIC COMPANY
# FERC ELECTRIC TARIFF
# FIFTH REVISED VOLUME NO. 11
# MARKET-BASED RATES TARIFF

1.  AVAILABILITY

1.1   This Electric Tariff applies to the sale of electric capacity and/or energy by Portland General
      Electric Company to a Buyer, including an affiliate, at wholesale pursuant to a signed service
      agreement between Portland General Electric Company and the Buyer. Portland General
      Electric Company will not make any sale of energy or capacity to, or purchase of energy or
      capacity from PG&E Energy Services Corporation absent the Commission's approval of the
      sale or purchase under Section 205 of the Federal Power Act.

1.2   This Electric Tariff also makes available for sale to the California Independent System
      Operator Corporation, its suppliers and market participants and duly registered scheduling
      coordinators, and the California Department of Water Resources, Replacement Reserve
      Service and the following ancillary services as defined by the California ISO Tariff, as it may
      be amended from time to time:   Regulation Service, Spinning Reserve Service, and Non-
      Spinning Reserve Service, ("California Ancillary Services").

2.  APPLICABILITY

2.1   ThisExcept as provided in Schedule A, this Electric Tariff is applicable to all sales of electric
      capacity and/or energy at wholesale unless such sales are made pursuant to another rate
      schedule or Electric Tariff of Portland General Electric Company.

2.2   Portland General Electric Company may also sell California Ancillary Services to the
      California Independent System Operator Corporation, its suppliers and market participants and
      duly registered scheduling coordinators and the California Department of Water Resources.

3.  CHARACTER OF SERVICE

3.1   Portland General Electric Company may provide capacity and/or energy, and/or California
      Ancillary Services under this tariff in varying amounts, at varying levels of firmness or
      priorities of service, for varying periods of service, and in accordance with varying delivery
      schedules, as agreed to between the Buyer and Portland General Electric Company.

4.  RATES

4.1   All sales hereunder shall be made at rates established by agreement between the Buyer and
      Portland General Electric Company.

4.2   Portland General Electric Company will sell capacity and/or energy to its power marketing
      affiliates at a rate that is no lower than the rate it charges non-affiliates. Portland General
      Electric Company will purchase capacity and/or energy from marketing affiliates at the

Issued by: Mary Turina  James Lobdell          Effective: April 26, 2001Effective Date
        Vice President, Power Supply Operations
Issued on: May 15, 2001 September ___, 2003

                                              Exhibit 1              Exhibit A
                                              Page 68 of 143         Page 55 of 74
                                              Memo in Oppo           PGE's Complaint

# SCHEDULE A

## 12-MONTH CAP ON MARKET-BASED RATES FOR AFFECTED TRANSACTIONS

This schedule places a twelve-month cap on sales under this tariff of capacity and/or energy, entered into by Portland General Electric Company during the twelve-month period beginning on the day following the date of issuance of a Commission order approving the Offer of Settlement filed by Portland General Electric Company and signing parties in Docket No. EL02-114 ("Effective Date").

1.    Definitions

    a.    Affected Transactions shall be sales under this tariff of capacity and/or energy entered into by Portland General Electric Company during the Applicable Period.

    b.    Applicable Period shall be the 12-month period beginning on the day following issuance of a Commission order approving the Offer of Settlement in Docket No. EL02-114.

    c.    Customer shall mean the party purchasing capacity and/or energy from Portland General Electric Company.

    d.    Third Party shall mean any person not owned, managed, controlled, or directed by Portland General Electric Company.

2.    Compensation

    a.    Prices charged for Affected Transactions for delivery during the Applicable Period shall not exceed the charges set forth in this Section.

    b.    Compensation for the supply and delivery of capacity and/or energy shall be no greater than the sum of the following rates for the transaction:

        i.    Demand charge ("Demand Charge"):

            (1)    At the rate of up to $ 7.32 per kilowatt reserved per month, or

            (2)    At the rate of up to $ 1.68 per kilowatt reserved per week, or

Issued by:  James Lobdell               Effective: Effective Date
         Vice President, Power Operations
Issued on:  September __, 2003

Exhibit 1
Page 69 of 143
Memo in Oppo

Exhibit A
Page 56 of 74
PGE's Complaint

   (3) At the rate of up to $ 0.3378 per kilowatt reserved per day, subject to the limitation that the total Demand Charge in any consecutive seven-day period shall not exceed the product of the highest number of kilowatts reserved on any day in the seven-day period and $ 1.68, or

   (4) At the rate of up to $21.11 per megawatt reserved per hour, subject to the limitation that the total Demand Charge in any consecutive seven-day period shall not exceed the product of the highest number of kilowatts reserved in any hour in the seven-day period and $ 1.68. In addition, the total Demand Charge in any day shall not exceed the product of the highest number of kilowatts reserved in any hour in the day and $ 0.3378.

  ii. Energy charge ("Energy Charge"):

   (1) For energy generated by Portland General Electric Company: The Energy Charge per megawatt-hour delivered is up to 100% of Portland General Electric Company's actual out of pocket cost of supplying energy.

   (2) For energy purchased from a Third Party to supply energy: The amount paid by Portland General Electric Company, plus the cost of any Third Party transmission charges and losses and any applicable taxes borne by Portland General Electric Company.

 3. Other Arrangements:

  a. Prices charged for Affected Transactions for delivery during the Applicable Period shall not exceed the charges set forth in this Section.

  b. Customer Supplied Fuel: Upon mutual agreement of the parties, Customers may supply fuel to Portland General Electric Company. In such event, the charges will not exceed the sum of the Demand Charge and Energy Charge in subsections 2(b)(i) and 2(b)(ii).

  c. Exchange: At the time an exchange is agreed to, Parties shall agree on the type of exchange as one of the following: (a) kilowatt for kilowatt exchange with no Demand Charge or Energy Charge

Issued by: James Lobdell                                              Effective: Effective Date
    Vice President, Power Operations
Issued on: September ___, 2003

              Exhibit 1   Exhibit A
              Page 70 of 143 Page 57 of 74
              Memo in Oppo PGE's Complaint

provided the exchange ratio does not exceed 1.5 to 1.0, (b) kilowatt-hour for kilowatt-hour with no Demand Charge or Energy Charge provided the exchange ratio does not exceed 1.5 to 1.0, (c) up to the Demand Charges specified in subsection 2(b)(i) and energy is returned in kind as mutually agreed, or (d) a rate of exchange where the value to Portland General Electric Company of energy received, as measured by Portland General Electric Company's out of pocket costs at the time of receipt, does not exceed the cumulative rate caps for capacity and energy. Should Portland General Electric Company resell the capacity and energy received in an exchange, the rates for the subsequent resale of such exchange shall not exceed the Demand Charge and Energy Charge in subsections 2(b)(i) and 2(b)(ii).

d.   Option: At the time an option is agreed to, Parties will agree on the terms of the transaction, provided that the compensation to Portland General Electric Company will in no event exceed the Demand Charge in subsection 2(b)(i) above. Parties will agree on compensation that is due whether or not the Customer exercises the option as well as additional charges that are due if the Customer exercises the option. The total compensation for the option shall, in no event exceed the Demand Charge and Energy Charge in subsections 2(b)(i) and 2(b)(ii).

e.   Kilowatt-hour denominated rate: Parties may agree to fixed rates per kilowatt-hour for the term of a transaction provided, however, in no case shall the compensation, during the Applicable Period, exceed the Demand Charge and Energy Charge above.

Issued by: James Lobdell                                    Effective: Effective Date
            Vice President, Power Operations
Issued on: September ___, 2003                  Exhibit 1          Exhibit A
                                                Page 71 of 143    Page 58 of 74
                                                Memo in Oppo      PGE's Complaint

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Portland General Electric Company | ) | Docket No. EL02-114-000 |
| Enron Power Marketing, Inc. | ) | EL02-115-001 |

## EXPLANATORY STATEMENT IN SUPPORT OF OFFER OF SETTLEMENT
## AND AGREEMENT AND STIPULATION

Portland General Electric Company ("Portland"), the Commission Trial Staff

("Staff"), the California Attorney General ("California AG"), the California Public

Utilities Commission ("CPUC"), the City of Tacoma, Washington ("Tacoma"), the

Oregon Public Utility Commission ("Oregon PUC"), Enron Power Marketing, Inc.

("Enron" or "EPMI"), Industrial Customers of Northwest Utilities ("ICNU"), and Blue

Heron Paper Company ("Blue Heron") (together, the "Signatories") jointly submitted an

Offer of Settlement ("Offer of Settlement") for certification to the Commission in full and

final resolution of the Portland issues that were set for hearing on August 13, 2002 in the

above-captioned proceeding. The Signatories have been advised by the remaining parties

to the proceeding that the Offer of Settlement is not opposed.

## BACKGROUND

During the course of the Commission's fact-finding investigation into potential

manipulation of electric prices in Docket No. PA02-2, Portland conducted an internal

investigation that disclosed certain posting errors with respect to its trades with its

affiliate EPMI. At Portland's request, a meeting was held with Commission Enforcement

Staff on April 15, 2002 to report and provide information with regard to these errors.

After receiving Enron memoranda describing trading strategies allegedly

employed by Enron's electricity traders in the West, the Commission, on May 8, 2002,

Exhibit 1
Page 72 of 143
Memo in Oppo

**Exhibit A**
**Page 59 of 74**
**PGE's Complaint**

issued data requests to identified sellers of wholesale electricity and/or ancillary services in the West seeking information about their knowledge and use of the Enron trading strategies. Portland responded to this data request on May 22, 2002 (even though Portland had not been served) and to two similar requests dated May 21 and May 22, 2002.

Based on Portland's May 22, 2002 response, on June 4, 2002, the Commission issued a show cause order to Portland directing it to show cause why its market-based—rate authority should not be revoked. *See* 99 FERC ¶ 61,272 (2002). Portland provided data regarding its purchases and sales during 2000-2001 and related trading and transmission transcripts.

Using Enforcement Staff's definition of what constituted a posting error, Portland had performed a comprehensive analysis of its affiliate trades over the period 1999-2001 and, on August 1, 2002, provided Enforcement Staff with a complete list of transactions for which posting had not been made in accordance with the Enforcement Staff's criteria.

On August 13, 2002, the Commission instituted a proceeding under Section 206 of the Federal Power Act, 16 U.S.C. § 824e, setting for hearing the issues of "possible violations by Portland . . .of [its code of conduct] or market-based rate tariffs and the Commission's standards of conduct, and the imposition of any appropriate remedies...[and] the issue of whether Portland has in fact provided all relevant information in the investigation and what the appropriate remedies for any failure should be, including whether Portland's market-based rate authority should be revoked." *Portland General Elec. Co.*, 100 FERC ¶ 61,186 (2002) ("Hearing Order"). The

2          Exhibit 1          **Exhibit A**
           Page 73 of 143    **Page 60 of 74**
           Memo in Oppo      **PGE's Complaint**

presiding administrative law judge was appointed by Chief Administrative Law Judge Wagner by order dated August 23, 2002.

## STATEMENT ADDRESSING PUBLIC INTEREST AND POLICY IMPLICATIONS

This Offer of Settlement was reached after months of investigation by Staff and certain of the Intervenors into Portland's activities during 2000 and 2001, and after the filing of several rounds of testimony, followed by diligent and productive settlement negotiations. The Offer of Settlement resolves the issues described in the Hearing Order, as set forth above, without requiring full litigation and decision on the legal issues by the Commission, thereby setting no precedent on issues that may still be before the Commission in other dockets and creating no policy implications. Further, although the issues involved may be of first impression (whether Portland violated its market-based rate tariff in its dealings with its affiliate and in its alleged participation in circular schedules under the facts and circumstances of the case), the Offer of Settlement does not make or require findings as to the propriety or legality of Portland's actions, and therefore, does not prejudice the Commission in its review of similar issues in the future.

## REQUEST FOR EXPEDITIOUS CERTIFICATION AND REFERENCE TO RELATED JOINT MOTIONS

All participants who have filed testimony in this proceeding join the Offer of Settlement. The result is a settlement that is fully consistent with the public interest, and which should be certified to the Commission expeditiously. Consistent with this request, the Signatories, by separate motion filed concurrently, ask that the Chief Judge and the Presiding Judge suspend the procedural schedule in this proceeding, pending review by the Presiding Judge of this Offer of Settlement and pending Commission action.

3

Exhibit 1
Page 74 of 143
Memo in Oppo

**Exhibit A**
**Page 61 of 74**
**PGE's Complaint**

Additionally, by separate motion filed concurrently, the Signatories are filing with the Commission a motion to transfer the issues in this docket related to EPMI to Docket No. EL03-154 conditioned upon ultimate Commission approval of this Offer of Settlement. In that respect only, the Offer of Settlement affects Docket No. EL03-154, as consolidated in *American Electric Power Services, Inc., et al.*, Docket Nos. EL03-137, *et al.*

## SECTION-BY-SECTION ANALYSIS OF THE OFFER OF SETTLEMENT AS TO PORTLAND GENERAL ELECTRIC COMPANY

**ARTICLE I. PROCEDURAL HISTORY.**

Article I contains a detailed description of the events that led to the institution of this proceeding, the investigation that followed (including the scope and types of information provided by Portland), the testimony that has been filed, the assertions made against Portland and its responses, and the current procedural posture of the case. This Article explains that the Signatories make no determination regarding any of the alleged violations. Rather, the Offer of Settlement includes an Agreement and Stipulation ("Agreement") that sets forth the Signatories' stipulation as to undisputed facts and agreement on certain remedies and conditions as a means to resolve this proceeding. It also explains that the Offer of Settlement is conditioned on the Commission making no adverse findings as to Portland (other than the simple finding that there were posting errors, and nothing more) in an order that approves the Offer of Settlement in its entirety, without modification or condition.

4

Exhibit 1
Page 75 of 143
Memo in Oppo

Exhibit A
Page 62 of 74
PGE's Complaint

## ARTICLE II. THE OFFER OF SETTLEMENT IS IN THE PUBLIC INTEREST.

Article II explains that the Signatories have been advised that the Offer of Settlement is uncontested. It further explains that the Agreement addresses the issues identified in the Hearing Order (as described above) without the need for full litigation and a decision on the merits by the Commission, and it establishes both a $8.5 million monetary remedy to be paid to the benefit of consumers and wholesale market participants, and a suspension of Portland's market-based rate authority. The Agreement also serves the public interest by increasing Portland's training and related document retention for code of conduct and affiliate issues (including maintenance for five years of Portland's recordings of affiliate trading transactions, postings and related accounting records.) Finally, the Agreement resolves proceedings pending before administrative agencies other than the Commission, as well as certain court proceedings, and commits Portland's cooperation in other ongoing investigations.

## ARTICLE III. DISTRIBUTION OF THE SETTLEMENT AMOUNT.

Article III of the Offer of Settlement references the Settlement Amount, Exhibit **A** of the Agreement (that sets forth the allocation of the Settlement Amount to specified entities) and Exhibits A-1, A-2, A-3, A-4 and A-5 (that describe how the funds will benefit retail customers.)

## ARTICLE IV. THE REMAINING ALLEGATIONS AS TO EPMI SHOULD BE TRANSFERRED TO DOCKET NO. EL03-154.

Article IV explains that the Offer of Settlement resolves only issues related to Portland, and is expressly conditioned on the transfer of allegations relating to EPMI to the pending proceeding in Docket No. EL03-154, consolidated with Docket Nos. EL03-137, *et al.*, where alleged gaming practices are already the subject of a pending

5

Exhibit 1
Page 76 of 143
Memo in Oppo

Exhibit A
Page 63 of 74
PGE's Complaint

proceeding. It also explains that the subject matter of Docket Nos. EL03-137, *et al.* includes alleged circular schedule transactions, the same gaming practice in dispute in this proceeding, and that the parties prefer to pursue the EPMI allegations in that docket, both to avoid duplication and to maximize global settlement possibilities.

Article IV expresses EPMI's support for the transfer, provided that the substantive and procedural issues set out in the Hearing Order, including the burden of proof, do not change. Article IV then summarizes the conditions of the transfer, which are more fully and expressly set forth in the Agreement. Finally, Article IV recognizes that the Commission has jurisdiction over the requested transfer, and relates that the Signatories are concurrently filing with the Commission a separate, conditional Joint Motion to Transfer.

## ARTICLE V. PROCEDURE FOR PARTIES THAT CONTEST SETTLEMENT.

Article V explains that the Offer of Settlement is either joined or unopposed by all of the participants in the proceeding (the "settling parties"), and that it is signed by all of the participants that have filed testimony. The Signatories are unaware of any party that intends to contest the Offer of Settlement. If, however, any party does contest the Offer of Settlement, Article V requests that it be certified to the Commission as uncontested as to the settling parties. To the extent that any party contests the Offer of Settlement, Article V requests that those parties be severed for purposes of hearing and decision. Commission case law supporting this procedure is cited. In this event, Article V provides that the hearing process that remains as of the date of the filing of the Offer of Settlement be rescheduled as to the contesting parties. Article V then explains that any contesting party has failed to avail itself of the opportunity to file testimony or present evidence, and

6

Exhibit 1
Page 77 of 143
Memo in Oppo

**Exhibit A**
**Page 64 of 74**
**PGE's Complaint**

that reinstituting the litigation schedule in precisely the posture in which it currently

stands is the most equitable and non-prejudicial way to ensure that Portland will not be

unfairly disadvantaged.

## ARTICLE VI. REQUEST FOR EXPEDITIOUS CERTIFICATION AND COMMISSION APPROVAL.

Article VI explains that the Offer of Settlement not only resolves an extended and

complex set of issues, but also, it includes procedural provisions, the timing of which

affects all parties. It cites the transfer of the EPMI issues to Docket No. EL03-154, and

the procedural schedule that has been established for the consolidated Docket No. EL03-

137, et al. cases, and it also refers to the possible need to sever the instant proceeding as

to contesting parties, if any. For these reasons, the Signatories request expeditious

treatment of the Offer of Settlement in Article VI.

## ARTICLE VII. CONCLUSION.

Article VII explains that the Offer of Settlement represents a delicate balance of

interests, negotiated over a period of several months, and requests that it be certified to

and approved by the Commission as a full and final resolution of the issues set for

hearing as to Portland, without condition or modification.


## SECTION-BY-SECTION ANALYSIS OF THE AGREEMENT AND STIPULATION

## BACKGROUND AND STIPULATED FACTS

The first paragraph of this section sets forth the identity of the Signatories and

incorporates by reference the Offer of Settlement. Paragraph 2 then describes Portland as

an integrated electric utility, serving customers at retail in Oregon and as a participant in

7

Exhibit 1
Page 78 of 143
Memo in Oppo

**Exhibit A**
**Page 65 of 74**
**PGE's Complaint**

the wholesale power market. Paragraph 3 describes Portland's relationship as an affiliate of Enron and EPMI and the conditions under which it may buy or sell capacity or energy to affiliates under its market-based rate authority.

Paragraph 4 of the section explains how Portland discovered and self-reported affiliate posting errors to the Commission's Enforcement Staff in 2002, describes the types of errors found or alleged, and relates the actions Portland took upon discovery of the errors.

Paragraph 5 of the section provides a description of a series of transactions (the "17-day transactions") totaling 2,529 MWhs in April through June, 2000, in which Portland may have provided service to EPMI that comprised one leg of the alleged EPMI circular schedules.

Finally, paragraph 6 of the section stipulates that Portland cooperated with the Commission's investigation in Docket No. PA02-2, with the June 4, 2002 show cause order, and with Staff's investigation in this docket.

## REMEDIES AND CONDITIONS OF SETTLEMENT

This section explains that the Agreement constitutes a full and final resolution of the issues set for hearing in the Hearing Order, is a compromise of disputed and uncertain claims, shall not be deemed an admission of liability by Portland for any reason, implies no admission or fault by Portland and is conditioned upon the Commission making no adverse findings as to Portland (other than the simple finding that there were posting errors) in its order approving the settlement.

Paragraph 9 of the section explains that Portland agrees to pay a Settlement Amount of $8.5 million, which does not constitute a penalty or fine and which is to be

8

Exhibit 1
Page 79 of 143
Memo in Oppo

**Exhibit A**
**Page 66 of 74**
**PGE's Complaint**

allocated to entities in California and Oregon and to Tacoma, ICNU and Blue Heron, as set forth in Exhibit A. Paragraph 10 provides that, for a period of twelve months, Portland's market-based rate authority will be amended (suspended as to new transactions) to include a cost-based rate cap on transactions entered into after the amendment becomes effective. The tariff amendment is attached to the Agreement as Exhibit B. Paragraphs 11 and 12 of the section provide that Portland will increase training and related document retention on code of conduct and affiliate issues and that it will maintain, for five years, recordings of affiliate trading transactions, affiliate postings and related accounting records. Paragraph 13 provides that Portland agrees to cooperate with the California AG in its investigations of electric power and gas markets in California.

Paragraph 14 provides that the Signatories will not pursue the issues set for hearing in this proceeding against Portland. It then excepts from the Agreement the right to pursue claims against Portland in *San Diego Gas & Electric Company v. All Sellers, et al.*, Docket Nos. EL00-95-000 *et al.*, in *Puget Sound Energy, Inc. v. All Sellers, et al.*, Docket Nos. EL01-10, *et al.* and claims of Blue Heron alleged against Portland in Clackamas County Circuit Court Case No. CCV0106223. Other existing cases resolved as between the California AG and Portland by this section include Docket No. EL03-165; *The People of the State of California, ex rel. Bill Lockyer, Attorney General v. Portland General Electric*, San Francisco Superior Court Case No. CGC-02-408493; United States District Court, Northern District of California, Case No. CV-02-3318 VRW; the pending appeal at the Ninth Circuit Court of Appeals, Case No. 03-15489, and the pending non-public investigation by the California AG. Another case resolved as between the Oregon

9

Exhibit 1
Page 80 of 143
Memo in Oppo

Exhibit A
Page 67 of 74
PGE's Complaint

PUC and Portland is the proposed Oregon PUC investigation into Portland's trading activities for the 17-day transactions, posting errors, and use of the integrated resource contract as they are outlined in the Oregon Public Utility Commission Staff Report dated June 12, 2003. This paragraph also states that the Agreement does not limit the Oregon PUC authority to hold Portland's retail customers harmless for the 12-month imposition of the cost-based rate cap. Further, nothing in the Agreement precludes the participants from pursuing claims against all parties in Docket Nos. EL03-137 through 179, except that the California AG has agreed not to pursue claims against Portland in Docket No. EL03-165-000. Except as enumerated in the Agreement, the Offer of Settlement does not resolve any other issues involving Portland in any other pending or future proceeding.

Paragraph 15 of this section provides that, with respect to the California AG, any waivers, including the waiver found at California Civil Code Section 1542, do not apply to any acts or omissions by Portland that are (a) criminal, or (b) willfully fraudulent; provided that this exception (b) does extend to claims of willful fraud which are based solely on the acts or omissions of Portland that occurred prior to the effective date of this Agreement and that are currently known to the California AG.

Paragraph 16 provides that the Signatories (other than Portland and EPMI) will not participate in any hearing that may be held in this proceeding, make their witnesses available or offer their pre-filed testimony into evidence.

Paragraphs 17 through 19 of this section explain that the Offer of Settlement is conditioned on the transfer of the EPMI issues to Docket No. EL03-154, as requested in a Joint Motion to Transfer, filed concurrently with the Commission, and on the express condition that the transfer of such issues will not alter in any way the procedural or

Exhibit 1
Page 81 of 143
Memo in Oppo

substantive issues as set forth in the Hearing Order and/or the burden of proof as they are presently aligned in this docket. The section defines the intent of the Signatories that these conditions be met, and details the burden of proof of the parties asserting claims against Enron. It sets forth the assertions of violations against EPMI, and specifies that the record in this proceeding, as developed to date in its entirety, including testimony and exhibits, pleadings, depositions and responses to discovery requests, be transferred to Docket No. EL03-154. It then defines procedures agreed by the Signatories for subpoenas, the procurement of testimony, depositions, cross-examination and other procedural commitments to apply to Docket No. EL03-154. Finally, the section adopts the current procedural schedule established for EL03-154, including any changes to that schedule that may be ordered in the future.

Paragraph 21 commits the Signatories to file appropriate pleadings and to take other appropriate actions in support of Commission approval of the Offer of Settlement.

**RESERVATIONS**

This section contains standard reservation provisions that no party shall be bound or prejudiced by the Agreement unless it is approved by the Commission without condition or modification and becomes effective in accordance with its terms. It further provides that the Agreement shall not establish precedent and no party shall be deemed to have accepted or agreed to any principle, methodology or damage calculation. Next, it provides that neither the Offer of Settlement nor a Commission order approving the Offer of Settlement shall be deemed or construed as an admission or evidence of wrongdoing or violation of any law or regulation, nor shall they be admissible as evidence in any judicial or administrative proceeding.

11

Exhibit 1
Page 82 of 143
Memo in Oppo

Exhibit A
Page 69 of 74
PGE's Complaint

## EFFECTIVENESS

Paragraph 25 provides that the Agreement shall not become effective until the Offer of Settlement is approved without modification or condition by final Commission order (upon rehearing if any such requests are filed). Under paragraph 26, if the Commission in any way conditions or modifies the Offer of Settlement, the Signatories may withdraw, in which case the Offer of Settlement and the Agreement will not become effective as to such withdrawing party and that portion of the Settlement Amount, if any, allocated to such withdrawing party shall not be paid.

Paragraph 28 of this section provides that Portland will pay the Settlement Amount within thirty-five days of Commission approval of the Offer of Settlement unless rehearing is sought, in which case Portland will deposit the Settlement Amount into either an interest bearing escrow account (in the case of the amounts allocated to the benefit of California, Tacoma, ICNU and Blue Heron) or into a credit account (in the case of the amount allocated to the Oregon PUC), to be distributed upon the entry of an administratively and/or judicially final order. This paragraph specifically provides that Blue Heron will not receive any further refunds or credits from the Oregon PUC's allocation. If the Offer of Settlement is ultimately rejected, the Settlement Amount, plus interest, will be returned to Portland.

## DESCRIPTION OF EXHIBITS A, A-1, A-2, A-3, A-4 and A-5

Exhibit A sets forth the allocation of the Settlement Amount as between entities in California and Oregon, Tacoma, ICNU and Blue Heron.

Exhibit A-1 describes Tacoma as the owner and operator of a municipal electric utility and a wholesale market participant. It explains that its portion of the Settlement

Amount will be used to reduce the revenue requirements for which its retail ratepayers are responsible.

Exhibit A-2 states that settlement funds to California shall be paid to the Department of Water Resources Electric Power Fund (the "Department") and will be utilized to reduce the amount for which ratepayers are responsible in satisfying the revenue requirement for the purchase of power by the Department that is delivered to retail end-users in California. It describes the creation, structure and authority of the Department, and the methodology by which the settlement funds will be distributed.

Exhibit A-3 describes the Oregon PUC and explains that Portland will establish an interest accruing credit account in the amount allocated to the Oregon PUC in the Offer of Settlement that would be refunded to Portland's retail customers.

Exhibit A-4 describes Blue Heron as a market-based price index, retail customer of Portland with a direct claim for relief, and states that it will utilize the amount allocated in the Offer of Settlement to offset the cost of electric service from Portland.

Exhibit A-5 describes ICNU as a non-profit organization representing large industrial customers of Portland and other northwest utilities. Exhibit A-5 commits ICNU to distribute its allocated funds to its members to offset the cost of electric service from Portland.

**DESCRIPTION OF EXHIBIT B**

Exhibit B sets forth the amendment to the market based rate tariff, pursuant to the Offer of Settlement, which imposes a market-based rate suspension (i.e., cost-based cap) on sales transactions entered into by Portland during the twelve-month period immediately following the date of Commission approval of the Offer of Settlement.

13                    Exhibit 1
                      Page 84 of 143        xhibit A
                      Memo in Oppo          age 71 of 74
                                            ʼCE's Complaint

# UNITED STATES OF AMERICA
## FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:    Pat Wood, III, Chairman
William L. Massey, and Nora Mead Brownell.

| | | |
|---|---|---|
| Portland General Electric Company | ) | Docket Nos. EL02-114-000 |
| | | and EL02-115-001 |

## ORDER APPROVING OFFER OF SETTLEMENT AND GRANTING MOTION TO TRANSFER

(Issued      )

1.    In this order, we approve the attached Offer of Settlement, including as Appendix A an Agreement and Stipulation and Exhibits A, A-1, A-2, A-3, A-4, A-5 and B (together, the "Offer of Settlement") between and among the Commission's Trial Staff ("Staff"), Portland General Electric Company ("Portland"), the People of the State of California, ex rel. Bill Lockyer, Attorney General ("California AG"), the California Public Utilities Commission ("CPUC"), the City of Tacoma, Washington ("Tacoma"), the Oregon Public Utility Commission ("Oregon PUC"), Enron Power Marketing, Inc. ("Enron" or "EPMI"), Industrial Customers of Northwest Utilities ("ICNU"), and Blue Heron Paper Company ("Blue Heron") (the "Signatories"). The Offer of Settlement is not opposed by the remaining parties to this proceeding, and is thus uncontested. We also grant the Motion to Transfer Allegations Related to Enron Power Marketing, Inc., filed by the Signatories to the Offer of Settlement as a condition to the Settlement. This order is in the public interest because it represents a full and final resolution of issues and allegations relating to the trading practices of Portland and its relationship with affiliate, EPMI, as set for hearing in the referenced dockets. It is also in the public interest and in the interest of efficiency in that it transfers issues related to Enron Power Marketing, Inc. into a docket where similar issues are already pending.

## BACKGROUND

2.    During the course of the Commission's fact-finding investigation into potential manipulation of electric prices in Docket No. PA02-2, Portland conducted an internal investigation that disclosed certain posting errors with respect to its trades with its affiliate EPMI. At Portland's request, a meeting was held with Commission Enforcement Staff on April 15, 2002 to report and provide information with regard to these errors.

3.    After receiving Enron memoranda describing trading strategies allegedly employed by Enron's electricity traders in the West, the Commission, on May 8, 2002, issued data requests to identified sellers of wholesale electricity and/or ancillary services

Exhibit 1
Page 85 of 143
Memo in Oppo

**Exhibit A**
Page 72 of 74
**PGE's Complaint**

in the West seeking information about their knowledge and use of the Enron trading strategies. Portland responded to this data request on May 22, 2002 and to two similar requests dated May 21 and May 22, 2002.

4.     Based on Portland's May 22, 2002 response, on June 4, 2002, the Commission issued a show cause order to Portland directing it to show cause why its market-based rate authority should not be revoked. *See* 99 FERC ¶ 61,272 (2002). Portland provided data regarding its purchases and sales during 2000-2001 and related trading and transmission transcripts.

5.     Portland performed a comprehensive analysis of its affiliate trades over the period 1999-2001 and, on August 1, 2002, provided Enforcement Staff with a complete list of transactions for which posting had not been made in accordance with the Enforcement Staff's criteria.

6.     On August 13, 2002, the Commission instituted a proceeding under Section 206 of the Federal Power Act, 16 U.S.C. § 824e, setting for hearing the issues of "possible violations by Portland . . .of [its code of conduct] or market-based rate tariffs and the Commission's standards of conduct, and the imposition of any appropriate remedies...[and] the issue of whether Portland has in fact provided all relevant information in the investigation and what the appropriate remedies for any failure should be, including whether Portland's market-based rate authority should be revoked." *Portland General Elec. Co.*, 100 FERC ¶ 61,186 (2002) ("Hearing Order").

7.     The Offer of Settlement was reached after months of investigation by Staff and certain of the Intervenors into Portland's activities during 2000 and 2001, and after the filing of several rounds of testimony. It resolves the issues described in the Hearing Order, as set forth above, without requiring full litigation and decision on the legal issues by the Commission..

8.     By separate motion filed concurrently with the Offer of Settlement, the Signatories filed with the Commission a motion to transfer the issues in this docket related to EPMI to Docket No. EL03-154, conditioned upon ultimate Commission approval of this Offer of Settlement. The issues to be transferred relate to allegations that EPMI engaged in circular schedule transactions. These issues are similar to issues currently pending in Docket No. EL03-154. In that respect only, the Offer of Settlement affects Docket No. EL03-154, as consolidated in *American Electric Power Service Corporation, et al.*, Docket Nos. EL03-137, *et al.*

## DISCUSSION

9.     The Offer of Settlement describes the allegations against Portland, the investigation that was conducted, the testimony that was filed, including Portland's answering testimony denying the allegations and alleged violations, and the remedies that have been agreed to by the Signatories in resolution of this proceeding as to Portland. In that regard, the Offer of Settlement provides that Portland's market-based rate authority

Exhibit 1
Page 86 of 143
Memo in Oppo

will be capped at cost-based rates (i.e., suspended as to new transactions) for a period of twelve months, commencing on the day after the date of Commission approval of this Offer of Settlement. Portland will also pay a Settlement Amount of $8.5 million, to be allocated in the amount of $6.1 million to electricity customers in California, $800,000 to be allocated to Portland's retail customers in Oregon, $1.1 million to the City of Tacoma, Washington to reduce the revenue requirements for which its municipal electric customers are responsible, $250,000 to ICNU to offset the cost of electric service from Portland and $250,000 to Blue Heron, also to offset the cost of electric service from Portland. In addition, Portland agrees to increase training and related document retention on code of conduct and affiliate matters and will maintain recordings of affiliate trading transactions, affiliate postings, and related accounting records for five years from the date of final Commission approval of the Offer of Settlement. In return, the California AG and the Oregon PUC agree that the Offer of Settlement resolves other administrative and judicial proceedings, as specified in the Agreement and Stipulation, including, as to the California AG, Portland's proposed settlement in Docket No. EL03-165.

10.    All participants who have filed testimony in this proceeding join the Offer of Settlement and all other parties are either Signatories to the Offer of Settlement, or do not oppose it. Thus, the Offer of Settlement is uncontested.

11.    In view of the foregoing, the Commission finds that the Offer of Settlement is fair and reasonable and is in the public interest. The Commission also finds that the requested transfer of issues related to EPMI to Docket No. EL03-154 will further administrative efficiency and is in the public interest.

The Commission orders:

(A)    The Offer of Settlement, including the Agreement and Stipulation, Exhibits A, A-1, A-2, A-3, A-4, A-5 and B, is hereby approved in its entirety, without condition or modification.

(B)    The Joint Motion to Transfer Allegations Related to Enron Power Marketing, Inc. is hereby granted.

By the Commission

(SEAL)

Magalie R. Salas,
Secretary.

3

Exhibit 1
Page 87 of 143
Memo in Oppo

Exhibit A
Page 74 of 74
PGE's Complaint

ORDER NO. 03-599

ENTERED   OCT 0 8 2003

U 1 0 2003

PGE

# BEFORE THE PUBLIC UTILITY COMMISSION

## OF OREGON

UE 154

In the Matter of )
)
PORTLAND GENERAL ELECTRIC )        ORDER
)
Signing of Settlement Offer in FERC )
Docket No. EL02-114 and Establishing )
Credit Account for PGE Retail Customers. )

DISPOSITION:   COMMISSION SIGN OFFER OF SETTLEMENT;
APPEARANCE OF CEO AT FUTURE PUBLIC MEETING.

At the September 24, 2003, public meeting of the Public Utility Commission of Oregon, Staff presented a report to the Commission recommending that the Commission join the Offer of Settlement in resolution of FERC Docket No. EL02-114 concerning trading activity by Portland General Electric (PGE). Staff further recommended that the Commission waive any claims in its proceedings regarding posting errors and 17 days of Death Star transactions discussed in Staff's Trading Activity Report, dated June 12, 2003, which had been previously submitted to the Commission. The total settlement for Oregon customers would be $1.3 million dollars. Staffs report is attached as Appendix A and incorporated in this order.

The Industrial Customers of Northwest Utilities and Blue Heron Paper Company supported Staff's recommendation. The Citizens' Utility Board of Oregon (CUB) stated that PGE's accountability, not money, is the issue. CUB wanted to make certain that PGE would not engage in similar activity, and would report what changes had been made to eliminate the possibility of similar activity in the future.

The Commission determined to accept Staff's recommendation, but added that the CEO of PGE must attend a Commission public meeting to indicate what PGE has done, and will do, to preserve the integrity of the wholesale power market.

Exhibit 1
Page 88 of 143
Memo in Oppo

Exhibit B
Page 1 of 5
PGE's Complaint

## ORDER

IT IS ORDERED that the Commission joins the Offer of Settlement in resolution of FERC Docket No. EL02-114 and the investigation proposed by OPUC staff into PGE's posting errors and involvement in alleged Death Star transactions during the western electricity crisis of 2000-01, provided, the CEO of PGE attend a public meeting to affirm the company's accountability to its customers by stating what PGE has done and will do to preserve, to the extent it can, the integrity of the wholesale power markets from which it purchases power.

Made, entered, and effective    OCT 0 8 2003

Lee Beyer
Chairman

John Savage
Commissioner

Ray Baum
Commissioner

A party may request rehearing or reconsideration of this order pursuant to ORS 756.561. A request for rehearing or reconsideration must be filed with the Commission within 60 days of the date of service of this order. The request must comply with the requirements in OAR 860-014-0095. A copy of any such request must also be served on each party to the proceeding as provided by OAR 860-013-0070(2). A party may appeal this order to a court pursuant to applicable law.

Exhibit 1
Page 89 of 143
Memo in Oppo

Exhibit B
Page 2 of 5
PGE's Complaint

## PUBLIC UTILITY COMMISSION OF OREGON
## STAFF REPORT
## PUBLIC MEETING DATE: September 24, 2003

REGULAR ___ CONSENT ___ EFFECTIVE DATE     September 24, 2003

DATE:       September 23, 2003

TO:         Commissioners Beyer, Savage, and Baum

FROM:       Lee Sparling and Maury Galbraith

RECEIVED

SEP 2 3 2003

Public Utility Commission of Oregon
Administrative Hearings Division

SUBJECT:    PORTLAND GENERAL ELECTRIC: Offer of Settlement in resolution of Federal Energy Regulatory Commission Docket No. EL02-114 and the investigation proposed by Oregon Public Utility Commission staff into Portland General Electric Company's posting errors and involvement in alleged Death Star transactions during the western electricity crisis of 2000-01.

## STAFF RECOMMENDATION:

We recommend that the Commission join the Offer of Settlement in resolution of Federal Energy Regulatory Commission (FERC) Docket No. EL02-114 and the investigation proposed by Oregon Public Utility Commission staff into Portland General Electric Company's (PGE's) posting errors and involvement in alleged Death Star transactions during the western electricity crisis of 2000-01.

## DISCUSSION:

Offer of Settlement

The Oregon Public Utility Commission (OPUC) is a party to FERC Docket No. EL02-114. FERC opened the docket in August 2002 to investigate possible misconduct by PGE and its affiliate Enron Power Marketing, Inc. (EPMI). Industrial Customers of Northwest Utilities (ICNU) and Blue Heron Paper Company (Blue Heron) are the other Oregon parties in the proceeding. The testimony in the case has focused on posting errors by PGE and the company's participation in alleged Death Star transactions on 17 days in April-June 2000.

PGE reached a tentative settlement with FERC staff and the California parties to the proceeding agreeing to pay a settlement amount and to amend its market-based rate

## DOCKETED

APPENDIX A
PAGE 1 OF 3

Exhibit 1
Page 90 of 143
Memo in Oppo

Exhibit B
Page 3 of 5

Offer of Settlement in resolution of FERC Docket No. EL02-114
September 24, 2003
Page 2

tariff to impose a cost-based cap for one year. The California parties committed to try to get other parties to support the settlement, but we were unable to reach agreement.

The Oregon parties then negotiated with PGE to increase the offer to settle the FERC docket. As a result of those discussions, PGE has proposed to add $1 million to the settlement amount if 1) the Oregon parties support settlement of the FERC case, and 2) the OPUC waives any claims in Commission proceedings regarding the posting errors and the 17 days of Death Star deals and related issues addressed in the OPUC staff Trading Activity Report dated June 12, 2003. Parties would not be precluded from raising additional claims at the OPUC regarding other trading activities during 2000-01.

The total settlement amount for Oregon parties would be $1.3 million ($300,000 from the original settlement amount plus the additional $1 million) and would be divided as follows: $250,000 to ICNU, $250,000 to Blue Heron, and $800,000 to the OPUC. PGE would provide direct disbursements to ICNU and Blue Heron. For the OPUC allocation, PGE would establish a credit account for $800,000 and interest would accrue at PGE's authorized rate of return. The agreement then provides that the Commission would use that credit account to order PGE to refund or otherwise credit PGE retail customers.

The length of the settlement discussions, the willingness of the other parties to proceed without Oregon, and the deadline of September 24, 2003 for the settlement to be submitted to FERC drive the short notice for this public meeting. We have worked closely with ICNU during the settlement discussions and have kept the Citizens' Utility Board (CUB) informed of progress toward settlement.

OPUC Staff Trading Activity Report

In its June 12, 2003 Trading Activity Report, staff concluded that there is a prima facie case that PGE mismanaged its trading activities because 1) PGE failed to properly post 65 percent of its transactions with EPMI in 1999-2001, 2) PGE should have been more vigilant and cautious in its dealings with EPMI, and 3) PGE may have jeopardized the continued use of transmission rights contained in its Integration of Resources contract with the Bonneville Power Administration. If the Commission concluded that PGE mismanaged its trading activities, the remedy would be to reduce rates going forward to reflect lower management expense than is presently included in rates.

PGE does not agree that it violated any FERC requirements or that it mismanaged its trading activities. However, PGE does acknowledge that it posted more than 10 percent of its transactions with EPMI incorrectly. At the November 4, 2002 OPUC public

APPENDIX A
PAGE 2 OF 3
Exhibit 1
Page 91 of 143
Memo in Oppo

Exhibit B
Page 4 of 5

Offer of Settlement in resolution of FERC Docket No. EL02-114
September 24, 2003
Page 3

meeting, PGE representatives conceded that management controls were not in place to detect and prevent the posting errors.


Commission Alternatives

The Commission has three alternatives. The first is to decline to settle either the FERC docket or the proposed investigation at the OPUC into PGE's trading activity. However, it is uncertain whether the Oregon parties would be able to successfully challenge the allocation of the FERC settlement funds or to continue the FERC case against PGE without the other, settling parties' (particularly the FERC staff) continued participation.

The second alternative is to agree to settle the FERC case but not to waive any claims at the OPUC. We believe that the FERC settlement would include $300,000 for Oregon parties in this case, but that may not be possible to achieve at this late hour. This approach would allow parties to pursue mismanagement or other claims for relief related to the Death Star deals and posting errors in a later Commission proceeding.

The third alternative is to join and become a signatory to the Offer of Settlement. This approach would resolve the claims in the FERC proceeding and at the OPUC against PGE related to the posting errors and Death Star deals.

Staff recommends that the Commission choose the third alternative because the $1.3 million reflects 1) a reasonable allocation of the funds available to settle the FERC case and 2) an amount consistent with the range of possible outcomes in a mismanagement case. Staff views the overall settlement as a fair and reasonable resolution of those claims related to the Death Star deals, posting errors, and other activities addressed in the FERC proceeding and the Trading Activity Report.


PROPOSED COMMISSION MOTION:

The Commission join the Offer of Settlement in resolution of FERC Docket No. EL02-114 and the investigation proposed by OPUC staff into PGE's posting errors and involvement in alleged Death Star transactions during the western electricity crisis of 2000-01.

Offer of Settlement Memo

APPENDIX  4
PAGE 3 OF 3
Exhibit 1
Page 92 of 143
Memo in Oppo

Exhibit B
Page 5 of 5

Portland General Electric Company        Docket No. EL03-165-000

## CERTIFICATION OF CONTESTED SETTLEMENT

### (Issued November 21, 2003)

TO THE COMMISSION:

### I. INTRODUCTION

1.      Pursuant to Rule 602 of the Rules of Practice and Procedure, 18 C.F.R. § 385.602 (2003), an Agreement and Stipulation ("Settlement Agreement" or "Agreement") between Portland General Electric Company ("Portland") and the Federal Energy Regulatory Commission Trial Staff ("Trial Staff" or "Staff") is certified to the Commission. Acceptance of the Agreement is in the public interest.

### II. PROCEDURAL HISTORY

2.      On June 25, 2003, the Commission issued its Order to Show Cause Concerning Gaming and/or Anomalous Market Behavior ("Show Cause Order").[1] The Show Cause Order set for hearing the issue of why the Identified Entities in this matter should not be found to have employed one or more gaming practices in violation of the California Independent System Operator Corporation's ("ISO") and California Power Exchange's ("PX") tariffs during the period January 1, 2000 to June 20, 2001.

3.      Pursuant to the Show Cause Order, the Identified Entities were required to file show cause responses no later than September 2, 2003.[2]

4.      The Show Cause Order asserted that Portland engaged in gaming practices such as False Import and Cutting Non-Firm. Although Portland was identified in the Show Cause Order as a potential participant in Circular Scheduling and Paper Trading, the

---

[1] American Electric Power Service Corporation, et al., 103 FERC ¶ 61,345 (2003).

[2] An Identified Entity was not required under the Show Cause Order to file a show cause response if an offer of settlement between Trial Staff and the Identified Entity was filed with the Commission before the specified date. Show Cause Order at P 72.

Exhibit 1
Page 93 of 143
Memo in Oppo

Exhibit C
Page 1 of 13
PGE's Complaint

Commission declined to investigate the alleged transactions further because they each involved less than $10,000.[3]

5.    The Show Cause Order encouraged the Identified Entities to resolve these proceedings through settlement.[4]

6.    On July 25, 2003, several parties, including the parties that now object to these Settlement Agreements, filed motions for rehearing of the Show Cause Order. On August 11, 2003, the Commission issued an order granting rehearing for the limited purpose of further consideration, and so that timely rehearing requests will not be denied by operation of law due to the absence of Commission action within thirty days. Thus, those motions for rehearing remain pending before the Commission.[5]

7.    On August 27, 2003, Trial Staff and counsel for Portland jointly submitted an Agreement and Stipulation in full and final resolution of all issues related to Portland in the Show Cause Order. On September 24, 2003, the Commission issued an Order Granting Joint Motion to Defer Issues Related to Distribution of Settlement Proceeds.[6] That Order clarified that "the ALJ may certify, and the Commission may approve, settlements on liability in these proceedings before the distribution of the proceeds is resolved."[7] On November 13, 2003, the Chief Administrative Law Judge issued an order consolidating the distribution issue in these proceedings for separate hearing and decision before Administrative Law Judge Carmen A. Cintron.[8]

---

[3] Show Cause Order at P 69.

[4] Id. at P 73.

[5] On October 21, 2003, the California Parties filed a Motion for Expedited Determination of Scope of Proceedings Issues and Temporary Suspension of Procedural Schedules Pending Ruling on Expedited Determination in Docket Nos. EL03-137-000, et al. and EL03-180-000, et al.. On October 24, 2003, the Commission issued a Notice Shortening Answer Period but has not acted on the Motion for Expedited Determination as of the date of this Certification.

[6] Order Granting Joint Motion to Defer Issues Related to Distribution of Settlement Proceeds, 104 FERC ¶ 61,323 (2003).

[7] Id. at P 6. It should be noted that only Reliant's settlement addressed the distribution of proceeds. Thus, the Order required that only comments filed in response to the Reliant settlement must address that issue.

[8] Order of Chief Judge Granting Clarification, Consolidating Distribution Issue for Hearing and Decision, and Designating Presiding Administrative Law Judge, Docket No. EL03-152-002, et al. (issued November 13, 2003).

Exhibit 1
Page 94 of 143
Memo in Oppo

Exhibit C
Page 2 of 13
PGE's Complaint

## III. THE OFFER OF SETTLEMENT

### A. ARTICLE I
### Procedural History

8.      This section provides the procedural history of this proceeding.

### B. ARTICLE II
### Background

9.      This section outlines the factual background pertinent to this Settlement Agreement. Paragraph 2.1 states that Portland, an electric utility, actively participates in the wholesale power market to supplement its owned generation supply to meet the needs of its retail customers in the State of Oregon. It further stipulates that during 2000-2001, Portland bought and sold power to the ISO and PX.

10.     According to paragraph 2.2, the ISO filed on July 16, 2003 data that identified specific transactions alleged to have constituted Gaming Practices ("ISO data"). The data corresponded in large part with the allegations of Gaming Practices against Portland contained in the testimony of Dr. Peter Fox-Penner, filed on behalf of the California Parties.

11.     According to paragraph 2.2.1, the Show Cause Order and the Fox-Penner testimony indicated that Portland may have participated in the practice of False Imports.[9] However, the ISO Data showed that no Portland transactions constituted False Imports under the definition established in the Show Cause Order, because none of the transactions identified were sold into California markets at price levels above the then existing caps.

12.     Paragraph 2.2.2 describes Portland's participation in two transactions totaling 127 MWh which allegedly constituted the practice of Cutting Non-Firm. Staff calculated revenues of $12,730[10] associated with those transactions and Portland has agreed to pay this sum for purposes of this Agreement.

---

[9] According to the Show Cause Order, the practice of False Imports involves parking day-ahead or day-of California energy with a company outside of California, buying it back for a small fee, and then selling it to the ISO as "imported" out-of-market power at prices higher than the applicable price cap. Id. at P 37-38.

[10] It should be noted that Portland's records showed revenues of $12,697 that were associated with this practice. However, Portland agreed to accept the Trial Staff's calculation of $12,730 for purposes of this Agreement.

13.     Paragraph 2.2.3 describes an affidavit attached to the Agreement as Appendix A. The affidavit explains the circumstances underlying all of the transactions identified in the ISO Data, in Dr. Fox-Penner's testimony, or referenced in the Show Cause Order and pertinent revenues associated with those transactions.

## C. ARTICLE III
### Settlement

14.     This section describes the substantive terms of the settlement. Paragraph 3.1 in this section indicates that the Agreement in this proceeding constitutes a full and final resolution of all issues related to Portland that were set for hearing in the Show Cause Order on June 25, 2003.

15.     In paragraph 3.2, Portland has agreed to pay $12,730 ("Settlement Amount") into a Deposit Fund Account of the U.S. Treasury within thirty (30) days of the approval of this Settlement Agreement by final order of the Commission. However, Portland does not admit to the truth of the allegations set forth in the Show Cause Order, or admit that its trading activities violated any governing tariff, regulation, or statute, or adversely affected the price formation process. The payment of this Settlement Amount does not constitute the payment of any refund, penalty, or fine.

16.     Paragraph 3.3 states that payment of the Settlement Amount constitutes complete and total satisfaction of the cause of action pertaining to Portland in this docket.

17.     In paragraph 3.4 of this section, Portland requests a dismissal with prejudice of any claims for trading activities that are at issue in the consolidated dockets, EL03-137 et al. Staff agreed to this stipulation subject to the caveat that Staff does not have authority to address issues outside those specifically raised in the Show Cause Order.

18.     The Staff agreed to take appropriate action in support of Commission approval of this Agreement in paragraph 3.5.

19.     The final order approving this Agreement will render moot any petition for rehearing of the Show Cause Order pending on behalf of Portland before the Commission, to the extent such petition relates to Portland or this Agreement.

## D. ARTICLE IV
### Reservations

20.     This section stipulates the reservations pertinent to execution of this Agreement. Pursuant to paragraph 4.1, no party or other person shall be bound or prejudiced by any part of this Agreement unless it is approved and executed in accordance with the

provisions in Article V, herein.

21.    Paragraph 4.2 states that no person shall be deemed to have consented to any ratemaking, jurisdictional, or tariff principle or methodology under this Agreement. This Agreement shall not establish a "settled practice" under Public Service Commission v. FERC, 642 F.2d 1335 (D.C. Cir. 1980). Thus this Agreement is the product of a negotiated settlement and does not establish any principle of law underlying any claims advanced or matters resolved pursuant to this Agreement.

22.    According to paragraph 4.3 of this section, the Agreement and any Commission order approving this Agreement shall not be deemed as any admission of wrongdoing or evidence of violation of any law or regulation, whatsoever, by Portland.

### E. ARTICLE V
### Effectiveness

23.    This section states that the Agreement will not be effective unless the Commission enters an order approving it without condition or modification, pursuant to section 5.3, herein. Paragraph 5.1 states that to the extent that the Commission conditions or modifies the Agreement, it will become effective upon its acceptance by Portland.

24.    Paragraph 5.2 states that Portland shall be permitted to withdraw from the Agreement if Commission approval of the Agreement is conditioned or the Agreement is modified, if within 20 days thereafter Portland provides written notice of its intent to the Commission. Portland shall be deemed to have accepted the Commission's conditions or modifications if it has not timely notified the Commission of its intent to withdraw from the Agreement.

25.    The term "final order" is defined in paragraph 5.3 as a Commission order which is no longer subject to further proceedings before the Commission. An order shall be deemed final as of the date rehearing is denied, or the date on which the right to seek rehearing expires.

26.    Paragraph 5.4 states that if the Agreement becomes subject to a petition for judicial review, the time period for payment of the Settlement Amount shall be stayed until 10 business days after such petition is conclusively denied. If such petition is granted, then all provisions governing effectiveness in this Article shall be applied to the order on remand.

### F. ARTICLE VI
### Conclusion

27.    This Article contains several miscellaneous provisions. Paragraph 6.1 stipulates

that the Agreement was entered into voluntarily.

28.    In paragraph 6.2, Trial Staff and Portland respectfully request that the presiding administrative law judge certify and accept the Agreement as a full and final resolution of the issues set for hearing, as the parties believe that the Agreement is in the public interest.

## IV. INITIAL COMMENTS

29.    The ISO filed comments on September 30, 2003 objecting to the Agreement in part. Although in its comments the ISO has no objection to settlement of the Cutting Non-Firm allegation, the ISO requests that the Commission not rule on the Agreement before it addresses the pending requests for rehearing and motions for clarification on the issue of False Import. The ISO disagrees with the Staff's interpretation of False Import serving as a basis for its Agreement with Portland. In particular, the comments refer to the ISO's July 25, 2003 Request for Rehearing and/or Clarification of the Show Cause Order, in which it sought to clarify that the investigation into False Import transactions would include all exports scheduled on a Day-Ahead or Hour-Ahead basis that could be associated with a subsequent sale of real time energy as an import. The comments note that limiting the scope of inquiry to only those transactions that involved an export from the State of California, a third-party, and a sale to the ISO above the then-applicable price cap would be inconsistent with the Commission's rationale for concluding that False Import constituted a gaming practice. Thus, the ISO urges the Commission not to approve the Agreement with respect to the issue of False Import, and to defer its decision on Settlement of that issue until after it renders a decision on the appropriate scope of the investigation into the practice of False Import. The ISO also objects to dismissal with prejudice of any claims against Portland for any trading activity at issue in the consolidated proceedings, arguing that such dismissal is against the public interest.

30.    On September 30, 2003, the California Parties[11] filed comments and an attached declaration of Dr. Fox-Penner opposing this Agreement. In their comments, the California Parties argue that this Agreement does not adequately address the involvement of Portland in False Import, as the proper definition of False Import remains disputed. Thus, the California Parties aver that there are genuine issues of material fact in dispute pertaining to the scope of False Import that prohibit certification of this settlement. In particular, the California Parties argue that the Agreement's interpretation of False Import transactions involving sales into the real time market "at a price above the cap" is inconsistent with the definitions used in the screening analyses performed by the ISO and

---

[11] The California Parties are the California Electricity Oversight Board, the California Public Utilities Commission, Pacific Gas and Electric Company and Southern California Edison Company.

Exhibit 1
Page 98 of 143
Memo in Oppo

Exhibit C
Page 6 of 13
PGE's Complaint

Dr. Fox-Penner, and the definition in the Staff Final Report.[12] They further argue that this Agreement does not properly reflect all relevant evidence adduced in discovery during the refund proceeding. Therefore, according to the California Parties, the true damages for False Import attributable to Portland are potentially far greater than is reflected in this Agreement.

31.     Citing to the attached declaration of Dr. Fox-Penner, the California Parties emphasize the enormous destructive impact that False Import transactions had on the California power markets. They suggest that the Commission underestimated the full consequences of False Import owing to its "unduly narrow" interpretation of that gaming strategy.[13] The California Parties claim that as a result, the Agreement's narrow reading eliminates 17,021 MWh of potential False Import trades for the period May 1, 2000 to October 1, 2000, with revenues of $2,354,973 attributable to Portland. Further, Portland admitted in another proceeding that it had failed to post correctly certain affiliate transactions.[14] Additionally, the California Parties argue that certification of this settlement will foreclose their opportunity to conduct discovery and present evidence on these issues. They also submit that additional discovery is required to substantiate the full extent of Portland's activities with respect to Circular Scheduling or Death Star. The California Parties allege that this Settlement cannot be approved under Rule 602 because there are disputed issues of material fact and there is an inadequate record on which to resolve these disputes.[15] Finally, these parties contend that the Agreement should be

---

[12] Investigation of Anomalous Bidding Behavior and Practices in the Western Markets, Docket No. PA02-2-000, issued March 26, 2003 at VI-17.

[13] For example, the Comments note "the ISO and Fox-Penner screens are also significantly *under* inclusive because they only capture single-party False Import transactions where the same scheduling coordinator exported and imported the power out and back in to the ISO's control area." California Parties' Comments in Opposition to Certification and Approval of Agreement and Stipulation, (Docket No. EL03-165-000, filed September 30, 2003).

[14] Offer of Settlement as to Portland in Docket Nos. EL02-114-000 and EL02-115-001 (September 26, 2003).

[15] Portland filed a motion to strike from the record Sections II.A-E (pp. 7-23) and pp. 31-34 of the California Parties comments, Section II (pp. 2-4) of the ISO's comments, and the entire Declaration of Dr. Peter Fox-Penner. Portland objects to those portions of comments that dispute the definition of False Import. Essentially, Portland argues that the comments and declaration improperly serve to challenge the Show Cause Order itself. On November 4, 2003, the California Parties filed an answer objecting to Portland's motion to strike. There is good cause to admit the comments and the Fox-Penner declaration in order to insure a complete record in this proceeding. Accordingly, the motion to strike is

Exhibit 1
Page 99 of 143
Memo in Oppo

**Exhibit C**
**Page 7 of 13**
**PGE's Complaint**

narrowly construed due to the Commission's piecemeal approach to remedying the California energy crisis. They argue that the injured buyers should be made whole and the alleged manipulative conduct should have been investigated under one proceeding, not various proceedings as the Commission has done. If the Agreement is approved, argue the California Parties, it should be clarified as requested by those parties.

32.     On September 30, 2003, Port of Seattle, Washington ("Port"), filed comments opposing this settlement. Port adopts by reference the comments filed by the Attorney General of the State of California, except for any portion(s) relating to distribution of settlement proceeds.[16]

## V. REPLY COMMENTS

33.     On October 20, 2003, Trial Staff filed general reply comments addressing the California Parties' objections. Staff asserts that the arguments concerning the definition of False Import are actually requests for rehearing of the Show Cause Order styled as issues of "material facts in dispute." Staff contends that the Show Cause Order clearly defined False Import as requiring payment to a third party and a price that exceeded the ISO purchase price cap.[17] Thus, says the Staff, the Agreements should be certified and the issue of whether Staff's interpretation of False Import was correct should be deferred to the Commission on rehearing.

34.     Staff argues that whether the Show Cause Order failed to include all possible gaming practices and whether certain Identified Entities were not charged to the full extent allowed under the Show Cause Order are also issues for rehearing. With respect to the California Parties' charge that they have not had sufficient opportunity to conduct discovery, Staff asserts that there has been ample opportunity for discovery, including the "100 Days Evidence" period and the long history of discovery and investigation that preceded the Show Cause Order. Staff points out that the Commission would not have allowed settling parties to abstain from filing show-cause responses if it did not envision certifying settlements prior to full discovery. On this basis, Staff argues that the inadequate-discovery allegation should also be addressed by the Commission on rehearing.

---

denied.

[16] It is noted that the California Parties in this proceeding do not include the Attorney General.

[17] Staff notes that the False Import issue is pending before the Commission under two filings filed by the California Parties, including a Motion for Clarification and Request for Rehearing.

Exhibit 1
Page 100 of 143
Memo in Oppo

Exhibit C
Page 8 of 13
PGE's Complaint

35.    Finally, Staff submits that disgorging profits was clearly established in the Show Cause Order as the only financial remedy available, and that whether the Identified Entities should be required to make other market participants whole is a rehearing issue. The California Parties' contentions about dealing with the market manipulation in one consolidated proceeding, the Staff says, have already been considered by the Commission and constitute another issue to be dealt with on rehearing.

36.    Staff submits that this Agreement, along with other settlement agreements it has negotiated, should be approved because they adhere to the rules the Commission laid down in the Show Cause Order. The Staff says that it has adhered to the salutary rule of settling cases where the evidence showed that the Identified Entity had not participated in gaming practice(s), that the total revenues from suspect transactions was less than $10,000, or where the Identified Entity agreed to disgorge its total revenue received from the suspect transactions.

37.    On October 20, 2003, Trial Staff submitted "Specific Reply Comments" in support of this Agreement with Portland and incorporating by reference its "General Reply Comments," defending all of its pending settlement agreements. Staff specifically addressed the California Parties' assertion that additional discovery is required to substantiate the full extent of Portland's activities with respect to Circular Scheduling or Death Star (i.e. including Portland's transactions with Enron and Avista). Staff repeats that those arguments are outside the scope of issues set for hearing in the Show Cause Order. Nonetheless, because the California Parties failed to quantify those allegations or otherwise refute the evidence reflecting less than $10,000 in revenues as a result of Circular Scheduling, Staff submits that there is no basis upon which to initiate a new investigation of Portland for Circular Scheduling or Death Star. Moreover, Staff indicates it is significant the California Parties have no objection with respect to the Agreement for Cutting Non-Firm load, although they object to the Agreement in its entirety. However, the California Parties have not provided any evidence that any additional revenues were received from this strategy.

38.    On October 22, 2003, Trial Staff filed a motion to supplement its general reply comments in order to address the "Information to be Provided with Settlement Agreements," as described in a Notice to the Public issued by the Chief Administrative Law Judge on October 15, 2003. Staff indicates that the settlements do not have significant implications beyond the settling entities' specific liability in these dockets. Some arguments in the opposing comments do raise policy questions involving the definition of False Import, whether the settlements provide a sufficient financial remedy, whether there was adequate discovery in these settlement proceedings, and whether the impact of all market manipulation issues should have been resolved in one proceeding. However, the settlements themselves do not raise any policy implications. Although in some instances other pending cases could be affected by the individual settlements, each settling entity recognizes that Staff has no authority to address claims outside those

Exhibit 1
Page 101 of 143
Memo in Oppo

Exhibit C
Page 9 of 13
PGE's Complaint

specifically raised in the Show Cause Order. Staff submits that settlement of these gaming practices generally is not an issue of first impression, except to the extent that the settlements resolve specific gaming practices not defined or prohibited prior to the Show Cause Order. Staff says that the Mobile-Sierra doctrine does not apply to this case.

39.     Portland filed reply comments on October 20, 2003. Portland submits that the Commission's definition of False Import requires a third party intermediary and prices for out-of-market sales to the ISO in excess of the cap. As to the objecting parties' arguments that this definition is too narrow, according to Portland, that matter is a policy issue for the Commission to determine at its discretion on rehearing. Furthermore, Portland argues that the objecting parties failed to raise any disputed issues of material fact pertaining to the alleged Cutting Non-Firm transactions, as the parties' general, unsubstantiated objection to the Agreement's resolution of that matter fails to satisfy the requirements of Rule 602(h)(2). Nor should approval of this Agreement be barred on the basis of inadequate discovery, Portland argues, because the objecting parties had access to voluminous data submitted during the "100 Days Evidence" period and pursuant to other data requests. Finally, Portland challenges the California Parties' representation of matters under Docket No. EL02-114-000 that were specifically excluded from this docket.

40.     In its reply comments Portland submits that the Agreement meets the necessary standards for certification and approval under Rule 602. According to Portland, the objecting parties failed to raise genuine issues of material fact, and failed to demonstrate that there is an inadequate record upon which the Commission may reach a reasoned decision on the merits of the contested issues. Furthermore, Portland asserts that the Agreement is just and reasonable, because it requires Portland to pay the entire proceeds of the transactions alleged to be Cutting Non-Firm, which is the only type of transaction remaining at issue within the scope of the Show Cause Order.[18] The conditions enumerated by the California Parties' for approval of the Agreement are unacceptable to Portland, as the California Parties are required to pursue all appropriate legal appeals before they may reopen the Agreement if new standards are adopted. Moreover, Portland contends that the Agreement never purported to resolve all issues relating to other dockets or unidentified issues that could be set for hearing in the future.

## VI. DISCUSSION AND CONCLUSION

41.     The Commission's Procedural Rules dealing with settlements give the

---

[18] According to Portland, Dr. Fox-Penner identified only one hour of one day in which it sold power to California at prices "out-of-market." This transaction, even if it were "False Import," is below the threshold set by the Commission for pursuing claims in this proceeding.

Exhibit 1
Page 102 of 143
Memo in Oppo

Exhibit C
Page 10 of 13
PGE's Complaint

Commission broad discretion as to how to deal with the arguments of parties who contest a settlement.[19] It is well settled that the Commission may approve a settlement notwithstanding an intervenor's objections. <u>Arctic Slope Regional Corporation v. FERC</u>, 832 F.2d 158 (D.C. Cir. 1987). Here, the central objection to certification and approval of the Agreement concerns Staff's "narrow" interpretation of False Import transactions as involving only sales into the real time market "at a price above the cap." The objecting parties allege this is inconsistent with the definitions used in the screening analyses performed by the ISO and Dr. Fox-Penner and in the Staff Final Report in Docket No. PA02-2-000.

42.     It is axiomatic, however, that in instituting these enforcement proceedings, the Commission had broad discretion to determine the nature of the offenses for which it would seek sanctions from the Identified Entities, including Portland. In <u>Fact-Finding Investigation into Possible Manipulation of Electric and Natural Gas Prices</u>, 103 FERC ¶ 61,019, 61,074 (2003), <u>reh'g dismissed</u>, the Commission noted that it has exclusive authority to enforce the Federal Power Act, and its decisions as to the scope of the issues it will pursue in an enforcement proceeding are non-reviewable. In a later order in its <u>Fact-Finding Investigation into Possible Manipulation</u> proceeding, the Commission reiterated that it "has exclusive authority under the FPA to decide how to resolve issues under investigation; decisions as to whether to settle a matter being investigated are solely within the Commission's discretion." <u>Fact-Finding Investigation into Possible Manipulation</u>, Order Dismissing Rehearing, 104 FERC ¶ 61,146, 61,527 (2003). As the Commission stated in both of those orders, general principles of administrative law hold that the Commission, rather than intervenors in its proceedings, determines what issues shall be the subject of enforcement proceedings. <u>See</u> <u>Baltimore Gas & Electric Co. v. FERC</u>, 252 F.3d 456, 458-60 (D.C. Cir. 2001); <u>Fort Sumter Tours, Inc. v. Babbitt</u>, 202 F.3d 349, 354 (D.C. Cir. 2000); <u>New York State Dept. of Law v. FCC</u>, 984 F.2d 1209, 1213-16 (D.C. Cir. 1993); <u>cf.</u> <u>Heckler v. Chaney</u>, 470 U.S. 821, 831-33 (1985). The California Parties and ISO's argument concerning the definition of False Import is really a matter for decision by the Commission and not a genuine issue of material fact concerning certification of the settlement.

43.     The Agreement is correctly confined to the scope of False Import that the Commission mandated in the Show Cause Order. Thus, the only vehicle for the objecting parties to vindicate their claims is through a request for rehearing. The Commission has not acted on the California Parties' and ISO's requests for rehearing of the Show Cause Order. The other arguments concerning remedies, discovery and whether there should be one gaming proceeding are also matters of policy which have been addressed by the

---

[19] Rule 602(h), 18 C.F.R. §385.602(h) (2003), provides, <u>inter alia</u>, that the Commission may decide the merits of the contested settlement issues or "[t]ake other action which the Commission determines to be appropriate."

Exhibit 1
Page 103 of 143
Memo in Oppo

**Exhibit C
Page 11 of 13
PGE's Complaint**

Commission and are pending rehearing by the Commission. Accordingly, these matters also do not raise issues of material fact preventing certification of the Agreement to the Commission.

44.    This Agreement provides a reasonable resolution of the issues set for hearing with respect to Portland in the Show Cause Order. The Agreement calls for payment of $12,730 for Cutting Non-Firm, the only issue remaining in this matter which was not objected to by any of the parties. Under the Commission's Show Cause Order, this is the maximum amount Portland could have been compelled to pay had the proceeding been litigated to a conclusion. It follows that disgorgement of this sum is a just and reasonable result. Approval of this Agreement terminates Docket No. EL03-165-000, avoids costly litigation, promotes administrative efficiency and benefits consumers. Accordingly, the public interest will be served by the approval of the Agreement.

45.    It is recommended that the Commission reiterate that the Agreement does not resolve any related issues in other proceedings. However, it does resolve all issues against Portland involving the transactions at issue in this proceeding, even if the Commission later expands the scope of the proceeding. As a result, dismissal of the claims against Portland should be with prejudice.

46.    The Agreement does not affect any other cases pending before the Commission. The Agreement does not resolve any issues of first impression or policy matters. Because this is an enforcement proceeding and does not involve a contractual agreement between a jurisdictional utility and its customers, the Mobile-Sierra standard of review does not apply in this case. For these reasons, it is recommended that the Commission approve the Agreement.

## VII. CERTIFICATION

47.    Pursuant to 18 C.F.R. § 385.602(h)(2)(i)-(ii), the following are certified for the Commission's consideration:

(a)    The Agreement and Stipulation, filed by Commission Trial Staff and Portland (including Appendix A and Schedules A-D);

(b)    An Explanatory Statement;

(c)    Comments of the California Independent System Operator on Agreement and Stipulation, filed on September 30, 2003;

(d)    The California Parties' Comments in Opposition to Certification and Approval of Agreement and Stipulation, filed on September 30, 2003;

Exhibit 1
Page 104 of 143
Memo in Oppo

Exhibit C
Page 12 of 13
PGE's Complaint

(e)     Comments of the Port of Seattle, Washington Opposing Settlements, filed on September 30, 2003;

(f)     Staff's General Reply Comments, filed on October 20, 2003;

(g)     Staff's Specific Reply Comments, filed on October 20, 2003;

(h)     Reply Comments of Portland General Electric Company on Agreement and Stipulation, filed on October 20, 2003; and

(i)     All pleadings, orders, and other documents of record in this proceeding.


Carmen A. Cintron
Presiding Administrative Law Judge

Exhibit 1
Page 105 of 143
Memo in Oppo

Exhibit C
Page 13 of 13
PGE's Complaint

DEPARTMENT OF JUSTICE

STATE OF OREGON

IN THE MATTER OF:

PORTLAND GENERAL ELECTRIC
COMPANY

| | |
|---|---|
| INVESTIGATIVE DEMAND | |

INVESTIGATIVE DEMAND
(646.618)
UNLAWFUL TRADE PRACTICES

**RECEIVED**

NOV 1 3 2003

**TONKON TORP LLP**

TO:    Portland General Electric Company
       C/o David A. Aamodt, Registered Agent
       121 SW Salmon Street, Ste. 1300
       Portland, OR 97204

GREETINGS:

        The Oregon Department of Justice has reason to believe that Portland General Electric

Company (PGE), and other persons or enterprises, has engaged in or is engaging in, acts or

practices declared to be unlawful by the Oregon Unlawful Trades Practices Act, ORS 646.605

et. Seq.  This Civil Investigative Demand is issued pursuant to the provisions of ORS

646.618(1).


        **Response to Interrogatories and Document Production Required**

        On or before **December 1, 2003**, you are required by law to respond to the

interrogatories and document production described herein.  Please provide the requested

information to: Oregon Department of Justice, Civil Enforcement Division, 1162 Court Street

NE, Salem, OR 97301, Attn: Caren Rovics, Assistant Attorney General.  Or you may email

your response and documents to caren.rovics@doj.state.or.


                        **DEFINITIONS**

        "AND" and "OR" shall be construed either disjunctively or conjunctively as necessary

to bring within the scope of the request all responses that might otherwise be construed to be

outside the scope.

Page 1 – CIVIL INVESTIGATIVE DEMAND(ORS 646.618)
         UNLAWFUL TRADE PRACTICES
DOCKETED                           DEPARTMENT OF JUSTICE
                                   1162 Court St. NE
                                   Salem, OR 97310
                                   Phone: (503) 378-4732

Exhibit 1
Page 106 of 143
Memo in Oppo

Exhibit D
Page 1 of 19
PGE's Complaint

1        "<u>ANY</u>" shall be construed as synonymous with every and shall be all inclusive.

2        "<u>ALL E-MAILS</u>" means e-mails addressed to, and copied to, a recipient.

3        "<u>BONNEVILLE POWER ADMINISTRATION</u>" (BPA) is the federal agency, under

4  the U.S. Department of Energy, that markets wholesale electrical power and operates and

5  markets transmission services in the Pacific Northwest.

6        "<u>CONTROL AREA OPERATION</u>" (Transmission Scheduler) means PGE employee

7  scheduling energy on the Western Energy Market during January 1, 1999 and December 31,

8  2001.

9        "<u>DEATH STAR TRANSACTION</u>" means submission of energy transactions by PGE

10  submission by PGE Energy Traders and Transmission Schedules implementing transactions on

11  the AC Intertie between the California-Oregon Boarder (COB) and John Day, involving a buy-

12  resell transaction between PGE and EMPI and using Avista Utilities (Washington Water Power

13  or WWP as a sleeve.)

14      <u>FEDERAL ENERGY REGULATORY COMMISSION DOCKET NO. EL02-114-000</u>

15  (FERC) means *In the Matter of Portland General Electric Company, Enron Power Marketing,*

16  *Inc.*

17      <u>FEDERAL ENERGY REGULATORY COMMISSION DOCKET NO. PA02-2-000</u>

18  (FERC) means *FERC Factfinding Investigation Docket No. PA02-2-000.*

19        <u>IDENTIFY</u> means to provide a statement of:

20      a.  in the case of a person other than a natural person, its name, the address (including ZIP

21           code) of its principal place of business, its telephone number, and the name of its chief

22           executive officer;

23      b.  in the case of a natural person, his or her name, business and address (including ZIP

24           code) and business telephone number, employer, and title or position;

25

26

Page 2 – CIVIL INVESTIGATIVE DEMAND(ORS 646.618)
        UNLAWFUL TRADE PRACTICES

DEPARTMENT OF JUSTICE
1162 Court St. NE
Salem, OR 97310
Phone: (503) 378-4732

Exhibit 1
Page 107 of 143
Memo in Oppo

Exhibit D
Page 2 of 19
PGE's Complaint

1       c. In the case of a document, the title of the document, the author, the title or position of

2          the addressee, the type of document, the date it was prepared, the number of pages it

3          cotains, and, if applicable, its production number.

4       "LEBOEUF LAMB GREENE & MACRAE, LLP" (LEBOEUF) refers to an August 2,

5  1999 memorandum by John Maas, and produced by PGE in FERC Docket No. PA02-2-000.

6       MARKETER (S) includes the company or corporate entity that engages in the marketing of

7  electricity in the wholesale market, its parent company, subsidiaries and affiliates, and its officers,

8  directors, employees, agents, vendors, consultants, representatives or other persons acting on its

9  behalf.

10      OWNER (S) OF ELECTRICITY GENERATION includes the company or corporate

11  entity that owns the generating unit(s), its parent company, subsidiaries and affiliates, and its

12  officers, directors, employees, agents, vendors, consultants, representatives or other persons acting

13  on its behalf.

14      POWER MARKETING AFFILLIATE has the same meaning as used in section 4.2 of

15  PGE's Market Based Rate Tariff.

16      "POWER OPERATIONS-REAL TIME" (Energy Trader) means PGE employees who

17  purchased and sold energy in the real-time Western Electricity Market during January 1, 1999 and

18  December 31, 2001.

19      "POWNOW" refers to "Week in Review" reports from Bill Casey.

20      PUBLIC UTILITY means a municipal utility, public utility district or a cooperative.

21      PURCHASER (S) means the public utility or private, government or corporate entity in the

22  State of Oregon that purchases electricity in the wholesale market, its parent company, subsidiaries

23  and affiliates, and its officers, directors, employees, agents, vendors, consultants, representatives or

24  other persons acting on its behalf.

25      RELATING and RELATE mean a reference to any given subject that constitutes, contains,

26  embodies, reflects, identifies, states, refers to, or is in any way relevant to that given subject.

DEPARTMENT OF JUSTICE
1162 Court St. NE
Salem, OR 97310
Phone: (503) 378-4732

Exhibit 1
Page 108 of 143
Memo in Oppo

Exhibit D
Page 3 of 19
PGE's Complaint

1    RELEVANT TIME PERIOD is January 1, 1999 to December 31, 2001.

2    SEVENTEEN (17) DAYS OF TRANSACTIONS refers to the following dates:

3    April 6, 2000, April 15, 2000, April 16, 2000, April 23, 2000, April 26/2000, May 1, 2000,

4    May 2, 2000, May 3, 2000, May 4, 2000, May 5, 2000, May 9, 2000, May 10, 2000, May 11,

5    2000, May 12, 2000, May 15, 2000, May 32, 2000, and June 6, 2000.

6    TRADER (S) means the company or corporate entity that trades electricity in the wholesale

7    market, its parent, subsidiaries and affiliates and its officers, directors, employees, agents, vendors,

8    consultants, representatives or other persons acting on its behalf.

9    "TRANSCRIPT OF SCHEDULER TELEPHONE CONVERSATIONS" means the

10   transcripts of PGE Energy Traders produced to the Federal Energy Regulatory Commission

11   (FERC) in Docket Nos. EL02-114-00 and PA02-2-000.

12   "WESTERN ELECTRICITY MARKET" means the market operating in the U.S. portion

13   of the Western Electricity coordinating Council (WECC) aka the Western Systems coordinating

14   Council (WSCC).

15   "YOU," "YOUR," and "YOUR COMPANY" means Portland General Electric Company

16   and its divisions, units, subsidiaries whether or not wholly owned, any merged, consolidated or

17   acquired predecessors and the present and former officers, directors, agents, representatives or

18   employees of any of the foregoing.

19   The singular includes the plural, and the plural includes the singular.

20

21

22

23

24

25

26

Page 4 – CIVIL INVESTIGATIVE DEMAND(ORS 646.618)
        UNLAWFUL TRADE PRACTICES

DEPARTMENT OF JUSTICE
1162 Court St. NE
Salem, OR 97310
Phone: (503) 378-4732

Exhibit 1
Page 109 of 143
Memo in Oppo

## INSTRUCTIONS

1. The relevant time period for which documents and information are requested is January 1,1999 to December 31, 2001.

2. In each instance in which a document is produced in response to a request, the current edition should be produced together with all earlier editions, or predecessor documents serving the same function during the relevant time period, even though the title of earlier documents may differ from current versions.

3. The document request calls for all described documents in your possession, custody or control without regard to the person or persons by whom or for whom the documents were prepared (e.g., your company employees, distributors or dealers, competitors, or others).

4. Counsel for your company and the State of Oregon may enter into an agreement to modify the scope and timelines for production, or suspend the timelines for document production, under this investigative demand.

5. The following procedures shall apply to the production, inspection and copying of documents:

    a. The producing parties shall produce original, complete documents. Documents shall be produced in the order that the documents are maintained in the producing party's files, in original folders, with the folder's original file tabs. The documents should be clipped, stapled or otherwise arranged or attached in the same form and manner as that in which they were maintained and stored. In lieu of producing original documents in their original folders, you and your company may produce duplicates of the originals if such duplicates are identical in all respects to the original and the duplicates are accompanied by a sworn statement from a representative of your company that the duplicates are identical copies of the originals and satisfy the test for admissibility under FRE 1003.

Page 5 – CIVIL INVESTIGATIVE DEMAND(ORS 646.618)
    UNLAWFUL TRADE PRACTICES

DEPARTMENT OF JUSTICI
1162 Court St. NE
Salem, OR  97310
Phone: (503) 378-4732

Exhibit 1
Page 110 of 143
Memo in Oppo

xhibit D
age 5 of 19
GE's Complaint

1         b.  All attachments to responsive documents shall be produced as attachments to

2              the responsive documents.

3         c.  Submit all non-privileged portions of any responsive document, noting where

4              redactions in the document have been made.  No portion of any documents will

5              be masked and the entire document shall be produced.

6         d.  You and your company shall label each group of responses to the

7              interrogatories and document requests in the following manner: Response to

8              Interrogatory Number 1; Response to Interrogatory No. 2; Response to

9              Document Request No. 1, etc., and attach the label to the corresponding

10             documents or interrogatory responses.

11        e.  You and your company will provide a key to all abbreviations used in the

12             documents produced pursuant to this investigative demand.  The key will be

13             attached to the appropriate documents.

14        f.  When your response requires identification of document(s) that exist and relate

15             to an information request, such responses shall include a description of the

16             general nature of the documents relating to the response.

17      6. If you contend that the answer to any interrogatory or a response to any document

18  request is privileged in whole or in part, or otherwise object to any interrogatory, document

19  request, or parts thereof, please state the reasons for such objections or grounds for exclusion with

20  respect to each part of the interrogatory or document request and identify each person having

21  knowledge of the factual basis, if any, on which the privilege or other ground is asserted.  If you

22  contend that an interrogatory or document request is unclear or ambiguous, state the basis for such

23  contention in detail. The purpose of this instruction is to facilitate judicial review of any refusal to

24  answer the interrogatories or documents requests fully and completely.

25

26

Page 6 – CIVIL INVESTIGATIVE DEMAND(ORS 646.618)
          UNLAWFUL TRADE PRACTICES

**DEPARTMENT OF JUSTICE**
1162 Court St. NE
Salem, OR 97310
Phone: (503) 378-4732

Exhibit 1
Page 111 of 143
Memo in Oppo

**Exhibit D
Page 6 of 19
PGE's Complaint**

1    7. The interrogatory responses shall be accompanied by a statement under oath of the

2    person(s) providing the answers to the interrogatories stating the information contained in the

3    responses to these interrogatories is true and correct to the best of his/her information and belief.

4

5    **NOTICE:**    Should you fail to produce the requested documents at the time and **place**

6    required by this Investigative Demand, the Oregon Department of Justice will request a court

7    order as soon thereafter as possible mandating your production pursuant to ORS 646.618

8    (Unfair Trade Practices).

9

10    DATED this _6_ day of November, 2003.

11

12                                    HARDY MYERS
                                      Attorney General
13

14

15                                    Caren Rovics, OSB #90149
                                      Assistant Attorney General
16                                    Financial Fraud/Consumer Protection Section

17    **REFER INQUIRIES TO:**
      Caren Rovics, Assistant Attorney General
18    Oregon Department of Justice, Financial Fraud/Consumer Protection Section
      1162 Court Street NE, Salem, OR 97301
19    Phone:  (503) 947-4333; Fax:  (503)378-5017

20

21

22

23

24

25

26

Page 7 – CIVIL INVESTIGATIVE DEMAND(ORS 646.618)
        UNLAWFUL TRADE PRACTICES

DEPARTMENT OF JUSTICE
1162 Court St. NE
Salem, OR 97310
Phone: (503) 378-4732

Exhibit 1
Page 112 of 143
Memo in Oppo

Exhibit D
Page 7 of 19
PGE's Complaint

1    INVESTIGATIVE DEMAND

2    EXHIBIT A

3    **INTERROGATORIES**

4    You are required by law to answer and produce the following for the relevant period of January 1,

5    1999 to December 31, 2001.

6    **NOTE:** Where applicable we would prefer to receive your responses in an electronic, searchable

7    format.

–8          ⎯

9          1.      Identify all PGE employees who worked as "Power Operations-Real Time"

10   (Energy Trader) involved in trading electricity, during the relevant period of time

11   ANSWER:

12

13

14         2.      Identify all PGE employees who worked in "Control Area Operations"

     (Transmission Scheduler),  involved in scheduling electricity, during the relevant period of time.

15   ANSWER:

16

17

18

19         3.      Identify the PGE Energy Trader(s) who participated in real-time transaction(s)

20   during the "17 days of transactions."

21         a. Indicate the date(s) that the identified Energy Trader participated in 17 days of

22   transactions.

23   ANSWER:

24

25

26

Page 8 -   INVESTIGATIVE DEMAND (ORS 646.618)
           UNLAWFUL TRADE PRACTICES

           CR:cr/CEDF2383        Department of Justice       Exhibit 1           Exhibit D
                                 1162 Court Street NE         Page 113 of 143    Page 8 of 19
                                 Salem, OR 97301-4096         Memo in Oppo       PGE's Complaint
                                 (503) 947-4333

1    4.    Identify the PGE Transmission Schedulers who were involved in the scheduling

2    of the "17 days of transactions."

3        a. State the date(s) that the identified Transmission Scheduler participated in a

4    power transaction.

5    ANSWER:

6

7

8

9    5. Identify all PGE employees, including managers, who knew of the meeting, or subject

10   of the meeting, on or about March or April, 2000, of Bill Casey (Casey) and Diana Scholtes

11   (Scholtes) in which Death Star transactions were discussed.

12   ANSWER:

13

14

15   6. Identify all PGE employees, including managers, who participated or had knowledge

16   of the decision to accept the Scoltes' Death Star power transactions proposal, subject of the

17   Case-Scholtes meeting in March or April 2000.

18   ANSWER:

19

20   7. Identify all PGE documents relating to the decision by PGE to agree to Death Star

21   power transactions discussed in the Casey-Scholtes meeting on or about March or April, 2000.

22   ANSWER:

23

24

25

26

Page 9 -   INVESTIGATIVE DEMAND (ORS 646.618)
           UNLAWFUL TRADE PRACTICES
           CR:cr/CEDF2383

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4333

Exhibit 1
Page 114 of 143
Memo in Oppo

Exhibit D
Page 9 of 19
PGE's Complaint

1  8. Identify and explain "Account No. 740768" as used in the PGE "Transcripts of

2  Scheduler Telephone Conversations" produced by PGE in FERC Docket No. EL02-114-000.

3  a) Explain why the "740468" was used for PGE Death Star power transactions

4  involving Bonneville Power Administration (BPA) transmission during the "17 days of

5  transactions."

6  ANSWER:

7

8

9  9. Identify all PGE documents that refer to power transactions in Account No. 740768

10  for the period January 1, 1999 to December 31, 2001.

11  a) Identify the ID numbers of the PGE Energy Trader and Transmission Scheduler

12  and corresponding names assigned to those ID numbers for all Account No. 74076 transactions.

13  ANSWER:

14

15

16

17  10. Identify all PGE employees, including managers, who knew of the August 2, 1999

18  "Power Transactions" memorandum from John Maas, LeBoeuf, Lamb, Greene & MacRae, LLP,

19  (LeBoeuf) between August 2, 1999 and June 30, 2000.

20  ANSWER:

21

22

23  11. Identify all PGE employees, including managers, who participated or had knowledge

24  of the decision to reject the "Power Transactions" explained in the August 2, 1999 LeBoeuf

25  memorandum.

26

Page 10 -  INVESTIGATIVE DEMAND (ORS 646.618)
           UNLAWFUL TRADE PRACTICES
           CR:cr/CEDF2383

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4333

Exhibit 1
Page 115 of 143
Memo in Oppo

Exhibit D
Page 10 of 19
PGE's Complaint

ANSWER:

12.  Identify all documents related to PGE's decision for rejecting the "Power Transactions" explained in the August 2, 1999 LeBoeuf memorandum.

ANSWER:

13.  State the compensation/salary paid to the following PGE employees for the years 1997, 1998, 1999, 2000 and 2001:

    a)  Bill Casey;

    b)  Marilyn Huntsinger;

    c)  Mary Turina.

ANSWER:

14.  State the amount of bonus compensation paid to the following PGE employees for the years 1997, 1998, 1999, 2000 and 2001:

    a)  Bill Casey;

    b)  Marilyn Huntsinger;

    c)  Mary Turina.

ANSWER:

15.  Identify all job position(s), job description(s) and time period(s) these former PGE employees held while employed by PGE.

Page 11 - INVESTIGATIVE DEMAND (ORS 646.618)
        UNLAWFUL TRADE PRACTICES
        CR:cr/CEDF2383

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4333

Exhibit 1
Page 116 of 143
Memo in Oppo

Exhibit D
Page 11 of 19
PGE's Complaint

1    a) Diana Scholtes;

2    b) Tim Belden;

3    c) John Forney.

4   ANSWER:

5

6
     16.    State the dollar amount and percent of PGE wholesale revenues derived from
7
     energy trades with Enron Power Marketing, Inc. (EMPI) for the years 1998, 1999, 2000 and
8
     2001.
9

10  ANSWER:

11      17.    State the dollar amount and percent of PGE wholesale revenues derived from

12   energy trades with energy Marketers, other than, EMPI for the years 1998, 1999, 2000 and **2001.**

13   ANSWER:

14

15
     18.  Identify all PGE employees, including managers, responsible for retention, archi**ving**
16
17   or purging of PGE electronic mail (e-mail) between January 1, 1999 and December 31, 2001.

18   ANSWER:

19

20
     19. Identify all documents related to PGE e-mail retention policy/procedure between
21
     January 1, 1999 and December 31, 2001.
22
     ANSWER:
23

24

25

26

Page 12 - INVESTIGATIVE DEMAND (ORS 646.618)
          UNLAWFUL TRADE PRACTICES
          CR:cr/CEDF2383

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4333

Exhibit 1
Page 117 of 143
Memo in Oppo

Exhibit **D**
Page 12 **of 19**
PGE's **Complaint**

20. Identify all PGE employees, including managers, responsible for recording or backing up PGE Energy Trader and Transmission Schedulers telephone lines, between January 1, 1999 and December 31, 2001.

ANSWER:


21. Identify all documents related to recording, back-up or recording over PGE Energy Trader and Transmission Schedulers telephone lines between January 1, 1999 and August 30, 2001.

ANSWER:


22. Identify all PGE employees, including managers, responsible for posting information on the Open Access Same-time Information System (OASIS) for "power marketing affiliate" transactions between January 1, 1999 and December 31, 2001.

ANSWER:


23. Identify documents relating to all PGE policies and procedures related to posting information on OASIS with a "power marketing affiliate" between January 1, 1999 and December 31, 2001.

ANSWER:


24. Identify PGE employees, including managers, who were responsible for conducting training related to posting information on OASIS for a "power marketing affiliate" transaction.


Page 13 - INVESTIGATIVE DEMAND (ORS 646.618)
        UNLAWFUL TRADE PRACTICES
        CR:cr/CEDF2383

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4333

Exhibit 1
Page 118 of 143
Memo in Oppo

**Exhibit D**
**Page 13 of 19**
**PGE's Complaint**

1               a)  Identify all dates of training by PGE related to "power marketing affiliate"

2 transactions.

3               b)  Identify all documents used in the training of PGE related to "power marketing

4 affiliate" transactions.

5               c)  Identify all PGE employees, including managers, who attended any training

6 related to "power marketing affiliate" transactions and dates of attendance.

7 ANSWER:

8 —                        —

9

10     25.    Identify all PGE employees, including managers, responsible for posting with

11 OASIS "power marketing affiliate" transactions for the "17 days of transactions."

12 ANSWER:

13

14     26.    Identify all documents related to posting on OASIS "power marketing affiliate"

15 transactions for the "17 days of transactions."

16

17

18 ANSWER:

19

20

21

22

23

24

25

26

Page 14 - INVESTIGATIVE DEMAND (ORS 646.618)
UNLAWFUL TRADE PRACTICES
CR:cr/CEDF2383

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4333

Exhibit 1
Page 119 of 143
Memo in Oppo

**Exhibit D**
**Page 14 of 19**
**PGE's Complaint**

        INVESTIGATIVE DEMAND

2                EXHIBIT B

3        **<u>DOCUMENTS TO BE PRODUCED</u>**

4    **NOTE:** Where applicable we would prefer to receive your responses in an electronic, searchable

5    format.

6

7        1.    Produce all documents disclosed by PGE related to Federal Energy Regulatory

8    Commission (FERC) Docket No. EL02-114-00, (Docket No. EL02-114-000). Include documents,

9    and portions of those documents, subject to Presiding Administrative Law Judge Jeffie J. Massey's

10    Protective Order dated September 6, 2002.

11           a) Including, but not limited to, PGE Responses and Exhibits 1 through 44.

12        2. Produce the sworn testimony, obtained in FERC docket No. EL02-114-000, including

13    portions subject to the FERC "Protective Order", for the following deponents:

14

15           a) Bill Casey

16           b) Mark Boesch

17           c) Joe Taylor

18           d) Terry Findley

19           e) Floyd Mullet

20           f) Bob Frost

21           g) Steve Sundet

22

23           h) Judy Madsen

24        3. Produce all documents of OASIS postings for all "power marketing affiliate"

25    transactions with EMPI for the period January 1, 1999 to December 31, 2001.

26        4. Produce all documents identified in your response to interrogatory No. 7.

Page 15 - INVESTIGATIVE DEMAND (ORS 646.618)
           UNLAWFUL TRADE PRACTICES
           CR:cr/CEDF2383

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4333

Exhibit 1
Page 120 of 143
Memo in Oppo

**Exhibit D
Page 15 of 19
PGE's Complaint**

5. Produce all documents identified in your response to interrogatory No. 9.

6. Produce all documents identified in your response to interrogatory No. 12.

7. Produce all documents identified in your response to interrogatory No. 21.

8. Produce all documents identified in your response to interrogatory No. 23.

9. Produce all documents identified in your response to interrogatory No. 24(b).

10. Produce all documents identified in your response to interrogatory No. 26.

11. Produce all documents, including e-mails and telephone records, related to PGE policy or procedure where PGE enters into an energy contract or energy agreement with a "power marketing affiliate."

12. Produce all documents that refer to the Casey-Scholtes meeting at PGE in March or April of 2000 where the "Death Star" transactions were discussed.

13. Produce all Power Scheduling and Accounting System (PSAS) records for all real-time transactions for power and transmission where EPMI was a counterparty for the period January 1, 2000 to December 31, 2001.

    a) Produce all documents that identify the "user" according to their user ID number.

14. Produce all documents related to the conclusion by PGE in determining that 1,290 postings on its web page for sales and purchases between PGE and EPMI were contrary to the PGE's Market Based Rate Tariff.

15. Produce OASIS postings for all "Death Star" energy transactions with EPMI for the "17 days of transactions."

16. Produce all PGE Real-Time Energy Trader telephone calls related to the trading of power for the following dates:

Page 16 - INVESTIGATIVE DEMAND (ORS 646.618)
UNLAWFUL TRADE PRACTICES
CR:cr/CEDF2383

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4333

Exhibit 1
Page 121 of 143
Memo in Oppo

Exhibit D
Page 16 of 19
PGE's Complaint

1    **2000**

2    a) January 2000:  1/10/2000 and 1/13/2000

3    b) February 2000:  2/7/2000, 2/8/2000 and 2/28/2000

4    c) March 2000: 3/6/2000

5    d) April 2000:  4/3/2000, 4/17/2000, 4/19/2000, 4/20/2000 and 4/24/2000

6    e) May  2000: 5/23/2000, 5/17/2000 and 5/23/2000

7    f) June 2000:  6/17/200

8    g) July 2000:  7/19/2000

9    h) August 2000:  8/18/ 2000

10    i)  September 2000:  9/5/2000, 9/6/2000, 9/8/2000, 9/9/2000, 9/11/200, 9/12/2000,

11  9/14/2000, 9/23/2000, and 9/29/2000

12    j)  November 2000:  11/13/2000, 11/16/2000, 11/18/2000, 11/23/2000, and 11/24/2000

13    k)  December 2000:  12/30/2000

14    **2001**

15    l)   January 2001: 1/7/2001 and 1/21/2001

16    m) March 2001:  3/31/2002

17    n)  May 2001: 5/21/2001, 5/22/2001, 5/23/2001 and 5/24/2001

18    o)  June 2001:  6/9/2001

19    17.    Produce all e-mails from or to Bill Casey and Tim Belden for the period January 1,

20  1999 and December 31, 2001.

21    18.    Produce all e-mails from or to Bill Casey and John Forney for the period January 1,

22  1999 and December 31, 2001.

23    19.    Produce all e-mails from or to Bill Casey and Diana Scholtes for the period January

24  1, 1999 and December 31, 2001.

25    20.    Produce all e-mails from Bill Casey to "POWNOW" for the period January 1, 1999

26  to December 31, 2001.

Page 17 -  INVESTIGATIVE DEMAND (ORS 646.618)
        UNLAWFUL TRADE PRACTICES
        CR:cr/CEDF2383

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4333

Exhibit 1
Page 122 of 143
Memo in Oppo

**Exhibit D**
**Page 17 of 19**
**PGE's Complaint**

1      21.     Produce all e-mails from or to Bill Casey and Marlene Huntsinger for the period

2 January 1, 1999 to December 31, 2001.

3      22.     Produce all e-mails from or to Marlene Huntsinger and Tim Belden for the period

4 January 1, 1999 and December 31, 2001.

5      23.     Produce all e-mails from or to Marlene Huntsinger and John Forney for the period

6 January 1, 1999 and December 31, 2001.

7      24.     Produce all e-mails from or to Marlene Huntsinger and Diana Scholtes for the period

8 January 1, 1999 and December 31, 2001.

9      25.     Produce all e-mails from or to Mary Turina and Tim Belden for the period January

10 1, 1999 and December 31, 2001.

11      26.     Produce all e-mails from or to Mary Turina and John Forney for the period January

12 1, 1999 and December 31, 2001.

13      27.     Produce all e-mails from or to Mary Turina and Diana Scholtes for the period

14 January 1, 1999 and December 31, 2001.

15      28.     Produce all cell phone records for PGE-issued cell phone for Bill Casey for the

16 period January 1, 1999 to December 31, 2001.

17         a) Cell phone records should include all telephone numbers called.

18      29. Produce all documents identified by PGE Energy Trader Mark Boesch in the April 26,

19 2000 "Transcript of Scheduler Telephone Conversation," as "Memo Account."

20      30. Produce all documents referred to by PGE Energy Trader Terry Finley in the May 4,

21 2000 "Transcript of Scheduler Telephone Conversation," including but not limited to a "sheet" in a

22 "3-ring binder" on how to do transactions with "these accounts."

23      31. Produce the "Memo" referred to by PGE Energy Trader Mitch Hawks in the May 5,

24 2000 "Transcript of Scheduler Telephone Conversation" produced in FERC Docket No. EL-02-

25 114-000. Memo begins: "To Water Power when Enron calls and wants a buy-resell at Malin with

26 WWP."

Page 18 - INVESTIGATIVE DEMAND (ORS 646.618)
          UNLAWFUL TRADE PRACTICES
           CR:cr/CEDF2383

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4333

Exhibit 1
Page 123 of 143
Memo in Oppo

Exhibit D
Page 18 of 19
PGE's Complaint

1        32.   Produce the "instructions" referenced by PGE Energy Trader Chris Hawkins or Chris

2  Hartman in the May 12, 2000 "Transcript of Scheduler Telephone Conversation."

3        33.  Produce documents relating to information sharing between PGE Merchants and PGE

4  Power Transmission.

5        34.  Produce the "PGE General Transmission Agreement" (IR) with BPA in effect during

6  2000 and 2001.

7

8        **NOTICE:** Should you fail to produce the information required by this Investigative —

9  Demand on or before the required date, the Oregon Department of Justice will request a court

10  order as soon thereafter as possible mandating your response pursuant to ORS 646.618(2).

11        DATED this _6_ day of November, 2003.

12                                  HARDY MYERS

13                                  Attorney General

14

15                                  Caren Rovics, OSB #90149

16                                  Assistant Attorney General
                                      Financial Fraud/Consumer Protection Section

17  **PLEASE REFER INQUIRIES TO:**
     Caren Rovics

18  Assistant Attorney General
     Oregon Department of Justice

19  Financial Fraud/Consumer Protection Section
     1162 Court Street NE, Salem, OR 97301

20  Phone: (503) 947-4333
     Fax: (503) 378-5017

21

22

23

24

25

26

Page 19 -  INVESTIGATIVE DEMAND (ORS 646.618)
             UNLAWFUL TRADE PRACTICES
             CR:cr/CEDF2383

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4333

Exhibit 1
Page 124 of 143
Memo in Oppo

**Exhibit D**
**Page 19 of 19**
**PGE's Complaint**

1

2

IN THE MATTER OF: ) INVESTIGATIVE SUBPOENA
3                           )
                            )
4                           ) Pursuant to the Oregon
PORTLAND GENERAL ELECTRIC   ) Racketeer Influenced and
5 COMPANY                   ) Corrupt Organization Act,
                            ) [ORICO] ORS 166.730
6                           )                    **RECEIVED**

7

TO:   Portland General Electric Company                    NOV 1 3 2003
8      c/o David a. Aamodt, Registered Agent
       121 SW Salmon Street, Ste. 1300
9      Portland, OR 97204                              **TONKON TORP LLP**

10

11 GREETINGS:

        The Oregon Department of Justice has reason to believe that Portland General Electric
12

13 and other persons or enterprises, has engaged in or is engaging in, acts or practices declared to

14 be unlawful under and the Oregon Racketeer Influenced and Corrupt Organizations Act, ORS

15 166.715 et. seq.  This investigative subpoena is issued pursuant to ORS 166.730.

        David A. Aamodt, is required by law to appear on **December 1, 2003**, at the hour of
16

17 10:00 am at the Oregon Department of Justice, Financial Fraud Section, Robertson Building 1st

18 floor Conference Room A, 1215 State St. NE, Salem, Oregon, and to answer the interrogatories

19 listed in Exhibit A and produce all records within your possession or control described in

20 Exhibit B. Or you may email your response and documents to caren.rovics@doj.state.or.

21

                              **DEFINITIONS**
22

        "AND" and "OR" shall be construed either disjunctively or conjunctively as necessary
23

24 to bring within the scope of the request all responses that might otherwise be construed to be

25 outside the scope.

        "ANY" shall be construed as synonymous with every and shall be all inclusive.
26

Page 1 – INVESTIGATIVE SUPOENA (ORS 166.730)
        OREGON RACKETEER INFLUENCED AND CORRUPTION ACT

**DOCKETED**

DEPARTMENT OF JUSTICE
1162 Court St. NE
Salem, OR 97310
Phone (503) 947-4333

Exhibit 1
Page 125 of 143
Memo in Oppo

Exhibit E
Page 1 of 19
PGE's Complaint

1  "ALL E-MAILS" means e-mails addressed to and copied to a recipient.

2  "BONNEVILLE POWER ADMINISTRATION" (BPA) is the federal agency, under the

3  U.S. Department of Energy, that markets wholesale electrical power and operates and markets

4  transmission services in the Pacific Northwest.

5  "CONTROL AREA OPERATION" (Transmission Scheduler) means PGE employee

6  scheduling energy on the Western Energy Market during January 1, 1999 and December 31,

7  2001.

8  "DEATH STAR TRANSACTION" means submission of energy transactions by PGE

9  Energy Traders and Transmission Schedules implementing transactions on the AC Intertie

10  between the California-Oregon Boarder (COB) and John Day, involving a buy-resell transaction

11  between PGE and EMPI and using Avista Utilities (Washington Water Power or WWP as a

12  sleeve.)

13  FEDERAL ENERGY REGULATORY COMMISSION DOCKET NO. EL02-114-000

14  (FERC) means *In the Matter of Portland General Electric Company, Enron Power Marketing,*

15  *Inc.*

16  FEDERAL ENERGY REGULATORY COMMISSION DOCKET NO. PA02-2-000

17  (FERC) means *FERC Factfinding Investigation Docket No. PA02-2-000.*

18  IDENTIFY means to provide a statement of:

19      a.  in the case of a person other than a natural person, its name, the address (including ZIP

20          code) of its principal place of business, its telephone number, and the name of its chief

21          executive officer;

22      b.  in the case of a natural person, his or her name, business and address (including ZIP

23          code) and business telephone number, employer, and title or position;

24      c.  In the case of a document, the title of the document, the author, the title or position of

25          the addressee, the type of document, the date it was prepared, the number of pages it

26          contains, and, if applicable, its production number.

Page 2 – INVESTIGATIVE SUPOENA (ORS 166.730)
OREGON RACKETEER INFLUENCED AND CORRUPTION ACT

DEPARTMENT OF JUSTICE
1162 Court St. NE
Salem, OR 97310
Phone: (503) 947-4333

Exhibit 1
Page 126 of 143
Memo in Oppo

**Exhibit E**
**Page 2 of 19**
**PGE's Complaint**

1    "LEBOEUF LAMB GREENE & MACRAE, LLP" (LEBOEUF) refers to an August 2,

2    1999 memorandum by John Maas, and produced by PGE in FERC Docket No. PA02-2-000.

3        MARKETER (S) includes the company or corporate entity that engages in the marketing of

4    electricity in the wholesale market, its parent company, subsidiaries and affiliates, and its officers,

5    directors, employees, agents, vendors, consultants, representatives or other persons acting on its

6    behalf.

7        OWNER(S) OF ELECTRICITY GENERATION includes the company or corporate entity

8    that owns the generating unit(s), its parent company, subsidiaries and affiliates, and its officers,

9    directors, employees, agents, vendors, consultants, representatives or other persons acting on its

10   behalf.

11       "POWER MARKETING AFFILLIATE" has the same meaning as section 4.2 of PGE's

12   Market Based Rate Tariff.

13       "POWER OPERATIONS-REAL TIME" (Energy Trader) means PGE employees who

14   purchased and sold energy in the real-time Western Electricity Market during January 1, 1999 and

15   December 31, 2001.

16       "POWER SCHEDULING AND ACCOUNTING SYSTEM" (PSAS) is a tool set used by

17   the Energy and Transmission Schedulers, Generation Coordinators, Power Accountants and

18   Management responsible for scheduled and operating PGE's energy and transmission assets.

19       "POWNOW" refers to "Week in Review" reports from Bill Casey.

20       PUBLIC UTILITY means a municipal utility, public utility district or a cooperative.

21       PURCHASER (S) means the public utility or private, government or corporate entity in the

22   State of Oregon that purchases electricity in the wholesale market, its parent company, subsidiaries

23   and affiliates, and its officers, directors, employees, agents, vendors, consultants, representatives or

24   other persons acting on its behalf.

25       RELATING and RELATE mean a reference to any given subject that constitutes, contains,

26   embodies, reflects, identifies, states, refers to, or is in any way relevant to that given subject.

Page 3 – INVESTIGATIVE SUPOENA (ORS 166.730)
         OREGON RACKETEER INFLUENCED AND CORRUPTION ACT

DEPARTMENT OF JUSTICE          Exhibit 1          **Exhibit E**
1162 Court St. NE              Page 127 of 143    **Page 3 of 19**
Salem, OR 97310               Memo in Oppo       **PGE's Complaint**
Phone (503) 947-4333

1       <u>RELEVANT TIME PERIOD</u> is January 1, 1999 to December 31, 2001.

2       <u>"SEVENTEEN (17) DAYS OF TRANSACTIONS"</u> refer to:

3       April 6, 2000, April 15, 2000, April 16, 2000, April 23, 2000, April 26/2000, May 1, 2000,

4 May 2, 2000, May 3, 2000, May 4, 2000, May 5, 2000, May 9, 2000, May 10, 2000, May 11,

5 2000, May 12, 2000, May 15, 2000, May 32, 2000, and June 6, 2000.

6       <u>TRADER (S)</u> means the company or corporate entity that trades electricity in the wholesale

7 market, its parent, subsidiaries and affiliates and its officers, directors, employees, agents, vendors,

8 consultants, representatives or other persons acting on its behalf.

9       <u>"TRANSCRIPT OF SCHEDULER TELEPHONE CONVERSATIONS"</u> means the

10 transcripts of PGE Energy Traders produced to FERC in Docket Nos. EL02-114-00 and PA02-2-

11 000.

12       <u>"WESTERN ELECTRICITY MARKET"</u> means the market operating in the U.S. portion

13 of the Western Electricity coordinating Council (WECC) aka the Western Systems coordinating

14 Council (WSCC).

15       <u>"YOU," "YOUR," and "YOUR COMPANY"</u> means Portland General Electric Company

16 and its divisions, units, subsidiaries whether or not wholly owned, any merged, consolidated or

17 acquired predecessors and the present and former officers, directors, agents, representatives or

18 employees of any of the foregoing.

19       The singular includes the plural, and the plural includes the singular.

20

21

22

23

24

25

26

Page 4 – INVESTIGATIVE SUPOENA (ORS 166.730)
OREGON RACKETEER INFLUENCED AND CORRUPTION ACT

DEPARTMENT OF JUSTICE
1162 Court St. NE
Salem, OR 97310
Phone: (503) 947-4333

Exhibit 1
Page 128 of 143
Memo in Oppo

**Exhibit E**
**Page 4 of 19**
**PGE's Complaint**

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | **INSTRUCTIONS** |
| 4 | 1. The relevant time period for which documents and information are requested is |
| 5 | January 1, 1999 to December 31, 2001. |

3                                      **INSTRUCTIONS**

4        1. The relevant time period for which documents and information are requested is

5 January 1, 1999 to December 31, 2001.

6        2. In each instance in which a document is produced in response to a request, the current

7 edition should be produced together with all earlier editions, or predecessor documents serving

8 the same function during the relevant time period, even though the title of earlier documents

9 may differ from current versions.

10        3. The document request calls for all described documents in your possession, custody

11 or control without regard to the person or persons by whom or for whom the documents were

12 prepared (e.g., your company employees, distributors or dealers, competitors, or others).

13        4. Counsel for your company and the State of Oregon may enter into an agreement to

14 modify the scope and timelines for production, or suspend the timelines for document

15 production, under this investigative subpoena.

16        5. The following procedures shall apply to the production, inspection and copying of

17 documents:

18               a.   The producing parties shall produce original, complete documents. Documents

19                      shall be produced in the order that the documents are maintained in the

20                      producing party's files, in original folders, with the folder's original file tabs.

21                      The documents should be clipped, stapled or otherwise arranged or attached in

22                      the same form and manner as that in which they were maintained and stored. **In**

23                      lieu of producing original documents in their original folders, you and your

24                      company may produce duplicates of the originals if such duplicates are

25                      identical in all respects to the original and the duplicates are accompanied by a

26                      sworn statement from a representative of your company that the duplicates are

Page 5 – INVESTIGATIVE SUPOENA (ORS 166.730)
OREGON RACKETEER INFLUENCED AND CORRUPTION ACT

DEPARTMENT OF JUSTICE
1162 Court St. NE
Salem, OR 97310
Phone: (503) 947-4333

Exhibit 1
Page 129 of 143
Memo in Oppo

**Exhibit E**
**Page 5 of 19**
**PGE's Complaint**

1                identical copies of the originals and satisfy the test for admissibility under FRE

2                1003.

3         b.   All attachments to responsive documents shall be produced as attachments to

4                the responsive documents.

5         c.  Submit all non-privileged portions of any responsive document, noting where

6                redactions in the document have been made.  No portion of any documents will

7                be masked and the entire document shall be produced.

8         d.  You and your company shall label each group of responses to the

9                interrogatories and document requests in the following manner: Response to

10             Interrogatory Number 1; Response to Interrogatory No. 2; Response to

11             Document Request No. 1, etc., and attach the label to the corresponding

12             documents or interrogatory responses.

13       e.  You and your company will provide a key to all abbreviations used in the

14             documents produced pursuant to this investigative demand.  The key will be

15             attached to the appropriate documents.

16       f.  When your response requires identification of document(s) that exist and relate

17             to an information request, such responses shall include a description of the

18             general nature of the documents relating to the response.

19      6. If you contend that the answer to any interrogatory or a response to any document

20  request is privileged in whole or in part, or otherwise object to any interrogatory, document

21  request, or parts thereof, please state the reasons for such objections or grounds for exclusion with

22  respect to each part of the interrogatory or document request and identify each person having

23  knowledge of the factual basis, if any, on which the privilege or other ground is asserted.  If you

24  contend that an interrogatory or document request is unclear or ambiguous, state the basis for such

25  contention in detail. The purpose of this instruction is to facilitate judicial review of any refusal to

26  answer the interrogatories or documents requests fully and completely.

Page 6 – INVESTIGATIVE SUPOENA (ORS 166.730)
OREGON RACKETEER INFLUENCED AND CORRUPTION ACT

DEPARTMENT OF JUSTICE
1162 Court St. NE
Salem, OR 97310
Phone: (503) 947-4333

Exhibit 1
Page 130 of 143
Memo in Oppo

Exhibit E
Page 6 of 19
PGE's Complaint

1    7. The interrogatory responses shall be accompanied by a statement under oath of the

2 person(s) providing the answers to the interrogatories stating the information contained in the

3 responses to these interrogatories is true and correct to the best of his/her information and belief.

4

5                              AUTHORITY

6    This subpoena may be enforced as provided in ORS 166.730(3).

7

8    **NOTICE:** Pursuant to ORS 166.730, should you fail to appear, produce the records, or

9 answer the interrogatories on December 1, 2003, as required by this investigative subpoena, the

10 Oregon Department of Justice will request a court order as soon thereafter as possible

11 mandating your appearance and such other relief as allowed in ORS 166.730(3).

12

13    Dated this _6_ day of November, 2003.

14

15

16                              HARDY MYERS
                                Attorney General
17

18                              _____
                                Caren Rovics, OSB #90149
19                              Assistant Attorney General
                                Financial Fraud/Consumer Protection Section
20

21 REFER INQUIRIES TO:
   Caren Rovics, Assistant Attorney General
22 Oregon Department of Justice, Financial Fraud/Consumer Protection Section
   1162 Court Street NE, Salem, OR 97301
23 Phone: (503) 947-4333; Fax: (503)378-5017

24

25

26

Page 7 – INVESTIGATIVE SUPOENA (ORS 166.730)
     OREGON RACKETEER INFLUENCED AND CORRUPTION ACT

DEPARTMENT OF JUSTICE
1162 Court St. NE
Salem, OR 97310
Phone: (503) 947-4333

Exhibit 1
Page 131 of 143
Memo in Oppo

Exhibit E
Page 7 of 19
PGE's Complaint

INVESTIGATIVE SUBPOENA

EXHIBIT A

**INTERROGATORIES**

**NOTE:** Where applicable we would prefer to receive your responses in an electronic, searchable format.

1.    Identify all PGE employees who worked in "Power Operations-Real Time" (Energy Trader) involved in trading electricity, during the relevant period of time

ANSWER:

2.    Identify all PGE employees who worked in "Control Area Operations" (Transmission Scheduler), involved in scheduling electricity, during the relevant period of time.

ANSWER:

3.    Identify the Energy Trader(s) who participated in real-time transaction(s) during the "17 days of transactions."

a. Indicate the date(s) that the identified Energy Trader participated in 17 days of transactions.

ANSWER:

4.    Identify the Transmission Schedulers who were involved in the scheduling of the "17 days of transactions."

a. Indicate the date(s) that the identified Transmission Scheduler participated in a power transaction.

Page 8 -  INVESTIGATIVE SUBPOENA (ORS 166.730) OREGON RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4333

Exhibit 1
Page 132 of 143
Memo in Oppo

Exhibit E
Page 8 of 19
PGE's Complaint

1   ANSWER:

2

3

4       5. Identify all PGE employees, including managers, who knew of the meeting, or subject

5   of the meeting, on or about March or April, 2000, of Bill Casey (Casey) and Diana Scholtes

6   (Scholtes) in which Death Star transactions were discussed.

7   ANSWER:                                    —                —            —

8

9

10      6. Identify all PGE employees, including managers, who participated or had knowledge

11  of the decision accept the Scoltes' power transactions proposal subject of the Casey-Scholtes

12  meeting in March or April, 2000.

13

14

15      7. Identify all documents relating to the decision by PGE to agree to power transactions

16  discussed in the Casey-Scholtes meeting on or about March or April, 2000.

17  ANSWER:

18

19

20      8. Identify and explain "Account No. 740768" as used in the PGE "Transcripts of

21  Scheduler Telephone Conversations" produced by PGE in FERC Docket No. EL02-114-000.

22          a) Explain why the "740468"was used for PGE Death Star power transactions

23  involving Bonneville Power Administration (BPA) transmission during the "17 days of

24  transactions".

25

26

Page 9 -   INVESTIGATIVE SUBPOENA (ORS 166.730) OREGON RACKETEER INFLUENCED
           AND CORRUPT ORGANIZATION ACT

CR·cr/CEDF2398                Department of Justice          Exhibit 1
                             1162 Court Street NE            Page 133 of 143      Exhibit E
                             Salem, OR 97301·4096            Memo in Oppo         Page 9 of 19
                             (503) 947·4333                                       PGE's Complaint

ANSWER:

9. Identify all documents that refer to power transactions in Account No. 740768 for the period January 1, 1999 to December 31, 2001.

a) Identify the ID numbers of the PGE Energy Trader and Transmission Scheduler and corresponding names assigned to those ID number for Account No. 74076 transactions.

ANSWER:

10. Identify all PGE employees, including managers, who knew of the August 2, 1999 "Power Transactions" memorandum from John Maas, LeBoeuf, Lamb, Greene & MacRae, LLP, (LeBoeuf) between August 2, 1999 and June 30, 2000.

ANSWER:

11. Identify all PGE employees, including managers, who participated or had knowledge of the decision to reject the "Power Transactions" explained in the LeBoeuf August 2, 1999 memorandum.

ANSWER:

12. Identify all documents relating to PGE's decision for rejecting the "Power Transactions" explained in the August 2, 1999 "LeBoeuf" memorandum.

Page 10 - INVESTIGATIVE SUBPOENA (ORS 166.730) OREGON RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT

CR:cr/CEDF2398

Department of Justice
1162 Court Street NE
Salem. OR 97301-4096
(503) 947-4333

Exhibit 1
Page 134 of 143
Memo in Oppo

Exhibit E
Page 10 of 19
PGE's Complaint

ANSWER:

13. State the compensation/salary paid to the following PGE employees for the years 1997, 1998, 1999, 2000 and 2001:

      a) Bill Casey;

      b) Marilyn Huntsinger;

      c) Mary Turina.

ANSWER:

14. State the amount of bonus compensation paid to the following PGE employees for the years 1997, 1998, 1999, 2000 and 2001:

      a) Bill Casey;

      b) Marilyn Huntsinger;

      c) Mary Turina.

ANSWER:

15. Identify all job position(s), job description(s) and time period(s) these former **PGE** employees held while employed by PGE.

      a) Diana Scholtes;

      b) Tim Belden;

      c) John Forney.

Page 11 - INVESTIGATIVE SUBPOENA (ORS 166.730) OREGON RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT

CR cr/CEDF2398      Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4333      Exhibit 1
Page 135 of 143
Memo in Oppo      **Exhibit E
Page 11 of 19
PGE's Complaint**

ANSWER:

16.    State the dollar amount and percent of PGE wholesale revenues derived from energy trades with Enron Power Marketing, Inc. (EPMI) for the years 1998, 1999, 2000 and 2001.

ANSWER:

17. State the dollar amount and percent of PGE wholesale revenues derived from energy trades with energy Marketers, other than, EPMI for the years 1998, 1999, 2000 and 2001.

ANSWER:

18. Identify all PGE employees, including managers, responsible for retention, archiving or purging of PGE electronic mail (e-mail) between January 1, 1999 and December 31, 2001.

ANSWER:

19. Identify all documents related to e-mail retention policy/procedure between January 1, 1999 and December 31, 2001.

ANSWER:

20. Identify all PGE employees, including managers, responsible for recording or backing up PGE Energy Trader and Transmission Schedulers telephone lines, between January 1, 1999 and December 31, 2001.

Page 12 - INVESTIGATIVE SUBPOENA (ORS 166.730) OREGON RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT

CR cr/CEDF2398

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4333

Exhibit 1
Page 136 of 143
Memo in Oppo

Exhibit E
Page 12 of 19
PGE's Complaint

1    ANSWER:

2

3    21.    Identify all documents related to recording, back-up or recording over of Energy

4    Traders and Transmission Schedulers telephone lines between January 1, 1999 and August 30,

5    2001.

6    ANSWER:

7

8                                                —                    —              —

9    22.    Identify all PGE employees, including managers, responsible for posting

10   information on the Open Access Same-time Information System (OASIS) for "power marketing

11   affiliate" transactions between January 1, 1999 and December 31, 2001.

12   ANSWER:

13

14

15   23.    Identify documents related to all PGE procedures and policies related to posting

16   information on OASIS with a "power marketing affiliate" between January 1, 1999 and

17   December 31, 2001.

18   ANSWER:

19

20   24. Identify PGE employees, including managers, who were responsible for conducting

21   training related to posting information on OASIS  for a "power marketing affiliate" transaction.

22        a)  Identify all dates of training by PGE related to "power marketing affiliate"

23   transactions.

24

25        b)  Identify all documents used in the training of PGE employees, including

26   managers, related to "power marketing affiliate" transactions.

Page 13 - INVESTIGATIVE SUBPOENA (ORS 166.730) OREGON RACKETEER INFLUENCED
         AND CORRUPT ORGANIZATION ACT

CR:cr/CEDF2398          Department of Justice        Exhibit 1          Exhibit E
                        1162 Court Street NE         Page 137 of 143    Page 13 of 19
                        Salem, OR 97301-4096         Memo in Oppo       PGE's Complaint
                        (503) 947-4333

1           c) Identify all PGE employees, including managers, who attended any training

2    related to "power marketing affiliate" transactions and dates of attendance.

3    ANSWER:

4

5        25.    Identify person(s) responsible for posting with OASIS "power marketing

6    affiliate" transactions for the "17 days of transactions."

7    ANSWER:

8

9

10       26.    Identify all documents related to posting on OASIS "power marketing affiliate"

11   transactions for the "17 days of transactions."

12   ANSWER:

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 14 - INVESTIGATIVE SUBPOENA (ORS 166.730) OREGON RACKETEER INFLUENCED
            AND CORRUPT ORGANIZATION ACT

CR:cr/CEDF2398

Department of Justice
1162 Court Street NE
Salem. OR 97301-4096
(503) 947-4333

Exhibit 1
Page 138 of 143
Memo in Oppo

Exhibit E
Page 14 of 19
PGE's Complaint

1

2

3
## DOCUMENTS TO BE PRODUCED

4
NOTE: Where applicable we would prefer to receive your responses in an electronic, searchable

5
format.

6

7
      1.     Produce all documents disclosed by PGE related to Federal Energy Regulatory

8
Commission (FERC) Docket No. EL02-114-000.  Include documents, and all portions of the

9
document, subject to Presiding Administrative Law Judge Jeffie J. Massey's Protective Order dated

10
September 6, 2002.

11
        a) Including, but not limited, to PGE Responses and Exhibits 1 through 44.

12
     2. Produce the sworn testimony, obtained in FERC Docket No. EL02-114-000, including

13
portions subject to the FERC "Protective Order," for the following deponents.

14

15
        a)  Bill Casey

16
        b)  Mark Boesch

17
        c)  Joe Taylor

18
        d)  Terry Findley

19
        e)  Floyd Mullet

20
        f)  Bob Frost

21

22
        g)  Steve Sundet

23
        h)  Judy Madsen

24
     3. Produce all documents of OASIS postings for all "power marketing affiliate"

25
transactions with EMPI for the period January 1, 1999 to December 31, 2001.

26

CR:cr/CEDF2398

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4333

Exhibit 1
Page 139 of 143
Memo in Oppo

Exhibit E
Page 15 of 19
PGE's Complaint

1     4. Produce all documents identified in your response to interrogatory No. 7.

2     5. Produce all documents identified in your response to interrogatory No. 9.

3     6. Produce all documents identified in your response to interrogatory No. 12.

4     7. Produce all documents identified in your response to interrogatory No. 21.

5     8. Produce all documents identified in your response to interrogatory No. 23.

6

7     9. Produce all documents identified in your response to interrogatory No. 24(b).

    10. Produce all documents identified in your response to interrogatory No. 26.

8

9     11. Produce all documents, including e-mail and telephone records, related to PGE

10 policy or procedure where PGE enters into a energy contract or energy agreement with a "power

11 marketing affiliate."

12     12. Produce all documents that refer to the Casey-Scholtes meeting at PGE in March or

13 April of 2000 where the "Death Star" transactions were discussed.

14     12. Produce all Power Scheduling and Accounting System (PSAS) records for all real-

15 time transactions for power and transmission where EMPI was a counterparty for the period

16 January 1, 2000 to December 31, 2001.

17

18     a) Produce all documents that identify the "user" according to their user ID

19 number.

20

21     14. Produce all documents relating to the conclusion by PGE that 1,290 postings on its web

22 page for sales and purchases between PGE and EPMI were contrary to the PGE's Market Based

Rate Tariff.

23

24     15. Produce OASIS postings for all "Death Star" energy transactions with EPMI in the "17

days of transactions."

25

26     16. Produce all PGE Real-Time Energy Trader telephone calls related to the trading of

Page 16 - INVESTIGATIVE SUBPOENA (ORS 166.730) OREGON RACKETEER INFLUENCED
        AND CORRUPT ORGANIZATION ACT

CR:cr/CEDF2398          Department of Justice     Exhibit 1          **Exhibit E**
                       1162 Court Street NE     Page 140 of 143     **Page 16 of 19**
                       Salem, OR 97301-4096    Memo in Oppo      **PGE's Complaint**
                       (503) 947-4333

1     power for the following dates:

2     <u>2000</u>

3     a) January 2000: 1/10/2000 and 1/13/2000

4     b) February 2000: 2/7/2000, 2/8/2000 and 2/28/2000

5     c) March 2000: 3/6/2000

6     d) April 2000: 4/3/2000, 4/17/2000, 4/19/2000, 4/20/2000 and 4/24/2000

7     e) May 2000: 5/23/2000, 5/17/2000 and 5/23/2000

8     f) June 2000: 6/17/200

9     g) July 2000: 7/19/2000

10     h) August 2000: 8/18/ 2000

11     i) September 2000: 9/5/2000, 9/6/2000, 9/8/2000, 9/9/2000, 9/11/200, 9/12/2000,

12 9/14/2000, 9/23/2000, and 9/29/2000

13     j) November 2000: 11/13/2000, 11/16/2000, 11/18/2000, 11/23/2000, and 11/24/2000

14     k) December 2000: 12/30/2000

15     <u>2001</u>

16     l) January 2001: 1/7/2001 and 1/21/2001

17     m) March 2001: 3/31/2002

18     n) May 2001: 5/21/2001, 5/22/2001, 5/23/2001 and 5/24/2001

19     o) June 2001: 6/9/2001

20     17.     Produce all e-mails from or to Bill Casey and Tim Belden for the period January 1,

21 1999 and December 31, 2001.

22     18.     Produce all e-mails from or to Bill Casey and John Forney for the period January 1,

23 1999 and 7ecember 31, 2001.

24     19.     Produce all e-mails from or to Bill Casey and Diana Scholtes for the period January

25 1, 1999 and December 31, 2001.

26     20.     Produce all e-mails from Bill Casey to "POWNOW" for the period January 1, 1999

Page 17 - INVESTIGATIVE SUBPOENA (ORS 166.730) OREGON RACKETEER INFLUENCED
AND CORRUPT ORGANIZATION ACT

CR:cr/CEDF2398

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4333

Exhibit 1
Page 141 of 143
Memo in Oppo

**Exhibit E**
**Page 17 of 19**
**PGE's Complaint**

1   to December 31, 2001.

2       21.   Produce all e-mails from or to Bill Casey to Marlene Huntsinger for the period

3   January 1, 1999 to December 31, 2001.

4       22.   Produce all e-mails from or to Marlene Huntsinger and Tim Belden for the period

5   January 1, 1999 and December 31, 2001.

6       23.   Produce all e-mails from or to Marlene Huntsinger and John Forney for the period

7   January 1, 1999 and 7ecember 31, 2001.

8       24.   Produce all e-mails from or to Marlene Huntsinger and Diana Scholtes for the period

9   January 1, 1999 and December 31, 2001.

10      25.   Produce all e-mails from or to Mary Turina and Tim Belden for the period January

11   1, 1999 and December 31, 2001.

12      26.   Produce all e-mails from or to Mary Turnina and John Forney for the period January

13   1, 1999 and 7ecember 31, 2001.

14      27.   Produce all e-mails from or to Mary Turina and Diana Scholtes for the period

15   January 1, 1999 and December 31, 2001.

16      28.   Produce all cell phone records for PGE issued cell phone for Bill Casey for the

17   period 1, 1999 to December 31, 2001.

18          a) Cell phone records should include all telephone numbers called.

19      29. Produce all documents identified by PGE Energy Trader Mark Boesch in the April 26,

20   2000 "Transcript of Scheduler Telephone Conversation," as "Memo Account."

21      30. Produce all documents referred to by PGE Energy Trader Terry Finley in the May 4,

22   2000 "Transcript of Scheduler Telephone Conversation, including but not limited to, a "sheet" in a

23   "3-ring binder" on how to do transactions with "these accounts."

24      31. Produce the "Memo" referred to by PGE Energy Trader Mitch Hawks in the May 5,

25   2000 "Transcript of Scheduler Telephone Conversation" produced in FERC Docket No.

26   EL-02-114-000. Memo begins: "To Water Power when Enron calls and wants a buy-resell at

Page 18 - INVESTIGATIVE SUBPOENA (ORS 166.730) OREGON RACKETEER INFLUENCED
         AND CORRUPT ORGANIZATION ACT

CR:cr/CEDF2398         Department of Justice      Exhibit 1          Exhibit E
                                  1162 Court Street NE     Page 142 of 143     Page 18 of 19
                                 Salem, OR 97301-4096    Memo in Oppo     PGE's Complaint
                                   (503) 947-4333

1     Malin with WWP."

2         32.    Produce the "instructions" referred to by PGE Energy Trader Chris Hawkins or Chris

3   Hartman in the May 12, 2000 "Transcript of Scheduler Telephone Conversation".

4         33. Produce documents related to information sharing between PGE Merchants and PGE

5   Power Transmission.

6         34. Produce the "PGE General Transmission Agreement" (IR) with BPA in effect during

7   2000 and 2001.

8

9      **NOTICE:**   Should you fail to produce the information required by this Investigative

10 Demand on or before the required date, the Oregon Department of Justice will request a court

11 order as soon thereafter as possible mandating your response pursuant to ORS 166.730(3).

12

13      DATED this _____ day of November, 2003.

14

15

16                                HARDY MYERS
                                Attorney General

17

18                                 Caren Rovics, OSB #90149
                                Assistant Attorney General

19                                 Financial Fraud/Consumer Protection Section

20 PLEASE REFER INQUIRIES TO:
   Caren Rovics

21    Assistant Attorney General
   Oregon Department of Justice

22    Financial Fraud/Consumer Protection Section
   1162 Court Street NE, Salem, OR 97301

23    Phone: (503) 947-4333
   Fax: (503) 378-5017

24

25

26

Page 19 - INVESTIGATIVE SUBPOENA (ORS 166.730) OREGON RACKETEER INFLUENCED
        AND CORRUPT ORGANIZATION ACT
    CR cr/CEDF2398

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4333

Exhibit 1
Page 143 of 143
Memo in Oppo

Exhibit E
Page 19 of 19
PGE's Complaint